**Stephen V. Piucci OSB No. 821056**
**Joseph E. Piucci OSB No. 135325**
Piucci Law, LLC
900 SW 13th Avenue, Suite 200
Portland, Oregon 97205
Telephone: 503-228-7385
Facsimile: 503-228-2571
E-mail: steve@piucci.com
joe@piucci.com

**Drake Aehegma, OSB No. 132905**
Drake Aehegma Attorney at Law LLC
PO Box 8404
Portland, OR, 97207
Telephone: 503-208-5717
Facsimile: 503-914-1472
E-mail: drake@aehegmalaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THE ESTATE OF RICHARD JASON FORREST,** Van Loo Fiduciary Services, LLC, Personal Representative,<br><br>                Plaintiff,<br><br>   v.<br><br>**MULTNOMAH COUNTY**, a political subdivision of the state of Oregon; **MICHAEL REESE**, Multnomah County Sheriff, **CAMILLE VALBERG, KOH METEA, JAMI WHEELER, JACOB DIAMOND, STEVEN ALEXANDER, JEFFREY WHEELER, DERRICK PETERSON, and NICOLE MORRISEY O'DONNELL**, acting in concert and in their individual capacities,<br><br>                Defendants. | Case No. 3:20-CV-01689-AC<br><br>**FIRST AMENDED COMPLAINT**<br><br>VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983; WRONGFUL DEATH - GROSS NEGLIGENCE, NEGLIGENCE<br><br><br>**JURY DEMAND** |

## INTRODUCTORY STATEMENT

This is an action brought to vindicate Richard Jason Forrest's rights under the Eighth Amendment to the Constitution of the United States pursuant to 42 U.S.C. § 1983 and the Oregon Tort Claims Act.

Jails have a basic obligation to keep inmates safe. Multnomah County has egregiously failed to do so. Like so many in our jails, Forrest was an addict. It was his wife's hope that being in custody would allow Forrest the opportunity to get clean. Instead, Multnomah County's Inverness Jail was awash in heroin and methamphetamine smuggled in through a rudimentary, preventable scheme.

It was only a matter of time before an inmate overdosed. It happened to be Forrest, and when he overdosed, Multnomah County failed him again. Despite the overdose-reversing drug Narcan being stocked in a medical cart which jail nurses had brought to his side, not one of them thought to use it. Forrest died with lifesaving medication mere feet away.

At this moment of reckoning for our criminal justice system, Richard Jason Forrest deserved a chance at a better life. Instead, it was taken from him.

Mr. Forrest is survived by his wife and their minor son.

## JURISDICTION AND VENUE

1. This action arises under the constitution and laws of the United States and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a). This Court has pendant jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

2. Venue is proper under 28 U.S.C. 1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District of Oregon, and because Defendants are subject to personal jurisdiction in the District of Oregon.

# PARTIES

## A. Plaintiff and Decedent

3.  Richard Jason Forrest, deceased, ("Forrest") was born on November 20th, 1981 in Portland, Oregon. He was the father of a minor son. At the time of his death, Richard Forrest was a citizen and resident of the State of Oregon. At all times herein pertinent, Richard Forrest was an inmate at the Multnomah County Inverness Jail.

4.  Plaintiff Van Loo Fiduciary Services, LLC is the duly appointed personal representative of the Estate of Richard Jason Forrest, deceased. Van Loo Fiduciary Services, LLC is an Oregon Limited Liability Company and its principal, Cindy Van Loo, is a citizen and resident of the State of Oregon.

## B. Defendants

5.  Multnomah County is an Oregon county. Multnomah County operates a jail, known as Inverness Jail. Multnomah County has a duty to provide for the health and safety of, and provide all necessary medical care for, all detainees and persons convicted of crimes held at Inverness Jail.

### ii. Supervisory Defendants

6.  The Supervisory Defendants named in this lawsuit are senior officials from the Multnomah County Sheriff's office who participated in the years-long decision-making process that left the Multnomah County jails unequipped with drug-detecting body scanners until after Forrest's death. Supervisory Defendants are each sued in their individual capacities for their own actions. At all times, Supervisory Defendants were acting in concert, in the course and scope of their employment, and under color of state law.

7. At all material times, Defendant Michael Reese was the elected Multnomah County Sheriff.

8. At all material times, Defendant Steven Alexander was a senior official at the Multnomah County Sheriff's Office. At the time of Forrest's death, Defendant Alexander was the Chief Deputy of Corrections. Previously and at times pertinent to this complaint, Defendant Alexander was the Facilities Commander for Inverness Jail.

9. At all material times, Defendant Jeffrey Wheeler was a Captain in the Multnomah County Sheriff's Office and was the Facility Commander of Multnomah County Detention Center.

10. At all material times, Defendant Derrick Peterson was a senior official at the Multnomah County Sheriff's Office. Defendant Peterson was the Chief Deputy of Corrections prior to Defendant Alexander.

11. At all material times, Defendant Nicole Morrisey O'Donnell was a Chief Deputy at the Multnomah County Sheriff's Office.

### iii. Medical Staff Defendants

12. The Medical Staff Defendants named in this lawsuit are employees of the Multnomah County Health Department, working at Inverness Jail, who provided medical treatment to Forrest on the day his death. At all times, Medical Staff Defendants were acting in the course and scope of their employment and under color of state law. Medical Defendants are each sued in their individual capacities for their own actions.

13. At all material times, Defendant Camille Valberg was a Registered Nurse working at Inverness Jail. Nurse Valberg was the first person to arrive at Mr. Forrest's side after he notified deputies of trouble breathing. Nurse Valberg failed to recognize or treat Forrest's overdose, despite having been recently named as a defendant in a lawsuit alleging that

she deliberately failed to treat a Clackamas County inmate's drug overdose, causing him to die.[1]

14.     At all material times, Defendant Koh Metea was a Registered Nurse working at Inverness Jail. Nurse Metea was the second RN to arrive at Mr. Forrest's side after he notified deputies of trouble breathing.

15.     At all material times, Defendant Jami Wheeler was a Registered Nurse working at Inverness Jail. Nurse Wheeler was the third RN to arrive at Mr. Forrest's side after he notified deputies of trouble breathing.

16.     At all material times, Defendant Jacob Diamond was a Registered Nurse working at Inverness Jail. Nurse Diamond was the fourth RN to arrive at Mr. Forrest's side after he notified deputies of trouble breathing, and was the lead nurse at Inverness Jail on the day of Forrest's death.

## FACTUAL ALLEGATIONS

### *Background*

17.     Multnomah County's Inverness Jail houses pretrial detainees and persons convicted of crimes. Multnomah County is obligated by state and federal law to provide for the health and safety of all persons lodged in the Inverness Jail, to prohibit the availability of illegal narcotics to detainees and inmates, and to provide adequate medical and mental health care for the same.

18.     On or about February of 2018, Forrest was released from the custody of the Oregon Department of Corrections and placed on Post-Prison Supervision with the Multnomah County Department of Community Justice.

---

[1] *Nordenstrom v. Corizon Health, Inc.* et al, 3:18-CV-01754-HZ (D. Or.)

19.     On or about April 28th, 2020, decedent's wife Chrystal Forrest called decedent's Post-Prison Supervision Officer with the Multnomah County Department of Community Justice and described that Forrest was spiraling downward with his addiction to heroin and methamphetamine. Ms. Forrest asked decedent's Post-Prison Supervision Officer to arrest her husband in an effort to get him clean, into treatment, and to save his life. The Post-Prison Supervision Officer then issued a detainer and warrant for Forrest's arrest.

20.     On April 29th, 2019, Richard Jason Forrest, then 37 years old, was booked into the Multnomah County Detention Center.  During his initial medical assessment upon coming into custody, Forrest reported a history of asthma and recent methamphetamine use.

21.     On April 30th, 2019, Forrest was transferred to Inverness Jail. On May 4th, 2019, Forrest filed a Medical Request Form stating "coming down from heroin[,] can't sleep[,] can I still get protocol[?]" He later reports to a nurse that he uses heroin "a lot."

22.     On June 10th, 2019, Forrest was transferred from to Inverness Jail Dorm 7 to Dorm 9, which houses inmates who participate in work crews outside of the jail.

23.     Mr. Forrest remained in the custody of the Multnomah County Sheriff at Inverness Jail for the final three months of his life until his death on July 25th, 2019.


*The Rich History of Drugs, Overdoses, Medical Neglect, and Death in Multnomah County Jails*

24.     Multnomah County and the Supervisory Defendants know that there is a rich history of drugs, overdoses, medical neglect, and death within the Multnomah County Jails.

25.     On April 2nd, 2003, Nick Baccelleri died at Inverness as a result of a methadone overdose. The methadone was provided by the medical staff at the jail. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Baccelleri's family.

26.     On October 1st, 2004, Anthony Delarosa died at either Multnomah County Detention Center or Inverness as a result of heroin withdrawal. On information and belief, he vomited and slipped into a withdrawal coma in his cell. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Delarosa's family.

27.     On September 17th, 2006, James Chasse died of blunt force trauma after being booked into and then released from MCDC. The jail staff did not call an ambulance for Mr. Chasse, who died during transport to a local hospital in a deputy's car. On information and belief, Multnomah County agreed to pay $925,000 to settle a lawsuit brought by Mr. Chasse's family.

28.     On January 4th, 2008, Holly Jean Casey died at MCDC of pneumonia after repeatedly seeking medical help. On information and belief, Multnomah County and other defendants agreed to pay $905,000 to settle a lawsuit brought by Ms. Casey's family, and Multnomah County fired one of the nurses who was working in the jail.

29.     In March 2008, the Multnomah County District Attorney's Office issued a memo detailing the results of its investigation into the deaths of Jody Gilbert Norman and Holly Jean Casey (the "2008 DA's Office Memo"). The 2008 DA's Office Memo stated that their deaths "seem to raise serious questions about inmate management and health care practices within the Multnomah County corrections system and the level of health services."

//

//

30.    On February 2nd, 2013, David Chilton died of a heroin overdose at MCDC from drugs he obtained while in custody. Regarding Chilton's death, Defendant Alexander stated, "You always have that problem of contraband. It's this constant battle we face." [2]

31.    In March 2015, an inmate arrested on federal drug trafficking charges, Channing Lacey, smuggled 33 packets of fentanyl into the jail within her body, weighing approximately 35 grams. The U.S. Department of Justice described what happened as a consequence:

> Three inmates overdosed on the fentanyl between March 7 and 9, 2015. All three victims required immediate life-saving medical attention and the administration of Narcan to reverse the overdose and prevent their death. On March 21, 2015, another inmate overdosed on the fentanyl and died as a result.[3]

32.    On July 17th, 2015, heroin addict Lloyd Vernig died at MCDC one day following his arrest for possession of heroin.

33.    On December 31st, 2015, William Coupchiak died of a drug overdose at MCDC. On July 25th, 2017, the family of Mr. Coupchiak filed a lawsuit against Multnomah County and other defendants. In September 2018, Multnomah County agreed to pay $195,000 to settle that lawsuit.

34.    In January 2017, Multnomah County received the Corrections Grand Jury 2016 Report (the "2016 GJ Report"). Here are some of the overview findings of the 2016 GJ Report:

> "The number of deputies on staff may be insufficient. There is no current study of the appropriate number of deputies needed to support Multnomah County correctional facilities. The 2006 Post Factor Study indicated that 440 deputies were needed (38 more than currently budgeted). However, this report neither reflects current policies nor the current number of inmates/available beds."

> "Some deputies are working multiple straight days of 16 hour shifts. While much of this is certainly voluntary overtime, the Corrections

---

[2] https://www.oregonlive.com/portland/2013/06/multnomah_county_inmate_died_o.html
[3] https://www.justice.gov/usao-or/pr/portland-woman-sentenced-135-months-prison-distributing-fentanyl-inside-multnomah-county

Grand Jury is concerned that working extremely long hours over multiple days is not good for the health of the employees and could put both employees and inmates in danger."

"At MCDC and [Inverness], the medical clinics hours are limited to five hours per day due to deputy availability, although the staff is there longer. Open hours could be expanded and more inmates served if additional deputy time was available to provide security. Many services that should be provided in a clinic setting have to be brought to the inmates in the dorms or cells."

35.    On August 11, 2017, Dee Glassman was booked into Multnomah County Detention Center. Ms. Glassmann appeared to be under the influence of drugs and alcohol and was "[a]t risk for withdrawal." Approximately 34 hours later, Ms. Glassmann was found dead in her cell. Ms. Glassman's estate has filed suit.

36.    In June and July of 2020, Multnomah County failed to protect inmates at the Multnomah County Detention Center from repeated and horrific exposure to tear gas through the ventilation system of the jail. Representatives for the putative class have filed suit.

### *The Drugs in Dorm 9*

37.    In 2019, after Forrest's booking and prior to his death, 12 or more individuals engaged in a criminal conspiracy to smuggle controlled substances including heroin and methamphetamine into Inverness Jail. The conspiracy, which was successful, involved dropping drugs at publicly accessible locations on the jail property, after which and inmates on the work crew would pick up the drug packages and walk them into their dorm at the jail, Dorm 9.

38.    As a result of this drug smuggling scheme, heroin and methamphetamine were readily available to inmates housed in Dorm 9, including Forrest.

39. The prevalence and availability of illegal narcotics at Inverness Jail in 2019 was easily preventable. The drug deliveries were arranged using jail telephones and paid for using the jail's system of inmate accounts. The work crew staging area on the Inverness property where civilians dropped and inmates picked up drugs was both open to the public and not covered by the jail's surveillance cameras. The drugs being smuggled into jail – whether smuggled within the inmates' clothes or within their bodies – were detectible by either strip search or by body scanner.

40. While Forrest was housed in Dorm 9, the Multnomah County Sheriff's Office and its deputies knew or should have known that drugs were present and readily available within the dorm, as shown by the following summaries of entries in the Inverness Jail Activity Diary for the period in which Forrest resided in the dorm:

   a. On June 10th, an inmate was moved to Dorm 16 on disciplinary for possession of contraband;

   b. On July 3rd, 2019, deputies conducted a "shake down" of Dorm 9. The "shake down" resulted in the following:

      i. Inmate A refused a urinalysis and deputies found two needles in his bunk area. The inmate was written up for major misconduct for contraband.

      ii. Inmate B refused a urinalysis and was written up for major misconduct;

      iii. Inmate C refused a urinalysis and was written up for major misconduct; and

      iv. Inmate D failed a urinalysis (meaning, tested positive for drugs or alcohol), and was written up for major misconduct for contraband.

   c. On July 14th, a deputy noted, "When I shut the dorm down at 2230, there was a faint smell of smoke in the bathroom. There were ashes on the ground in one of the stalls. There seems to be a lot of smoking going on this dorm from what I have heard from other deputies."

   d. On July 15th, inmate RG was found in possession of a syringe on the back of the work crew truck;

e. On July 17th, inmate DP failed a random urinalysis test and was written up for major misconduct for contraband.

41. The day prior to Forrest's death, Nurse Helen Blasko observed what looked like a transient female in an area open to the public near Inverness Jail, acting strangely and possibly trying to hide something. Nurse Blasko reported this information to a Sergeant at Inverness Jail, and on information and belief the Sergeant inspected the area and found syringes.

42. Despite this knowledge, Defendant Multnomah County and its Sheriff's deputies took no meaningful steps to determine the source and prevent the continued entry of drugs and their availability to inmates.

43. Regarding the availability and prevalence of illegal drugs in Dorm 9 of Inverness Jail during for the period in which Forrest resided in the dorm, other inmates have reported the following:

f. ""If it was a meth week - you'd hear shit all night. Everyone was up all night wired."

g. "The guards knew but they couldn't figure out how it was coming in. They'd know someone was on meth and if someone was too wired or couldn't keep it together – they'd pull them off the work crew and keep them in the dorm."

h. "About a week before it happened, [another inmate] was on heroin and he was nodding off like crazy. A deputy saw it and walked over to him and said, 'You're high.' The deputy just walked away and didn't do shit. If he had just pulled [the other inmate] out, Forrest would still be alive."

i. "Workers were bringing [drugs] in. I thought it was real obvious."

j. "The guards knew there were drugs and cigarettes in there and they ignored it. The way people were acting in there – the guards had to know."

k. "Most of the people coming back [from the work crew] were high. The staff knew full well what was going on."

l. "I swear, they have more drugs than they do outside. They can get them fast."

m. "People calling family, 'Can you do drops?' Even the COs told them where we'd be going to be. Sometimes we do freeway cleaning, and friends they throw drugs. Lots of drug pick-ups at the homeless camps. People would drop off drugs by the big machines right at the jail where people grab tools. Two inmates go in – one grabs the tools and one grabs the drugs."

n. "There was a lot of drugs. Some days it was all heroin and some days it was all meth. During that period, there was someone getting drops outside and another inmate 'butt carries' it in. If you are in the group of people, you just know who has what – word of mouth."

o. "A lot of pills, a lot of people cheek their prescriptions, and a lot of heroin – especially heroin. In that dorm everyone was doing heroin."

44. The investigation into Mr. Forrest's death confirmed this extreme availability of drugs in Dorm 9 of Inverness jail during this time period. The report concluded, "there is not enough evidence to know who gave [Forrest] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."

//

//

//

//

//

## The Years-Long Body Scanner Delay

45. At the time of Forrest's booking though his death, Multnomah County did not possess or utilize body scanners for the purpose of detecting drugs brought into the jail.

46. Multnomah County has a longstanding contractual relationship dating back to at least 2012 with Smiths Detection Inc. as a vendor and service provide for metal detectors and X-Ray equipment at Multnomah County jails and courthouses. Smiths Detection has offered its "B-Scan" series of body scanners since at least 2012.

47. Following Mr. Forrest's death. Multnomah County purchased Smiths Detection B-Scan series body scanners.

48. As described in paragraph 31, in early March of 2015, several inmates at MCDC overdosed on fentanyl that was smuggled into the jail within another inmate's vagina.

49. On March 21st, 2015, inmate Latina Brogdon died of a fentanyl overdose while in custody at MCDC.

50. Not coincidentally, in March of 2015 the Multnomah County Sheriff's office began considering SecurPASS body scanners for Multnomah County Jails. Sgt. Kraig Anspach, Classifications Unit Manager, obtained a quote for two SecurePASS body scanners at the cost of $175,000 each.

51. In August of 2015, Sgt. Anspach communicated with Shawn Scarbrough of the United States Bureau of Prisons to arrange a tour of the FCI Sheridan prison, to examine the SecurPASS body scanner in use at that facility.

52. For the following two years, between August of 2015 and July 13th, 2017, Multnomah took no further steps towards obtaining body scanners for its jails.

53.     On July 13th, 2017, Sgt. Anspach wrote to then Chief Deputy of Corrections Michael

        Shults:

> I know your (sic) busy but I forgot to ask you yesterday….. Do you know if we will ever revisit getting SecurPass Digital X Ray Scanner's or even getting a Chair for detecting drugs.
>
> We already did the Tour at Sheridan and I know we talked about going on another tour to a jail in Reno.
>
> I know this happened during Sheriff Stanton['s] stint. I was just inquiring to see if this has been discussed since Sheriff Reese has taken over?
>
> I was hoping this could be brought up again in the future, since it would be such an awesome tool to have.
>
> Thank you for your time.

54.     On July 14th, 2017, Chief Deputy Shults replied:

> I believe we can – Year end money is the key. We just need to ask for it. This year we would have been able to ask for it, but we had a number of other items on the table.
>
> If we give Gwen a heads up now, she might have time to look up some products and guide us through the process. Send me over links that you are looking at.
>
> One last note - Be careful on the items you ask for. Getting a body scanner is a big under taking. Policy and procedure; do you continue with strip searches; what do you do if the system goes down, with repair costs; how much training does someone need to operate the machine, and what do you do with all the false positives that you may find on the system. Medical transports will increase, and some staff members may not be good at reading the results - creating more transports.
>
> Be prepared.

55.     On August 7th, 2017, Sgt. Anspach forwarded the 2105 SercurPASS quote and product

        information to Defendant Jeffrey Wheeler.

56.     On August 31st, 2017, the Washington County Sheriff's Office installed and began using a

SecurPASS Body Scanner. Washington County officials lauded its effectiveness in a

November 17th, 2017 interview. KOIN 6 News reported:

> Washington County Sheriff's Office spokesperson Deputy Jeff
> Talbot said shortly after the scanner went live, an arrestee came into
> the jail and was in the booking waiting area. While she was waiting,
> she bragged to other inmates that she had narcotics on her and would
> be able to get them through the scanner because she assumed that
> "only metal shows up."
>
> The woman later went through the scanner, and a glass pipe and
> bindle of methamphetamine was seen on the scanner, concealed in
> a body cavity. She later told deputies in regards to the scanner, "That
> s—- works!"
>
> According to Talbot, since the implementation, deputies have
> noticed an increased number of narcotics left behind in the booking
> area. The sheriff's office believes it's because arrestees are seeing
> the device in the booking area and it is acting as a deterrent.
>
> "And ultimately, that's okay because the goal is to keep drugs out
> of the jail," Frohnert said.[4]

57.     One year later, Lt. Vance Stimler with the Washington County Sherriff's office told KPTV,

"We've been able to stop a lot of people from bringing drugs in and probably stopped quite

a few medical events from occurring." [5]

58.     On November 21st, 2017, Sheriff Reese receives a marketing email from Find-All Security

Systems LLC, offering to sell Nuctech HT2000GA body scanners at the cost of $105,000

per unit.

//

//

[4] https://www.koin.com/news/washington-countys-jail-body-scanner-gets-results/
[5] https://www.kptv.com/news/we-catch-quite-a-few-different-things-body-scanners-in-oregon-jails-used-to-find/article_2bce9a1c-b618-11e8-b267-9f555a45c150.html

59.   On December 18th, 2017, Maggie Leach from Command Sourcing Inc. sent a "Proposal for Body Scanner Solution on a Volume Purchase" to the Oregon State Sheriff's Association, writing:

> We are very pleased to present a solution from 'Smith's Detection.' On behalf of the Oregon State Sheriff's Association we have also negotiated a bottom line price that has not only been reduced by other fifty-five thousand dollars but ALSO includes all training, shipping, installation, and support.

60.   On January 5th, 2018, Ms. Leach emailed Sheriff Reese the proposal she negotiated on behalf of the Oregon State Sheriff's Association ("OSSA") for the purchase of SecurPASS body scanners. Included in the email was a draft invoice offering the product for sale to Multnomah County at $135,000 per unit.

61.   On the same day, Ms. Leach forwarded the proposal to Defendant Peterson and Defendant Morrisey-O'Donnell. Sheriff Reese also forwarded the proposal to Defendant Peterson and Defendant Morrisey-O'Donnell, writing, "Let's discuss this equipment on Monday."

62.   On January 8th, 2018, Sheriff John Bishop (Ret.), the executive director of the OSSA, emailed Sheriff Reese and other Oregon sheriffs regarding the bulk body scanner proposal from Command Sourcing. He wrote:

> As most of you know, Command Sourcing has negotiated a price for body scanners that is way below what we would normally pay. (Approximately a $56,852.00 savings. See attached). However this is for a minimum order of 10 units. Some of you are ready to buy now, others may be ready in July. Mike is trying to push out the price till new fiscal year but we need to have commitments. Some have even suggested   in 2017, and half in 2018. OSSA may be able to help but haven't finished that one yet.
>
> We have also reached out to DOC who may be purchasing several so that we can get to 10 units. What we need to have though is a commitment from you on buying a scanner. I know that is extremely hard for some of you to do, but if we can get to 10 and keep pricing fixed till next fiscal year we may be able to save you some money.

> I know right now that Yamhill and Josephine are on board to purchase ASAP. I need to see what the numbers are by end of this week. Please let me know by email if this is something you are interested in and can give commitment for next year.

63. On January 29th, 2018, Defendant Wheeler contacted the Washington County Sheriff's office, asking if he and Defendant Alexander could visit to see Washington County's body scanner. The visit was arranged for February 13th, 2018.

64. On March 1st, 2018, Defendant Alexander emailed Maggie Leach at Command Sourcing to request more information regarding the B-Scan body scanner, and a meeting with Defendant Wheeler. The meeting was arranged for March 22nd, 2018.

65. On April 6th, 2018, Ms. Leach sent an email to Defendants Alexander, Wheeler, and Morrisey-O'Donnell asking if they needed more information to move forward with the "Body Scanner project." Ms. Leach informed them that Command Sourcing would be placing another order of body scanners in July of 2018.

66. On April 11th, 2018, Defendant Morrisey-O'Donnell replied:

> Thank you very much for all of the information you have provided. At this time, **we will be delaying consideration for purchasing this product** until we have additional information and input from the other agencies that will be receiving the scanner. (Emphasis added).

67. On June 19th, Ms. Leach emailed Defendant Alexander, writing,

> We are in the process of finalizing the second part of the B-Scan Body Scanner order, what I need from you is final approval… Lead time on the units is still 14-16 weeks, but if we can get them here sooner we will.

Sixteen weeks from June 19th, 2018 would have been nine months before Forrest's death.

//

//

68. Defendant Alexander replied on June 26th, "I will forward this on to Chief Deputy Peterson for further consideration. They will determine next steps and decisions on moving it forward."

69. Ms. Leach also emailed Defendants Peterson and Morrisey-O'Donnell on June 26th, 2018, noting, "If you would like to order, simply sign both quotes."

70. In the summer of 2018, Yamhill County, Polk County, Josephine County, and Lincoln County purchased body scanners through the OSSA/Command Sourcing bulk order via Ms. Leach, and began utilizing them. The Oregonian reported on August 11th, 2018:

> Officials say these scanners will help protect both inmates and jail staffs and that they are a less intrusive means of detecting contraband.
> …
> Polk County Sheriff Mark Garton said he has seen reports from other jails of million-dollar lawsuits filed after overdose deaths. Lincoln County Sheriff Curtis Landers called the price of a scanner a drop in the bucket compared to one of those lawsuits.
>
> "It just clicked and hit home to the realization if something really bad happened here, and we hadn't done anything about it, that's a bad situation," Garton said.
> …
> Sgt. Jeremy Ruby from Yamhill County said inmates may view being in custody as an opportunity to get sober, clean and back on track. Contraband available in the jail can be problematic for those trying to get clean.
>
> "If we minimize it coming in," he said, "we can help that problem." [6]

71. Josephine County Sheriff Dave Daniel gave an interview to Smiths Detection for a promotional "case study" of its B-Scan devices following the 2018 installation of the device at the Josephine County Jail. Sheriff Daniel explained, "We have found knives,

---

[6] https://www.oregonlive.com/pacific-northwest-news/2018/08/oregon_jails_have_a_new_tool_t.html

heroin, meth – the scanner has been a very good addition… We find it, whether it's in their mouth or the other end…. Everybody knows the tool has been successful." [7]

72.     On July 9th, 2018, Ms. Leach notified Sheriff Reese of a "Hawaiian BBQ & B-Scan Demo" at the Yamhill County Jail:



Sheriff Reese emailed Defendants Peterson and Morrisey-O'Donnell, writing, "FYI… have we viewed this scanner in action? If not, let's have someone attend." Defendant then Morrisey-O'Donnell informed Defendants Wheeler and Alexander of the Hawaiian BBQ & B-Scan Demo. Defendants Wheeler and Alexander attended.

73.     On July 30th, 2018, Ms. Leach emailed Defendants Wheeler and Alexander updated quotes for two B-Scan body scanners.

74.     On August 7th, 2018, Ms. Leach emailed Defendants Wheeler and Alexander Clackamas County's Request for Proposal relating to the body scanners.

---

75.    On September 9th, 2018, MCSO Deputy Heath Harrison composed an email outlining

concerns with performing strip searches of transgender inmates and proposing a solution:

> I would like to see the purchase and use of body scanners. Many other smaller County Jails throughout Oregon already have them up and running and yet we are the largest jail system in Oregon. I have attached a couple of articles talking about their experiences and how valuable they are for detecting drugs and other contraband items. They make a lot of good points about putting some dignity back into the strip search process. I see the value in carrying this over to everyone coming into custody.

This email circulated widely amongst MCSO staff.

76.    On September 18th, 2018, Ms. Leach emailed Defendant Wheeler:

> We are trying to set reasonable expectations for our manufacturer for pending orders. I know there were some construction considerations for the downtown facility but, our lead time at this point is 18 - 20 weeks so, hopefully that is going to be plenty of time to get things sorted out. I am placing an order next week and another in mid October and would like to include your units in one of those if possible to get them delivered and installed at the beginning of 2019.

The beginning of 2019 would have been seven months before Forrest's death.

77.    On December 11th, 2018, Defendant Wheeler responded to a marketing email from ADANI

Systems regarding body scanners, "At this time we are still evaluating the idea and have

not made any decisions at this point."

78.    On April 2nd, 2019, Ms. Leach emailed Defendant Wheeler, writing:

> I was hoping to get a status update on the Multnomah County Body Scanner project. I have a scanner available for delivery mid May to early June but, it is a first come, first serve situation. If we get an intent to purchase or signed quote from the County then I can earmark the machine for them, otherwise it will likely be September/October (depending on when the order is placed) before I can get it installed. I appreciate your help.

Mid-May to early June 2019 was still prior to Forrest's death.

79. On April 10th, 2019, Ms. Leach emailed Defendant Alexander, writing:

> Were you able to connect with the Sheriff and/or Chief Deputy about getting the signed body scanner quote? If we are going to earmark one of the ones we have coming in, I need to get it from you. Not pushing, just don't want to lose it and have to wait another 4 1/2 to 5 months to get it to you.

80. Defendant Wheeler replied on August 11th, 2019, "I don't believe we will have the Sheriff ready to sign anything until I get a cost for the raised ceiling."

81. On May 13th, 2019, Ms. Leach emailed defendant Wheeler:

> If you just have [Sheriff Reese] sign the quote authorizing the purchase then we can earmark one of the ones we have coming in at the end of the month and get the Low Dose ordered for Inverness (16-20 weeks for delivery).

Sixteen weeks after May 13th is September 2nd, 2018, after Mr. Forrest's death.

82. Defendant Wheeler emailed Ms. Leach on June 4th with Sheriff Reese's response:

> As of this point the Sheriff has chosen not to sign the form. It is our intention to move forward after July 1st to raise the ceiling in Booking at MCDC and then purchase 2 scanners as well. As I know more I will let you know.

Ms. Leach replied:

> "Thanks for the update Thanks for the update….HE knows he's killing me right?!?!?!"

83. On July 15th, 2019, KBND reported that the Deschutes County Jail had begun using a body scanner. Deschutes County Jail Commander and former Multnomah County Chief Deputy of Corrections Michael Shults told KBND, "I can tell you, having a piece of equipment like this will hopefully prevent a future tragedy." [8]

//

---

[8] https://kbnd.com/kbnd-news/local-news-feed/451719

84.     On July 25th, 2019, Forrest died of an overdose from drugs smuggled into Inverness Jail,

        drugs which would have been detected had the county purchased a body scanner sooner.


### *Nurse Valberg's History of Deliberate Indifference to Overdosing Inmates*

85.     On November 3rd, 2016 at 7:15pm, a 31 year-old US Army veteran named Bryan Perry was

        booked into the Clackamas County Jail. Mr. Perry was overdosing on methamphetamines

        and was not able to control his bodily movements. Clackamas County Jail deputies did not

        send him to the hospital and instead placed him in a padded cell, where he continued to

        move uncontrollably for four hours. Jail deputies recorded cell phone videos of Mr. Perry

        while laughing and joking about his deteriorating condition. Defendant Camille Valberg

        was his nurse, and Bryan Perry died.

86.     On October 2nd, 2018, less than one year prior to Forrest's death, the Estate of Bryan Perry

        filed suit against Nurse Valberg and others, alleging that she was deliberately indifferent to

        Mr. Perry's constitutional rights by failing to properly treat Bryan Perry's serious medical

        needs while he was overdosing, causing his death.

87.     On June 18th, 2021, Federal District Court Judge Marco Hernandez denied Nurse Valberg's

        Motion for Summary Judgment regarding her participation in the death of Brian Perry at

        Clackamas County Jail. Judge Hernandez summarized the facts regarding Nurse Valberg's

        actions, which include lying about her own conduct and delaying CPR until five minutes

        after Mr. Perry had stopped moving: [9]

                Plaintiff creates a question of fact as to whether Nurse Valberg had
                the requisite knowledge and was deliberately indifferent to Mr.
                Perry's life and serious medical needs. Nurse Valberg made the

---

[9] *Nordenstrom v. Corizon Health, Inc., et al,* 3:18-CV-01754-HZ (D. Or.), ECF 115, at 26-27. (Internal citations omitted).

decision to send Ms. Mountsier[10] to the emergency room. She knew Mr. Perry had taken a similar mixture of drugs and was exhibiting similar symptoms to Ms. Mountsier. Still, she did not call the ER to get a report on Ms. Mountsier's condition after she was transferred out of the jail.

Nurse Valberg conducted her assessment of Mr. Perry around 11 pm. There is video evidence of the entire assessment. In her late entry chart note, Nurse Valberg said that Mr. Perry sat up on his own at the start of her visit, but the video shows two deputies lifting Mr. Perry into a seated slumped position. Nurse Valberg attempted to check his blood pressure while he was in this position. During this check Mr. Perry stopped moving. A deputy in the cell stated at this point Mr. Perry's "breath started slowing" and that he "was foaming at the mouth."

Nurse Valberg did not begin life saving measures at this point but left the cell to retrieve an automatic blood pressure cuff. When she returned, Mr. Perry was still motionless lying flat on his back. Again, rather than check his vitals or call for emergency help, Nurse Valberg attempted to use the automated blood pressure machine on Mr. Perry. At the suggestion of a deputy, Nurse Valberg then attempted to use an AED. She delayed CPR while she waited for it to work properly. Deputy Savage, who was in cell during the assessment testified that in this time the "color left his body" and "he turned to a gray, kind of ashy color."

In the incident report, Sergeant Johnson wrote that when he arrived in the cell, around when Nurse Valberg was waiting for the AED to work, "Mr. Perry was ashy colored and was not breathing on his own that I could tell." At the apparent direction of Nurse Valberg, jail staff did not begin sustained CPR or call 911 until approximately 5 minutes after Mr. Perry appears to stop moving in the video.

88.   After the death of Mr. Perry, Nurse Valberg ceased working at the Clackamas County Jail.

89.   On May 10th, 2018, Multnomah County hired Nurse Valberg as a part-time Community Health Nurse within its jails. On July 26th, 2018, Nurse Valberg became a full-time Multnomah County Health Department employee.

90.   On January 4th, 2019, Nurse Valberg filed a Petition for a Stalking Protective Order against

---

[10] Ms. Mountsier was Mr. Perry's girlfriend who was arrested at the same time. She survived.

the "spouse of a co-worker." On January 1st, 2020, Nurse Valberg filed a second Petition for a Stalking Protective order against the same woman, whom she noted was an employee of "MCDC Recog." Both Stalking Protective Orders have been dismissed.

91.    On information and belief, Nurse Valberg has been terminated as an employee of Multnomah County.

### The Narcan Policy for Multnomah County Jails

92.    The Multnomah County Health Department Corrections Division policy for the lifesaving, overdose-reversing drug Narcan use is as follows:

**MULTNOMAH COUNTY HEALTH DEPARTMENT**
**CORRECTIONS HEALTH**
CLINICAL STANDARD

| | |
|---|---|
| Issued: | 08/10/03 |
| Previous Revision: | 12/01/16 |
| Current Revision: | 12/03/18 |

Approved by: _[signature]_
Michael Seale, M.D.
*Director*
*Responsible Health Authority*

J-D-02/J-E-08

## NARCAN (NALOXONE) USE

**POLICY:**    Appropriate and timely use of Narcan (Naloxone). Naloxone is an antagonist of various opiates and can be useful in reversing the adverse effects of narcotic overdose, particularly respiratory depression. It should be given promptly when respiratory depression is observed in the setting of known or possible narcotic toxicity. Other than precipitating prompt narcotic withdrawal, there are no major contraindications to its use in the emergency setting.

**PROCEDURE:**

**Subjective:**
- Reduced level of consciousness and/or respirations in the setting of possible narcotic use, either prescription or non-prescription

**Objective:**
- Client will often present with reduced respiratory rate or shallow breathing
- O2 Oxygen saturation may be reduced (<92%)
- Blood pressure may be low and heart rate may be reduced
- Client may be slow to respond or be unresponsive: speech may be sparse or slurred
- Pupils may be small and pinpoint
- Rapid response with agitation and combativeness may be observed after successful reversal of narcotic induced symptoms

**Assessment:**
- Respiratory depression and reduced level of consciousness in the setting of possible narcotic overdose or toxicity
- Nursing diagnoses
   - Ineffective self-health management
   - Ineffective breathing pattern
   - Impaired spontaneous ventilation
   - Readiness for enhanced self-care

Page 24 – **First Amended Complaint**

**Plan:**

1. Access ABC's-Airway, Breathing, Circulation.
2. Monitor oxygen saturation.
3. Call 911.
4. If time permits, call provider for orders.
5. For clients with no pulse, proceed to BLS guidelines.
6. If client apneic with pulse, establish oral airway and begin bag ventilation with 100% oxygen.
7. Peel back the package to remove the device (Narcan Nasal Spray 4 mg).
8. Hold the device with your thumb on the bottom of the plunger and two fingers on the nozzle.
9. Place and hold the tip of the nozzle in either nostril until your fingers touch the bottom of the client's nose.
10. Press the plunger firmly to release the dose into the client's nose.
11. Continue ventilating client as needed.
12. The goal of naloxone administration is NOT a normal level of consciousness, but adequate ventilation. If no clinical effect is seen, the diagnosis of opiate intoxication should be reconsidered.
13. Continued evaluation of the client is required. Repeat vital signs every five minutes at a minimum. Clients who use long-acting opiate preparations may need repeated dosing. If breathing does not return to normal or if breathing difficulty resumes, after 2-3 minutes, give an additional dose of Narcan Nasal Spray using a new device in the alternate nostril.
14. Acceptable to administer to pregnant women in opiate overdose. Use lowest dose that has clinical effect to avoid triggering acute opioid withdrawal, which may cause fetal distress.
15. Initiate appropriate life support activities, including the use of O2 by NC or mask, as needed.

    Note: it is not necessary to delay use of naloxone to obtain consent in the emergent situation.

**Documentation:**

1. Record assessment and intervention on Emergency Response Form with any additional information on progress notes and send with the client to the hospital.
2. Notify provider, on-site or on-call as needed for additional orders.

**Education:**

Naloxone restores breathing and cannot be abused. The effects of naloxone wear off after approximately 30 to 90 minutes. Naloxone can't cause additional harm to someone not experiencing an opiate overdose.

### *FORREST'S DEATH BY OVERDOSE*

93.  On July 25th, 2019, Forrest ingested, inhaled, or injected heroin and/or methamphetamine he obtained while in custody at Inverness Jail. One inmate reported smoking a joint with Forrest in the bathroom after returning from work crew on the day of Forrest's death. The inmate stated, "pretty sure he did some other shit too." A different inmate reported, ""He [Forrest] was doing bumps (snorting heroin) with a guy in his house on bunk next to his."

94. At 5:45 p.m. on July 25th, 2019, Forrest reported trouble breathing to a deputy at Inverness Jail. Nurse Valberg arrived at 5:47 p.m. and assessed Forrest for an asthma attack, despite his presentation of the subjective and objective symptoms of a heroin overdose. At this point in time, Forrest was seated in a chair and responsive.



Nurse Valberg did not administer Narcan to Forrest.

95. Nurse Metea arrived at 5:48 p.m., along with two medical assistants and a "code cart." The "code cart" is a medical cart with supplies necessary for medical emergencies, and is visible in the image below:



96. The Inverness Jail "code cart" is stocked with five nonexpired doses of Narcan, the lifesaving drug that per Multnomah County Correctional Health Policy "restores

breathing" and "can't cause additional harm to someone not experiencing an overdose." Nurse Metea did not administer Narcan to Forrest.

97. At 5:51 p.m., Forrest's breathing deteriorated, and he was lowered to the floor.



98. Between 5:51 and 6:00 p.m., Nurse Wheeler arrived. Nurse Diamond arrived at 6:00 p.m. Neither Nurse Wheeler nor Nurse Diamond administered Narcan to Forrest.

99. Between 5:47 and 6:01 p.m. – the period of time when only Multnomah County nurses and deputies were treating Forrest – multiple other inmates were yelling "Narcan!" to the nurses and deputies. The deputies told the inmates to sit down and be quiet. Another inmate reported, "I heard them tell the COs, 'I think he's overdosed.' The CO was saying back, 'Well that's your guys' fault - you know not to do drugs in here.'" During this period of time, no one administered Narcan to Forrest.

100. Portland Fire and Rescue paramedics arrived at 6:01 p.m. and administered Narcan within four minutes of their arrival. By then, it was too late. Mr. Forrest was taken to Adventist Hospital where he was pronounced dead.

101. Jail medical staff reported their awareness of Forrest's possible heroin use to the Portland Fire and Rescue paramedics, which the paramedics documented in the following medical record regarding Forrest's death:

E2 ARRIVED TO FIND THE PT WHO WAS AN INMATE AT INVERNESS JAIL LYING SUPINE ON THE FLOOR CAOX0 WITH THE JAIL STAFF PERFORMING CPR AND THEIR AED HOOKED UP, THE STAFF STATED THAT THE PT CAME TO THEM AND STATED THAT HE WAS HAVING TROUBLE BREATHING AND HAD TOOK HIS INHALER AND THEN COLLAPSED TO THE FLOOR AND WENT UNCONSCIOUS, **THE STAFF DID STATE THAT THERE IS A CHANCE THAT THE PT DID DO HEROIN** AS WELL, LATER IN THE CALL WHEN ASKED BY STAFF OTHER INMATES DID SAY HE HAD DONE HEROIN. (Emphasis added).

102.    The American Medical Response ("AMR") medical record also readily acknowledges the implications of heroin in Forrest's death:

INMATES RELATE PT WAS SOB REPORTED AS ASTHMA BUT THEY ADMITTED PT HAD USED HEROINE (sic) AN UNKNOWN TIME BEFORE BECOMING NONRESPONSIVE.

103.    Following Forrest's death, an inmate relayed, "People one-by-one are going to the bathroom to flush drugs. Some dudes are pissed because people are hiding their drugs in their mouth instead of flushing."

104.    On July 26th, 2019, Dr. Michelle Stauffenberg, the county medical examiner, performed an autopsy of Forrest. Dr. Stauffenberg wrote: "It is my opinion that Richard Forrest… died as a result of the combined effects of the heroin and methamphetamine."

105.    In the aftermath of Mr. Forrest's death, at least 12 individuals were indicted for their involvement in smuggling drugs into the jail.

106.    On July 31st, 2019, Michael Seale, MD, Deputy Director of Corrections Health, performed a "chart review" of Forrest's death. He wrote, "Narcan should have been considered as an early step in the resuscitation process."

107.    On August 6th, 2019, Multnomah County completed a purchase order for a body scanner for Inverness Jail.

108.    Mr. Forrest is survived by his wife and their minor son.

//

//

## FIRST CLAIM FOR RELIEF

### 42 USC § 1983 – Eighth Amendment Violation - *Monell*

### Unconstitutional Policy, Custom, or Practice

### *Defendant Multnomah County*

109.    Plaintiff realleges and incorporates each previous paragraph.

110.    At all material times, Forrest had a protected liberty interest under the Eighth Amendment not to be subjected to cruel and unusual punishment through regular access to heroin and methamphetamine while incarcerated, and though the delay or denial of lifesaving, essential, or appropriate medical treatment. Defendants violated each of these Eighth Amendment rights.

111.    At all material times, Multnomah County had a custom, practice, or unofficial policy of the following:

    a.    Failing to keep drugs including heroin and methamphetamine out of Multnomah County jails;

    b.    Failing to enforce policies and procedures that would prevent heroin, methamphetamine, and other controlled substances from being accessible to inmates;

    c.    Failing to appropriately supervise inmate work crews;

    d.    Failing to properly search each inmate returning from work crew into Inverness jail;

    e.    Failing to secure and surveil its own facility, such that a member of the public could not enter and leave drugs on the property without jail staff noticing and intercepting the drugs;

f.      Delaying the purchase of body scanners that would detect and prevent drugs from entering Multnomah County jails via inmate body cavities;

g.      Failing to adequately train jail deputies to recognize the signs and symptoms of drug use by inmates;

h.      After discovering drugs within a secured facility, or discovering that an inmate tested positive for drugs that could only have been used or consumed while the inmate was in custody, failing to find, confiscate, and destroy the remaining drugs available to inmates within the facility;

i.      Failing to monitor the jail's telephones and system of inmate accounts for evidence of drug incursion, and failing to then find, confiscate, and destroy the remaining drugs available to inmates within the facility;

j.      Failing to adequately train correctional staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

k.      Failing to adequately train medical staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

l.      Failing to adequately train correctional staff in the administration of Narcan;

m.      Failing to adequately train medical staff in the administration of Narcan;

n.      Hiring medical and nursing personnel indifferent to the medical needs of Multnomah County inmates;

o.      After an inmate overdose, failing to take appropriate measures to prevent future inmate overdoses;

p.      After an inmate death by overdose, failing to take appropriate measures to prevent future inmate deaths by overdose;

112.	These customs, practices, or unofficial policies were the moving forces that resulted in the unconstitutional cruel and unusual punishment of Forrest by way of access to drugs and lack of access to lifesaving medical treatment. As a direct result of these constitutional violations, Forrest died of a drug overdose.

113.	These customs, practices, or unofficial policies posed a substantial risk of causing substantial harm to Multnomah County inmates, and Multnomah County was aware of the risk.

114.	As a direct result of these customs, practices, or unofficial policies, Forrest was provided regular access to heroin and methamphetamine while incarcerated and overdosed. As a further direct result of these customs, practices, or unofficial policies, Forrest was not provided appropriate lifesaving medical care, and he suffered an agonizing death. His wife and son have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages in the sum of $10,000,000.

115.	Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.


## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Eighth Amendment Violation

### Delay and Denial of Essential Medical Care

*Medical Staff Defendants*

116.	Plaintiff realleges and incorporates each previous paragraph.

117.	Forrest, as a jail inmate, was entitled to be free from cruel and unusual punishment pursuant to the 8th Amendment of the United States Constitution. This protection includes a right to

adequate and timely medical care. This protection extends to providing appropriate care during a drug overdose. Failure to provide adequate medical care amounts to deliberate indifference to an inmate's wellbeing and constitutes cruel and unusual punishment in violation of the 8th Amendment. Recklessness with respect to the required standard of care can constitute "deliberate indifference" to a prisoner's medical needs under the 8th Amendment. In this case, the Medical Defendants – in particular, Nurse Valberg – acted with deliberate indifference in failing to respond to Plaintiff's serious medical needs when he presented the symptoms of a heroin overdose, and they failed to recognize his condition and utilize the lifesaving medicine, Narcan, that was available in the cart at his side.

118.   Plaintiff alleges that the acts and omissions performed by Defendants Valberg, Metea, Wheeler, and Diamond violated the 8th Amendment standards in the following ways:

a.   Defendants Valberg, Metea, Wheeler, and Diamond failed to identify Forrest's symptom presentation as that of a heroin overdose;

b.   Defendants Valberg, Metea, Wheeler, and Diamond administer Narcan to Forrest during the fourteen minutes before paramedics arrived, despite Forrest presenting the symptoms of an overdose and inmates yelling out "Narcan!";

c.   Defendants Valberg, Metea, Wheeler, and Diamond failed to consider Narcan as an early step in the resuscitation process;

d.   Defendants Valberg, Metea, Wheeler, and Diamond failed to consider alternative diagnoses, other than an asthma attack, despite Forrest presenting symptoms inconsistent with an asthma attack;

e.   Defendants Valberg, Metea, Wheeler, and Diamond failed to provide appropriate resuscitative treatment other than Narcan to Forrest;

f.   Defendants Valberg, Metea, Wheeler, and Diamond failed, generally, to respond properly to Richard Forrest's serious medical needs before, during, and after his overdose; and

g.   Defendants Valberg, Metea, Wheeler, and Diamond failed to provide Richard Forrest with adequate medical attention.

119.   As a direct result of the actions and inactions of the Medical Staff Defendants, as set forth in the paragraph above, Forrest was not provided timely and appropriate medical care. If Forrest had received timely and appropriate medical care, he would not have died. Richard Forrest suffered an agonizing death as a result of the Medical Staff Defendants' failures. His wife and son have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages in the sum of $10,000,000.

120.   The Medical Staff Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal *per se*.

121.   The Medical Staff Defendants' conduct was malicious, oppressive, and/or in reckless disregard of Plaintiff's Eighth Amendment rights. Plaintiff is entitled to an award of punitive damages against each Medical Defendant to punish and deter each defendant and others from similar deprivations of constitutional rights in the future.

122.   Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

//

//

//

## THIRD CLAIM FOR RELIEF

### 42 USC § 1983 – 8th Amendment – Deliberate Indifference

#### *Supervisory Defendants*

123.    Plaintiff re-alleges all previous paragraphs as if more fully set forth herein.

124.    The constitutional deprivations suffered by Plaintiff are the proximate and direct cause of a non-interested, indifferent and willfully ignorant supervisory practice by the named defendants. The supervisors have a constitutional duty to protect detainees and inmates and to provide them with a safe and humane condition of confinement including the right to be free from heroin, methamphetamine, and other controlled substances.

125.    The duty is enhanced when the inmate population is especially vulnerable, as here, with a high incidence of inmates suffering from drug addiction and many, including Forrest, specifically waiting to enter a drug treatment program.

126.    Defendants Reese, Wheeler, Alexander, Peterson, and Morrisey-O'Donnell, in their supervisory capacities, were aware of the policies, customs or practices as alleged in paragraph 111 and were aware that said policies, customs or practices created a substantial risk of causing substantial harm to Multnomah County detainees and inmates by endangering their physical safety and their medical needs. Despite that knowledge, said supervisors allowed, approved of and ratified said policies, customs or practices.

127.    Defendants Reese, Wheeler, Alexander, Peterson, and Morrisey-O'Donnell additionally violated Forrest's Eighth Amendment right to be free regular access to heroin and methamphetamine while incarcerated as follows:

      a.    Following the March 2015 fentanyl inmate overdoses and death, and despite many opportunities to do so as described in paragraphs 45-84, defendants failed to

purchase, implement, and utilize any drug-detecting body scanner at any Multnomah County jail for over four years, until after Forrest's death.

128. As a direct result of the Supervisory Defendants' failure to purchase, implement, and utilize drug-detecting body scanners, heroin and methamphetamine was readily available to inmates of Inverness Jail Dorm 9 as described in paragraphs 37-44, and Forrest overdosed and died. Forrest's wife and son have been denied his love, society and companionship. Forrest's estate and his wife and son are entitled to compensatory damages in the sum of $10,000,000.

129. The Supervisory Defendants' conduct was malicious, oppressive, and/or in reckless disregard of Plaintiff's Eighth Amendment rights. Plaintiff is entitled to an award of punitive damages against each Supervisory Defendant to punish and deter each defendant and others from similar deprivations of constitutional rights in the future.

130. Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.


## FOURTH CLAIM FOR RELIEF

### State Law – Wrongful Death, Negligence

### *Defendant Multnomah County*

131. Plaintiff re-alleges and incorporates each previous paragraph.

132. Defendant Multnomah County, acting by and through its employees and agents, was negligent in one or more of the following particulars:

   b. In failing to prevent drugs, including heroin and methamphetamine, from entering Multnomah County and being accessible to inmates;

c.  In failing to enforce policies and procedures that would prevent heroin, methamphetamine, and other controlled substances from being accessible to inmates;

d.  In failing to appropriately supervise inmate work crews;

e.  In failing to properly search each inmate returning from work crew into Inverness jail;

f.  In failing to notice that inmates on the work crew were picking up packages of controlled substances left on the Inverness Jail property and bringing them into the jail;

g.  In failing to secure and surveil its own facility, such that a member of the public could not enter and leave drugs on the property without jail staff noticing and intercepting the drugs;

h.  In failing to notice that members of the public were entering the Inverness Jail property and leaving drugs on the property;

i.  In failing surveil with appropriate camera coverage all portions of the Inverness Jail property that were accessible both by members of the public and inmates on the work crew;

j.  In failing to immediately purchase and utilize body scanners following the 2015 fentanyl overdoses and death within MCDC;

k.  In delaying for four years the purchase of body scanners that would detect and prevent drugs from entering Multnomah County jails via inmate body cavities;

l.  In failing to adequately train jail deputies to recognize the signs and symptoms of drug use by inmates;

m. After discovering drugs within a secured facility, or discovering that an inmate tested positive for drugs that could only have been used or consumed while the inmate was in custody, failing to find, confiscate, and destroy the remaining drugs available to inmates within the facility;

n. In failing to monitor the jail's telephones and system of inmate accounts for evidence of drug incursion, and failing to then find, confiscate, and destroy the remaining drugs available to inmates within the facility;

o. In failing to adequately train correctional staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

p. In failing to adequately train medical staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

q. In failing to adequately train correctional staff in the administration of Narcan;

r. In failing to adequately train medical staff in the administration of Narcan;

s. After an inmate overdose, failing to take appropriate measures to prevent future inmate overdoses;

t. After an inmate death by overdose, failing to take appropriate measures to prevent future inmate deaths by overdose;

133. Defendant Multnomah County is vicariously liable for the acts of its employees, the Medical Staff Defendants Valberg, Metea, Wheeler, and Diamond. The Medical Staff Defendants were negligent, and failed to meet the appropriate standard of care, in the following particulars:

a. In failing to identify Forrest's symptom presentation as that of a heroin overdose;

b.  In failing to administer Narcan to Forrest during the fourteen minutes before paramedics arrived, despite his symptom presentation of a heroin overdose and inmates yelling out "Narcan!";

c.  In failing to consider Narcan as an early step in the resuscitation process;

d.  In failing to consider alternative diagnoses, other than an asthma attack, despite Forrest presenting symptoms inconsistent with an asthma attack;

e.  In failing to provide appropriate resuscitative treatment other than Narcan to Forrest;

f.  In failing generally to respond properly to Richard Forrest's serious medical needs before, during, and after his overdose; and

g.  In failing to provide Richard Forrest with adequate medical care.

134.  As a direct result of the actions and inactions of Multnomah County, and of its employees and agents, Forrest was provided regular access to heroin and methamphetamine while incarcerated, after which he overdosed and died. His wife and son have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages in the sum of $10,000,000.

135.  Notice pursuant to the Oregon Tort Claims Act was given to defendant Multnomah County within the time prescribed by law.

//

//

//

//

//

## FIFTH CLAIM FOR RELIEF

### State Law - Wrongful Death, Gross Negligence/Reckless Misconduct

#### *Defendant Multnomah County*

136.    Plaintiff re-alleges all previous paragraphs as if more fully set forth herein.

137.    The acts and omissions alleged in paragraphs 132 and 133 constitute gross negligence and reckless misconduct. As a result, Defendant Multnomah County was recklessly indifferent to Richard Forrest's civil rights, callously disregarded his physical safety, and Forrest died.

138.    CLAIM NOT SUBJECT TO ORS 31.60. At the time of Forrest's death, Defendant Multnomah County was aware of and consciously disregarded a substantial and unjustifiable risk that an inmate would overdose and die within its jails. This risk was of such a nature that it constituted a gross deviation from the standard of care that a reasonable person would observe in such circumstances. As such, Defendant Multnomah County acted recklessly.

139.    As a direct result of the misconduct of defendant Multnomah County, and of its employees and agents, Forrest was provided regular access to heroin and methamphetamine while incarcerated, after which he overdosed and died. His wife and son have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages in the sum of $10,000,000.

//

//

//

//

//

Page 39 – **First Amended Complaint**

## SIXTH CLAIM FOR RELIEF

### State Law – Negligent Hiring and Retention

#### *Defendant Multnomah County*

140.    Plaintiff re-alleges all previous paragraphs as if more fully set forth herein.

141.    Defendant Multnomah County hired Nurse Camille Valberg on May 10th, 2018, as a part-time Community Health Nurse within its jails. On July 26th, 2018, Nurse Valberg became a full-time Multnomah County Health Department employee.

142.    Defendant Multnomah County was negligent in hiring Nurse Valberg when it knew – or in the exercise of reasonable care should have known – that Nurse Valberg lacked the appropriate skills, competency, diligence, or compassion necessary to perform the duties of her job as described in paragraphs 85-91.

143.    Defendant Multnomah County should have reasonably discovered that Nurse Valberg was, shortly after she was hired by Multnomah County, served with a lawsuit alleging she was deliberately indifferent to the serious medical needs of an inmate who died in custody. At a minimum, Multnomah County had an obligation to conduct an investigation into Nurse Valberg's conduct, which would have revealed that Nurse Valberg lied about her own conduct and had delayed CPR until five minutes after the inmate under her care had stopped moving. As such, Multnomah County was negligent in retaining Nurse Valberg as an employee.

144.    As a foreseeable result of Multnomah County's negligent hiring and retention of Nurse Valberg, she failed to provide adequate medical care to Forrest, and he died. His wife and son have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages in the sum of $10,000,000.

145.     Notice pursuant to the Oregon Tort Claims Act was given to defendant Multnomah County

within the time prescribed by law.

146.

WHEREFORE, plaintiff prays for a judgment against Defendants, and each of them, as

follows:

1.     For compensatory economic and noneconomic damages in the amount of

$10,000,000.

2.     For punitive damages against the Medical Staff Defendants and Supervisory

Defendants on claims 2 and 3;

3.     For plaintiff's attorney fees pursuant to 42 U.S.C. § 1988;

4.     For plaintiff's costs and such other and further relief as the Court may deem just

and equitable; and

5.     Plaintiff demands a jury trial for all matters triable by jury.


Dated : July 2, 2021

/s/ *Drake Aehegma*
Drake Aehegma, OSB #132905
Email: drake@aehegmalaw.com
Drake Aehegma, Attorney at Law, LLC
PO Box 8404
Portland, OR 97207
Telephone: (503) 208-5717

/s/ *Joe Piucci*
Joseph E. Piucci, OSB No. 135325
E-mail: joe@piucci.com
Piucci Law, LLC
900 SW 13th Avenue, Suite 200
Portland, Oregon 97205
Telephone: 503-228-7385