JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON
B. Andrew Jones, OBS No. 091786
Deputy County Attorney
Veronica R. Rodriguez, OSB No. 181818
Assistant County Attorney
Multnomah County Attorney
501 S.E. Hawthorne Blvd., Suite 500
Portland, Oregon 97214
Telephone:  (503) 988-3138
Facsimile:  (503) 988-3377
E-mail:  andy.jones@multco.us
          veronica.rodriguez@multco.us
    *Of Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| THE ESTATE OF RICHARD JASON FORREST, Van Loo Fiduciary Services, LLC, Personal Representative,<br><br>     Plaintiff,<br><br> v.<br><br>MULTNOMAH COUNTY, a political subdivision of the state of Oregon; MICHAEL REESE, Multnomah County Sheriff, CAMILLE VALBERG, KOH METEA, JAMI WHEELER, JACOB DIAMOND, STEVEN ALEXANDER, and JEFFREY WHEELER, acting in concert and in their individual capacities,<br><br>     Defendants. | No. 3:20-CV-01689-AR<br><br>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>**FRCP 56**<br><br>**Oral Argument Requested** |

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................... 9

II.     MOTION ................................................................................................................. 10

III.    STATEMENT OF MATERIAL FACTS ................................................................. 10

        A.      MCSO COMMAND STRUCTURE ................................................................. 10

        B.      COUNTY BUDGETING FOR SHERIFF'S OFFICE ...................................... 11

        C.      MULTNOMAH COUNTY'S LOW JAIL MORTALITY RATES ................... 12

        D.      INVERNESS STAFFING ............................................................................... 13

        E.      RULES FOR ADULTS IN CUSTODY ............................................................ 13

        F.      MCSO SEARCH POLICIES IN 2019 ............................................................. 14

        G.      REVIEW OF MCSO POLICIES AND PROCEDURES .................................. 15

        H.      CONTRABAND DETECTION AND DOCUMENTATION ........................... 16

        I.      MCSO TRAINING ON LIFE SAVING AND OPIATES ................................. 17

        J.      HEALTH CARE AT INVERNESS ................................................................. 18

        K.      RELEVANT JOB REQUIREMENTS FOR COUNTY NURSES ..................... 18

        L.      POLICIES/TRAINING ON OPIATES AND NALOXONE ............................. 18

        M.      REVIEWS OF CORRECTIONS HEALTH POLICY AND PROCEDURES ... 19

        N.      RICHARD JASON FORREST'S BOOKING AND HISTORY ........................ 20

        O.      FACTS ABOUT DORM 9 – WORK CREW .................................................... 21

        P.      FORREST'S BREATHING COMPLAINTS IN JUNE AND JULY, 2019 ....... 22

        Q.      DORM 9 IN JUNE AND JULY, 2019 .............................................................. 22

                1.      July 2, 2019 – Multiple Adults Removed from Dorms after Searches and
                        UAs ................................................................................................... 22
                2.      July 3, 2019 - Shakedown of Entire Dorm ............................................. 23

i – TABLE OF CONTENTS

3.     July 3rd, 2019 to July 24th, 2019 – Searches and Discipline Continue...... 23
4.     Mr. Forrest's Calls with Mrs. Forrest. ..................................................... 24

R.     JULY 25, 2019 ............................................................................................... 25

1.     6:50 a.m. – 3:00 p.m. – Mr. Forrest Having Breathing Issues During Work Assignment ............................................................................................. 25
2.     5:42 – 5:45 p.m. – Mr. Forrest in Respiratory Distress Before Approaching Deputies. ...................................................................................................... 25
3.     5:45 p.m. - Deputies Maxwell and McClure Call for Nurse After Mr. Forrest Tells Them He Can't Breathe and Needs An Inhaler. ................. 26
4.     5:47 p.m. – Defendant Camille Valberg, RN Arrives............................. 26
5.     5:48 p.m. – Defendant Koh Metea, RN and Medication Aides Stephanie Stewart and Amy Hatton Arrive ............................................................... 27
6.     5:50 p.m.  Nurse Metea Tells Deputies to Call 911 ................................ 28
7.     5:51 p.m. – 6:01 p.m. – Medical Staff Initiate and Continue CPR/Basic Life Support ............................................................................................... 29
8.     6:01 p.m. – Portland Fire & Rescue Arrive and Begin ALCS................. 29
9.     6:04 p.m. – Delontae Dickinson Approaches Deputy.............................. 30
10.    6:05 p.m. – Portland Fire Administers Naloxone for First Time............. 30
11.    6:08 p.m. - AMR Arrives and Continues Care. ...................................... 30
12.    6:47 p.m. – Mr. Forrest Arrives at Portland Adventist Emergency .......... 31

S.     MCSO INVESTIGATION FOLLOWING MR. FORREST'S DEATH ............ 31

T.     BODY SCANNER REVIEW AND PURCHASE ............................................. 31

U.     FUNDING SOURCES AND PURCHASING DECISIONS ............................. 33

V.     NECESSARY PROCEDURES FOR BRINGING SCANNERS ONLINE........ 33

W.     JAIL PHONE CALL VOLUME ...................................................................... 34

X.     EXPERT REVIEW AND REPORTING ........................................................... 34

IV.    SUMMARY OF CLAIMS.......................................................................................... 35

V.     SUMMARY JUDGMENT STANDARD...................................................................... 37

VI.    ARGUMENT .............................................................................................................. 37

A.     42 U.S.C. §1983 – EIGHTH AMENDMENT CLAIMS ................................... 37

1.     Eighth Amendment Is A Demanding Standard for Plaintiffs. .................. 37
2.     Individual Sheriffs Defendants are Entitled to Summary Judgment ........ 39

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

a.    Reese, Alexander, and Jeffrey Wheeler Had No Personal Involvement with Mr. Forrest's Death........................................... 39

b.    Plaintiff Cannot Demonstrate Subjective Indifference by Any Named Sheriff's Office Defendant. ................................ 40

c.    The Record Does Not Satisfy Eighth Amendment Requirements for Objective Risk. ...................................................... 41

d.    No Causal Link Between any Individual Sheriff's Office Defendant and Mr. Forrest's Harm. ................................ 43

e.    Qualified Immunity Bars a Claim Against Sheriff Reese or Chief Deputies Alexander and Wheeler. .................................. 43

3.    Eighth Amendment – Defendants Valberg, Metea, Jami Wheeler, and Diamond.......................................................................... 44

a.    Plaintiff's Expert Reports Demonstrate Jacob Diamond is Not Liable under 42 U.S.C. §1983. ..................................... 45

b.    Nurses Valberg, Metea, and Wheeler were not Indifferent. ......... 45

c.    The Nursing Defendants are Immune from Suit under 42 U.S.C. §1983........................................................................... 47

4.    Eighth Amendment Claim – Multnomah County ................................... 48

a.    Requirements of Monell claim.................................... 48

b.    No Monell Claim for Hiring Practices.......................... 49

c.    Failure to Train Medical Staff Lacks Factual Basis..................... 50

d.    No Claim for Failure to Train Sheriff's Staff. ............................. 50

e.    No Claim for Deficient Security Policies or Procedures. ............. 51

f.    No Policy or Practice was "Moving Force" Behind an Eighth Amendment Violation........................................................ 51

g.    No Claim Against Policies Drawn with Legitimate Purposes. ..... 51

h.    No Evidence of Unconstitutional Security Measures. ................. 52

i.    No Ratification Theory ........................................... 53

B.      STATE CLAIMS ................................................................. 53

1.    Discretionary Immunity for Policy-Level Decisions on Jail Safety and Security ................................................................ 53

2.    Apparent Authority Immunity Bars Policy-Level Claims. ...................... 54

3.    Summary Judgment is Warranted on Negligence Claims as Pled........... 55

4.    No Negligent Hiring Claim as a Matter of Law ................................... 56

5.    No Negligence Claim for Lack of Body Scanners................................... 57

VII.    CONCLUSION ............................................................... 58

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

# TABLE OF AUTHORITIES

**Cases**

*Barren v. Harrington,* 152 F.3d 1193 (9th Cir. 1998) ................................................................. 38

*Bearchild v. Cobban*, 947 F.3d 1130 (9th Cir. 2020) ................................................................. 37

*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................. 39

*Berg v. Kincheloe*, 794 F.2d 457 (9th Cir. 1986) ................................................................. 37, 51

*Boncher ex rel Boncher v. Brown County*, 272 F.3d 484 (7th Cir. 2001) ................................... 49

*Branford v. Washington County*, 2019 WL 1957951 1 (D. Or May 2, 2019) .............................. 55

*Camreta v. Greene*, 563 U.S. 692 (2011) ................................................................. 43

*Carillo v. City of Portland*, 2022 WL 4243460 1 (D. Or June 3, 2022) ...................................... 52

*Cavanaugh v. Cty of San Diego,* 3:18-CV-02557-BEN-LL, 2020 WL 6703592 (S.D. Cal

    11/12/20) ................................................................. 51

*Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013) ................................................................. 37, 51

*Chesterman v. Barmon*, 82 Or.App. 1, 727 P.2d 130 (1986) ....................................................... 55

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) ................................................................. 52

*Christopher v. Buss*, 384 F.3d 879 (7th Cir. 2004) ................................................................. 41

*City of Canton v. Harris*, 489 U.S. 378 (1989) ................................................................. 48

*City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988) ................................................................. 47

*Clement v. Gomez,* 298 F.3d 898 (9th Cir. 2002) ................................................................. 44

*Conn v. City of Reno*, 591 F.3d 109 (9th Cir. 2010) ................................................................. 41

*Connick v. Thompson*, 561 U.S. 51 (2011) ................................................................. 47, 48

*Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015) ................................................................. 41

*Cruz v. Multnomah County*, 279 Or. App. 1 (2016) ................................................................. 53

iv – TABLE OF AUTHORITIES

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780 (9th Cir. 2008) ................................................................................................................. 48

*Davidson v. Cannon,* 474 U.S. 344 (1986) ................................................................. 38

*Dickerson v. City of Portland*, 2020 WL 7391267 1 (D. Or. 12/16/20) ...................... 51

*District of Columbia v. Westby*, 138 S.Ct. 577 (2018), .............................................. 43

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011) ........................................ 49

*Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (9th Cir. 2002) ....................... 43, 44

*Estelle v Gamble*, 429 U.S. 97 (1976) ................................................................... 37, 46

*Farmer v. Brennan*, 511 U.S. 825 (1994) ........................................................... passim

*Felarca v. Birgeneau*, 891 F.3d 809  (9th Cir. 2018) ................................................. 42

*Fraihat v. U.S. Immigration and Customs Enforcement*, 16 F.4th 613 (9th Cir. 2021) ................ 44

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992) ............................................... 47, 52

*Green v. Gilbert, 830* Fed. Appx. 543 (9th Cir. 12/2/20) ........................................... 41

*Haas v. Weiner*, 765 F.3d 123 (8th Cir. 1985) ...................................................... 41, 50

*Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002) ....................................................... 36

*Harrison v. Ash*, 539 F.3d 510 (6th Cir. 2008) .......................................................... 44

*Helling v. McKinney*, 509 U.S. 25 (1993) ........................................................ 36, 37, 40

*Hines v. Youseff*, 914 F.3d 1218 (9th Cir. 2019) ....................................................... 37

*Hoffman v. Preston*, 26 F.4th 1059 (9th Cir. 2022) .................................................... 37

*Horton by Horton v. City of Santa Maria*, 915 F.3d 592 (9th Cir. 2019) ........... 42, 43, 47

*Hudson v. McMillan*, 468 U.S. 517 (1984) ............................................................... 41

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098 (9th Cir. 2016) ......... 57

*Joshi v. Providence Health Systems, Inc.*, 342 Or 152 (2006) ............................... 54, 56

v – TABLE OF AUTHORITIES

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) ............................................................... 36

*Kunzetov v. Zamrippa*, 2002 WL 5244251 1 (D. Or Oct 6, 2022) ............................... 36

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) ............................................. 39

*Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988) .............................................................. 42

*Legate v. Livingston*, 822 F.3d 207 (5th Cir 2016) ................................................ 41, 50

*Lemire v. California Dept. of Corrections and Rehabilitation*, 726 F.3d 1062 (9th Cir. 2012).. 44, 45, 46

*Lund v. United States*, 2022 WL 19039088 1 (D. Or., Dec 7, 2022) ........................... 36

*May v. Enomoto,* 633 F.2d 164 (9th Cir.1980) ............................................................... 38

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) .............................................. 51

*Mickens v. Stafford Creek Correction Center*, 132 Fed. Appx 691 (9th Cir. 2005) ...................... 41

*Monell v. Dept. of Soc. Serv. of N.Y.,* 436 U.S. 658 (1978) ........................................... 47

*Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017) ............................................................... 42

*Norbert v. City and County of San Francisco*, 10 F.4th 918 (9th Cir. 2021) ................ 40

*Nordenstrom, et al v. Corizon, et al*, 18-CV-01754-HZ (D. Or 6/21/21) .................... 56

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021) ....................................................... 42

*Overton v. Bazzetta*, 539 U.S. 126 (2003) .................................................................... 39

*Peck v. Montoya*, 51 F.4th 877 (9th Cir. 2022) ............................................................. 39

*Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) ........................................................ 38

*Pietrafeso v. Lawrence County, S.D.,* 452 F.3d 978 (8th Cir. 2006) ............................. 44

*Poppell v. City of San Diego*, 149 F.3d 951 (9th Cir. 1998) .................................... 36, 57

*Ramirez v. Hawaii T & S Enterprises, Inc.,* 179 Or. App. 416 (2002) ......................... 52

*Reichle v. Howards*, 566 U.S. 658 (2012) .................................................................... 46

vi – TABLE OF AUTHORITIES

*Rhodes v. Chapman*, 452 U.S. 337 (1981)..............................................................36, 37

*Rodriguez v. County of Los Angeles*, 891 F.3d 776 (9th Cir. 2018) ..............................39

*Sandford v. Chevrolet Division of General Motors*, 292 Or 590 (1982) ......................54

*Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021) ................... 43, 44, 45, 46

*Simmons v. G. Arnett*, 47 F.4th 927 (9th Cir. 2022) ........................................38, 42, 44

*Simmons v. Navajo County, Ariz.*, 609 F.3d 1011 (9th Cir. 2010) ................................41

*Somers v. Thurman*, 109 F.3d 614 (9th Cir 1997) .......................................................38

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .............................................................42

*Strizich v. Batista*, 2022 WL 823587 1 (9th Cir. March 18, 2022)...............................39

*Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996)...........................................................48

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012) ........................................47

*Turner v. Safley*, 482 U.S. 78 (1987) .......................................................................37

*Westfall v. State ex rel Oregon Dept. of Corrections*, 355 Or. 144 (2014)...................52

*Wood v. Housewright*, 900 F.2d 1332 (9th Cir. 1990)................................................44

*Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675 (9th Cir. 1984) ....................38

*Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022) .....................................................41

**Statutes**

ORS 30.265.......................................................................................... 35, 52, 53

ORS 132.440(2) ..........................................................................................53

ORS 169.070(3) ..........................................................................................53

ORS 181A.520(1)(a).....................................................................................54

ORS 678.021 ...............................................................................................54

**Other Authorities**

42 U.S.C §1983 ................................................................................................................. passim

**Rules**

Fed. R. Civ. P 26(a) ............................................................................................................... 55

Fed. R. Civ. P 56 ................................................................................................................... 55

Fed. R. Evid. 407 .................................................................................................................. 57

OAR 259-008-0085(2), (7) .................................................................................................. 54

OAR 85, Division 31 ............................................................................................................ 54

Rule 12(b)(6) ........................................................................................................................ 41

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

**CERTIFICATION**

Pursuant to Local Rule 7-1(a), counsel certifies the parties have conferred via telephone conversation to resolve the dispute and have been unable to do so.

## I. INTRODUCTION

On July 25, 2019, at 5:45 p.m., visibly struggling to breathe and using his inhaler, Richard Forrest summoned deputies in his dorm at the Multnomah County Inverness jail. He told them he was having trouble breathing and needed an inhaler. Nurses were by his side within two minutes, telling deputies to call 911 and giving him oxygen and asthma medication to help him breathe. Mr. Forrest did not tell anyone that he had taken drugs.

Within minutes, his heart and breathing had stopped and he had lost consciousness. Nurses and deputies immediately started life support to try to keep him alive until first responders could arrive. They did not know Mr. Forrest had used drugs, or that other adults in custody had been smuggling drugs into Inverness jail past jail security measures. Despite their efforts, Mr. Forrest died.

Mr. Forrest's Estate did not sue the people who gave him drugs. Rather, the Estate sued the County and its employees. Plaintiff makes the most serious claims against four individual nurses, claiming they killed Mr. Forrest wantonly and with a state of mind approaching criminal recklessness. His Estate also sues the Sheriff and two jail commanders for failing to prevent Mr. Forrest from getting and taking drugs, and Multnomah County as well.

With respect, these allegations must be challenged because they are wrong. Defendants are entitled to summary judgment.

/// /// ///

/// /// ///

Page 9 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## II. MOTION

Pursuant to Federal Rule of Civil Procedure 56, Defendants Multnomah County, Michael Reese, Camille Valberg, Koh Metea, Jami Wheeler, Jacob Diamond, Steven Alexander, and Jeffrey Wheeler respectfully move for summary judgment on the following grounds:

- No individual defendants violated the Eighth Amendment, and qualified immunity bars suit under 42 §U.S.C. 1983 against them.

- The facts do not establish a 42 U.S.C. §1983 claim against Multnomah County.

- Multnomah County is immune under the Oregon Tort Claims Act from claims relating to jail security policies and training.

- Plaintiff cannot create a triable issue for a negligence claim.

Defendants rely on the pleadings on file and declarations of Keith French, Kathy Wild, Don Sullivan, Brandon Pedro[1], Koh Metea, Scott Schlimpert, Michael Seale, B. Andrew Jones, and the following memorandum.

## III. STATEMENT OF MATERIAL FACTS

All facts are offered under Fed. R. Civ. P. 56(c)(1) for purposes of this motion only. Defendants apologize for the length, but the volume of defendants, claims, and sub-claims requires a large record.

### A. MCSO COMMAND STRUCTURE

Multnomah County has two adult jail facilities – the Multnomah County Detention Center ("MCDC") and the Multnomah County Inverness Jail ("MCIJ" / "Inverness")(Declaration of Brandon Pedro, ¶4). The Multnomah County Sheriff is responsible for those jails. (*Id.*).

---

[1] Brandon Pedro is submitting two declarations, one containing material that is designated confidential and that is being filed under seal in accordance with the Court's Protective Order (ECF 12).

Page 10 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Multnomah County Charter 6.50, Multnomah County Code 15.001(A)[2]. Defendant Michael

Reese was the Multnomah County Sheriff from 2016 until 2022. (*Id.*).

The Sheriff appoints one facility commander for MCDC and another for MCIJ. (Pedro

Declaration, ¶¶5, 14, Exhibits 12 and Exhibit 15, p. 3). The facility commander is responsible

for operations and administration of the facility, with day to day operations carried out by

deputies. (*Id.*, ¶6). Defendant Steve Alexander was the facility commander for Inverness until

May, 2019. (Declaration of B. Andrew Jones, ¶4, Exhibit 45, p. 2, lines 17 to p. 3, line 7; p. 4,

lines 3-11)[3]. Defendant Jeffrey Wheeler was the facility commander for MCDC. (*Id.*, ¶5, Exhibit

46, p. 2, line 6 to p. 3, line 5).

## B. COUNTY BUDGETING FOR SHERIFF'S OFFICE

Sheriff's Office expenses are funded by the Multnomah County budget prepared by the

Chair and approved by the County Board. (Charter 6.10(6), 2.20). The County's fiscal year runs

from July 1st to July 30th, identified by calendar year end (i.e. fiscal year 2018 ends June 30,

2018)(Declaration of Scott Schlimpert ¶4). The Sheriff cannot spend in excess of the Board

allocated budget for capital projects or operations, and must make purchases consistent with state

law. (*Id.*, ¶7, ORS 294.100). The Sheriff uses a fiscal team to ensure the office operates within

the budget and complies with purchasing and contracting law. (*Id.*, ¶7).

---

[2] Defendants respectfully request this Court take judicial notice of Multnomah County's Charter and Code under Federal Rule of Evidence 201. The Charter is available online at https://www.multco.us/file/58418/download, and code at https://www.multco.us/county-attorney/multnomah-county-code LR 5-2(c)(1).

[3] Kurtiss Morrison (who is not a named defendant) was the commander for Inverness jail at the time of Mr. Forrest's death. (Declaration of B. Andrew Jones, ¶3, Exhibit 44, p. 2, lines 6-8 and p. 3, line 25 to p. 4, line 18).

Page 11 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### C.      MULTNOMAH COUNTY'S LOW JAIL MORTALITY RATES

Multnomah County housed over 30,000 adults a year for at least one night in its jails before COVID-19 reduced capacity. (Pedro Declaration, ¶¶ 7-8, Exhibit 13). From 2003[4] to 2019[5], Multnomah County booked 631,815 adults for at least one night. (*Id.*).

Plaintiff's First Amended Complaint references nine people who died in Multnomah County custody over that time period. (ECF 17, ¶¶25 – 28, 30-33, 35, Answer ¶24). Two do not involve drugs. (ECF 17, ¶27, 28). Another alleges the person was a "heroin addict," but nothing about an overdose in jail. (ECF 17, ¶32). Plaintiff therefore relies on six deaths over sixteen years in a population of six hundred thirty thousand individuals booked into custody – with no finding of wrongdoing – to allege a "rich history" (ECF 17, ¶24) of overdose deaths.

Using Plaintiff's allegations, Multnomah County has a drug/alcohol death rate of less than one in 100,000 individuals booked into custody. The reported drug/alcohol death rate per 100,000 adults for jails nationally was *eleven times* greater over a similar time period. See *Mortality in Local Jails, 2000-2018 – Statistical Tables*, United States Department of Justice, Bureau of Justice Statistics, page 12, Table 8 page 7, Table 3[6]. The reported drug/alcohol death per 100,000 rate in prisons – facilities with less outside contact and more consistent population than jails – is *twenty times* greater. *Mortality in State and Federal Prisons, 2001 – 2018 – Statistical Tables*, U.S. DOJ, BJS, page 9, table 5.[7]

---

[4] First year cited in the First Amended Complaint, ECF 17, ¶25.
[5] The year of Mr. Forrest's death, ECF 21, ¶2.
[6] Available online at https://bjs.ojp.gov/content/pub/pdf/mlj0018st.pdf. The report is compiled and generated to fulfill BJS' responsibility to collect and disseminate information pursuant to the Death in Custody Reporting Act of 2000, P.L. 106-297. The methodology for compiling the statistics is available at pages 25-29 of the report.
[7] Available online at https://bjs.ojp.gov/content/pub/pdf/msfp0118st.pdf., see footnote 6.

Page 12 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## D.     INVERNESS STAFFING

In 2019, Inverness had funding to operate eight dormitory units housing seven hundred forty four adults. (Pedro Declaration, ¶9)[8].  Most dormitories house fifty or more adults assigned to their own bunk, in a large common room.  (*Id.*).  The Sheriff's office divides each day into three eight hour shifts.  (Pedro Declaration, ¶10).  There is a lieutenant designated Officer in Charge ("OIC") of Inverness for each shift.  (*Id.*, ¶11). Deputies carry out day-to-day operations reporting to the OIC.  (*Id.*, ¶11).

Deputies are in dorms for day and swing shifts, and monitoring by video and periodic in-person checks during graveyard.  (Pedro Declaration, ¶12).  During day and swing shift there are deputies doing many other jobs, including moving adults through the facility and to appointments and supervising and transporting work crews.  (*Id.*).  Neither Sheriff Reese nor other individually named defendants served in any of these roles in 2019.  (*Id.*).

## E.     RULES FOR ADULTS IN CUSTODY

MCSO has jail rules approved by the Sheriff and published in a handbook available at booking and in each dorm (Pedro Declaration, ¶13, Exhibit 14).  Adults in custody must "follow all laws, jail rules, staff orders" (*Id.*, Exhibit 14, p. 2).  Cells, bunk areas, property, dorms, and mail are subject to searches, and adults are subject to urinalysis and unclothed searches at certain times.  (*Id.*, Exhibit 14, p. 3 and pp. 9-11).  Bringing in or possessing contraband like controlled substances or paraphernalia is prohibited.  (*Id.*, Exhibit 14, p. 6).

Adults in custody can ask for a new housing assignment if they feel their unit creates a personal safety concern.  (Pedro Declaration, ¶13, Exhibit 14, pp. 4-5).  They can obtain

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

medical care any time of day, and must notify staff members if they are having a medical emergency.  (*Id.*, Exhibit 14, p. 11).

### F.    MCSO SEARCH POLICIES IN 2019

The Sheriff Office Corrections Division Policy Manual is approved by the Sheriff. (Jones Declaration, ¶3, Exhibit 44, p. 5, line 14 to p. 6, line 2; Pedro Declaration, ¶14).  Policies balance facility safety and security with supporting connections for people in custody through programs like contact visits and work assignments.  (Jones Declaration, ¶6, Exhibit 47, p. 4, line 24 to p. 5, line 25 and p. 6, lines 5-14).  There are policies directed towards contraband detection and deterrence, recognizing it is impossible to create a facility with no vulnerabilities that also protects rights for people in custody like mail and personal contact.  (*Id.*, Exhibit 47, p. 7, line 24 to p. 9, line 7 and p. 4, line 24 to p. 5, line 25).  Policy protects adults in custody from searches that are unreasonable or abusive, and protects the ability to communicate with people through visitation, mail, and phone calls.  (Pedro Declaration, ¶ 14, Exhibit 10, pp. 11-12).

Adults in custody must comply with searches.   (Pedro Declaration, ¶14, Exhibit 15, p. 9). Adults are pat searched when they arrive, when admitted into or transported out of a facility, when moving between housing areas, when going to or from programs or work, and when suspected of having contraband.  (*Id.*, Exhibit 15, pp. 4-6 and 13-18).  Every adult entering housing or returning from a contact visit is visually strip searched.  (Pedro Declaration, ¶14, Exhibit 15, pp. 6-7)  People returning from work are visually strip searched every time before

---

[8] In July, 2019, the total combined capacity for MCDC and MCIJ was one thousand one hundred ninety two adults by Board Resolution.  R3 on 11/15/2018 Board Agenda.  Fed. R. Evid. 201, LR 5-2(c)(1).

Page 14 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

re-entering.  (*Id.*, Exhibit 15, p. 7).  Deputies perform visual strip searches as trained by the

Oregon Department of Safety, Standards, & Training ("DPSST").  (*Id.*, ¶15).[9]

MCSO policy forbids physically intrusive searches.  (Pedro Declaration, ¶17).  Anyone

suspected of having contraband inside their body is placed in isolation in a "dry cell" (a cell with

no running water or plumbing), and monitored until the person passes the item or is transported

to a medical facility for an intrusive search.  (*Id.*, ¶¶ 14, 17, Exhibit 15, pp. 7-8).

In addition, people entering MCSO facilities are subject to search, and incoming non-

legal mail is searched.  (Pedro Declaration, ¶16, Exhibit 15, p. 10 and pp. 19-22).  Staff search

for and confiscate contraband in mail, including drugs and paraphernalia.  (*Id.*, ¶14, Exhibit 16,

pp. 2-3).  There are Inverness specific policies that identify specific work assignments or visits

subject to searches.  (*Id.*, ¶18, Exhibit 17, pp. 3-12).

### G.  REVIEW OF MCSO POLICIES AND PROCEDURES

Policies are reviewed internally and by third parties.  (Pedro Declaration, ¶19).  The

Oregon State Sheriff's Association ("OSSA") is an organization that publishes model standards

in addition to Oregon statutory requirements, including security and contraband detection.

(Pedro Declaration, ¶¶ 19-20 and ORS 169.090(1).  OSSA also inspects and audits jail

operations and policies.  (*Id.*, ORS 169.090(1), ORS 169.070).

OSSA inspectors reviewed policies and toured Inverness in 2014, 2016, and 2018.

(Pedro Declaration, ¶21).  Each of the reviews reported Inverness' policies and the

administration by staff met standards.  (*Id.*, Exhibit 18).  The 2016 and 2018 letters documenting

the audit findings went to Defendant Reese directly.  (*Id.,* Exhibit 18, pp. 13-51).  Two letters

---

[9] Sergeant Brandon Pedro's declaration sets out the process in greater detail.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

note that OSSA copied the Oregon Department of Corrections Jail Inspectors regarding Inverness' compliance with state statutory standards. (*Id.*, Exhibit 83, pp. 1-12).

A Multnomah County grand jury convenes each year to inquire about jail operations, and has access to facilities, staff, people in custody, records, and testimony. (ORS 132.440, Pedro Decl, ¶22). The grand jury issues a public report of its findings and recommendations.[10] None of the grand jury reports raised concerns with security or suggested body scanners in either facility. (*Id.*)

Disability Rights Oregon is the federally designated protection and advocacy organization. 42 U.S.C. §10805, *Wolfe v. City of Portland, et al,* 566 F.Supp.3d 1069, 1076 (D. Or. Oct 8, 2021). DRO reviews of Multnomah County jails in 2017 and 2018 emphasized less restrictive housing and more time in contact with others, specifically citing Inverness' open bunk dormitories as a good environment to avoid mental health problems.[11]

## H. CONTRABAND DETECTION AND DOCUMENTATION

At Plaintiff's request the Sheriff's Office pulled a subset of contraband reports containing the word "drugs" before and after Mr. Forrest's death. (Pedro Decl, ¶¶24-25). Those records documented deputies at Inverness before 2019 searching individuals and their bunks after receiving inmate tips, after deputies observed suspicious behavior, and as part of routine security measures. (*Id.*). They also show deputies intercepting and confiscating suspicious mail. (*Id.*).

---

[10] 2019 Grand Jury Report at: https://www.mcda.us/wp-content/uploads/2019/12/Corrections-Grand-Jury-Report-2019.pdf
2018 Grand Jury Report: https://www.mcso.us/site/pdf/grand_jury_2018.pdf
2017 Grand Jury Report: https://www.mcso.us/site/pdf/grand_jury_2017.pdf
LR 5-2(c)(1).
[11] Available at
https://static1.squarespace.com/static/5d645da3cf8e4c000158e55a/t/5f050b2df7806574bc223b95/1594166071316/MCDC-progress-report_May-9-2018.pdf . LR 5-2(c)(1).

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

# I.  MCSO TRAINING ON LIFE SAVING AND OPIATES

Jail deputies receive training in basic life support ("BLS") and use of an automatic external defibrillator, and also train on topics relating to drug recognition and response. (Pedro Declaration, ¶26. Jones Declaration, ¶2, Exhibit 43, p. 2, line 20 to p. 5, line 19; ¶7, Exhibit 48, p. 3, line 2 to p. 6, line 21). DPSST academy training before 2019 specifically included detecting and responding to suspected drug overdose as part of medical emergency training and the medical awareness course. (Jones Declaration, ¶8, Exhibit 49, p. 9, line 25 to p. 11, line 1; pp. 20-33; p. 17, line 1 to p. 18, line 1, pp. 50-57).

Prior to 2019, the Sheriff's Office internal CPR class included discussions of narcan[12] for a person suspected to have overdosed on opioids. (Jones Declaration, ¶8, Exhibit 49, p. 2, lines 7-25). Beginning in 2016 the Sheriff's Office offered additional training specific on Narcan, required for patrol deputies and available to corrections deputies. (*Id.*, Exhibit 49, p. 3, line 1 to p. 5, line 5; p. 6, line 19 to p. 7, line 18 and p. 19). In 2018, the Sheriff's Office also included a fentanyl-specific training for all deputies, portions of which included signs and symptoms of opiate overdose. (*Id.*, Exhibit 49, p. 12, lines 12-14, pp. 34-49, p. 13, line 19 to p. 15, line 2). Several deputies in Dorm 9 the day of Mr. Forrest's death had taken one of these courses. (*Id*, ¶¶9, 20, Exhibit 50, p. 2, lines 12-22 and p. 5; Exhibit 61, p. 2, line 13 to p. 3, line 2, pp. 10-11).

When an adult in custody asks for medical attention or has an emergency, jail deputies are to contact medical staff immediately. (Pedro Declaration, ¶26). Multnomah County health

---

[12] The terms "naloxone" and "Narcan" are used interchangeably in depositions and records. Naloxone refers to a synthetic drug that blocks opiate receptors in the nervous system. "Narcan" is a brand name for a nasally delivered version of the drug naloxone.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

staff has had naloxone available in the jail for years.  (Jones Declaration, ¶10, Exhibit 51, p. 2, lines 16-19).

## J.  HEALTH CARE AT INVERNESS

The Multnomah County Health Department – Corrections Division provides medical care to people in jail with onsite nurses and physicians and on-call providers.  (Declaration of Michael Seale, ¶10).  Nurses are onsite at all times, on-call physicians available by phone around the clock. (Seale Declaration, ¶11).

## K.  RELEVANT JOB REQUIREMENTS FOR COUNTY NURSES

County nurses must possess licensure from the Oregon State Board of Nursing to practice as a registered nurse, must have an associates or bachelor's from an accredited nursing program, and must be certified in basic life support ("BLS") and CPR. (Seale Decl, ¶12).  Nurses do not have advance cardiovascular life support ("ACLS") certification.  (*Id.*).   In the event of a patient emergency requiring intervention beyond BLS, nurses are to call for emergency medical services and provide BLS while they await emergency response.  (*Id.*).

## L.  POLICIES/TRAINING ON OPIATES AND NALOXONE

The Corrections Health division has policies for particular areas of care.  (Seale Decl, ¶¶13 – 19).  Corrections Health provides on-site nurses for 24/7 responses, and will arrange for emergency medical services ("EMS") when appropriate for treatment and transport.  (Seale Decl, ¶16, Exhibit 8).  Corrections Health has policies in place for patients withdrawing from various substances, including opiates.  (*Id.*, ¶17, Exhibit 9).  Nurses have naloxone and a specific policy in place for assessment and treatment of a potential opioid/opiate overdose.  (*Id.*, ¶18, Exhibit 10).

Page 18 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

County nurses have administered naloxone to patients at MCDC and MCIJ responding to known or possible opioid ingestion.  (Seale Declaration, ¶19).   Nurses are expected to know basic signs of opiate/opioid use in their required nursing education, and receive additional information through review of County policies when hired.  (Jones Declaration, ¶11, Exhibit 52, p. 4, lines 4-13; p. 5, line 4 to p. 6, line 4; p. 7, lines 9-19).   County Heath also circulated a notification to Inverness staff in 2016 that nasal narcan – in addition to intramuscular naloxone - was available, citing a County Health video on proper administration.  (*Id.*, Exhibit 52, p. 2, line 7 to p. 3, line 3; p. 7, line 24 to p. 8, line 5).

The nurses Plaintiff is suing - Koh Metea, Camille Valberg, Jacob Diamond, and Jami Wheeler - all had experience with naloxone, either through administering it themselves, being present when it was administered by others, and/or through County training materials.  (Jones Declaration, ¶¶12-15, Exhibit 53, pp. 2-4; Exhibit 54, p. 2, lines 7-25; Exhibit 55, pp. 2-3; Exhibit 56, p. 2, lines 10-18).

## M.     REVIEWS OF CORRECTIONS HEALTH POLICY AND PROCEDURES

The grand jury reviews health care policies and practices, as does Disability Rights Oregon.  (Seale Decl, ¶¶ 20 -21).  Neither organization raised concerns about nursing training or response to potential drug use.  (*Id.*).

Multnomah County also works with the National Commission on Corrections Health Care ("NCCHC"), a nonprofit organization with a mission of improving health care to people in local jails that promulgates model standards and audits and accredits facilities.  (Seale, ¶22, Cite to https://www.ncchc.org/jails-and-prisons/).  Multnomah County's health care policies were NCCHC-accredited in 2016 and in 2018.  Seale Decl, ¶23.  (*Id.*).  NCCHC never raised concerns with policies on treating drug overdoses or withdrawal.  (*Id.*).

Page 19 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## N.     RICHARD JASON FORREST'S BOOKING AND HISTORY

Richard Jason Forrest came into custody on April 29, 2019 after threatening his wife, in violation of his post-prison supervision terms.  (Pedro Declaration, ¶27, Exhibit 19).  Mr. Forrest had several felony convictions at the time[13].  (*Id.*, ¶28).  Mrs. Forrest did not mention heroin when she reported Mr. Forrest's threats to police.  (*Id.*, Exhibit 19).

Mr. Forrest had been in Multnomah County custody thirty-six times before.  (Pedro Declaration, ¶28, Exhibit 21).  Mr. Forrest never mentioned opiate use or withdrawal at any prior bookings, and denied being at risk of withdrawal during prior bookings.  (*Id.*, ¶29, Exhibit 22).  His April, 2019 booking was no different– he denied issues with substance abuse and did not mention opiate use or withdrawal.  (*Id.*, ¶28, Exhibit 21).

The consistent health issue for Mr. Forrest is asthma.  (Seale Declaration, ¶24, Exhibit 11, pp. 1-14).  Mr. Forrest always made sure to let staff know he had asthma, nurses made sure he always had a rescue inhaler.  (*Id.*).  This booking was no different - Mr. Forrest had an inhaler, staff gave him a "keep on person" form so deputies knew he should have it in his property.  (*Id.*, ¶25, Exhibit 11, pp. 15-18).  Nurses gave him a fresh inhaler a week later.  (*Id.*, ¶25, Exhibit 11, p. 19).

Mr. Forrest knew how to ask for help.  (Seale Declaration, ¶26, Exhibit 11, pp. 20-24).  From May 4, 2019 until his death, Mr. Forrest filed five medical request forms pertaining to inhaler, breathing, and/or allergy issues.  (*Id.*).  As cited in the First Amended Complaint, on May 4, 2019 – while in a different dorm than Dorm 9 and for the first time in his thirty-seven

---

[13] See, e.g., *State of Oregon v. Richard Jason Forrest*, Multnomah County Circuit Court Case Number 15CR04076.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

times in custody – Mr. Forrest asked for an opiate withdrawal protocol. (*Id.*, ¶27, Exhibit 11, p. 25).

Mr. Forrest told Stephanie Groenevelt, RN on May 5, 2019 that he uses heroin 'a lot' when she saw him to respond to that request and two others for tooth pain and an inhaler refill. (Seale Declaration, ¶28, Exhibit 11, pp. 32-33). Mr. Forrest said he couldn't sleep, but all his other symptoms were improving. (*Id.*). His vital signs were normal, and Nurse Groenveld educated him on the medications he would receive and how nursing checks would work. (*Id.*). Mr. Forrest told her he no longer wanted the service, and completed a refusal of treatment form. (*Id.*, ¶28, Exhibit 11, p. 24, p. 34).

There is no mention of opiates in his nursing exam three days later. (Seale Decl, ¶28, Exhibit 11, pp. 35-37). Mr. Forrest spoke to his wife on May 4th and May 8th, 2019 and made no mention of using heroin or withdrawing. (Pedro Declaration, ¶49). On June 10th, 2019, Mr. Forrest moved into Dorm 9 after being sentenced to a 180 sentence on his post-prison supervision violation. (Pedro Declaration, ¶¶30 - 33, Exhibit 23).

### O.    FACTS ABOUT DORM 9 – WORK CREW

Dorm 9 is an open dorm, direct supervision model – during the day and most of swing shift deputies are in the module or the indirect room looking out into the dorm. (Pedro Declaration, ¶34). Dorm 9 houses adults that are assigned to work crews – kitchen, laundry, outside work – who leave the dorm each day, and is organized into five to six bunk pods. (*Id.*, ¶¶34 -35). Dorm 9 had no history of any inmate overdoses. (*Id.*, ¶36).

Work crews have been part of Inverness since 1987, and it is a sought-after assignment for adults in custody to get out of the dorm, keep busy, and earn credit against their sentence. (ORS 169.120, Pedro Declaration, ¶36). Sergeant Daniel Brown is the sergeant in charge of the

Page 21 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Inverness work crew, overseeing deputies that transport and monitor outside work crews. (Jones Declaration, ¶7, Exhibit 48, p. 2, lines 9-19; p. 7, line 15 to p. 9, line 2). Sergeant Brown and deputies conduct strip searches at the end of shifts, and workers confirmed these strip searches took place every time they returned. (Jones Declaration, ¶¶16-18, Exhibit 57, p. 2, lines 8-10; Exhibit 58, p. 4, lines 9-25; Exhibit 59, p. 2, line 14 to p. 3, line 4 and Exhibit 48, p. 21, line 14 to p. 25, line 5).

### P. Forrest's Breathing Complaints in June and July, 2019

Mr. Forrest was assigned to bunk #28 adjacent to the recreation yard. (Pedro Declaration, ¶¶37 -38, Exhibits 25). The day Mr. Forrest moved into Dorm 9, deputies caught a Dorm 9 resident with contraband during a bunk search and moved him to Dorm 16, the dorm for people pending disciplinary sanctions or serving sanctions. (Pedro Declaration, ¶¶33, 37 – 40, Exhibits 24, 27).

Nurses checked in with Mr. Forrest regularly and filled orders for allergy medications, a rescue inhaler, and a corticosteroid inhaler for long-term relief of poorly controlled asthma and his complaints about breathing issues. (Seale Declaration, ¶29, Exhibit 11, pp. 21-23). Mr. Forrest refilled his rescue inhaler on July 8, 2019 and continued on daily allergy medication through July, 2019. (*Id.*, Exhibit 11, pp. 38-39).

### Q. Dorm 9 in June and July, 2019

#### 1. July 2, 2019 – Multiple Adults Removed from Dorms after Searches and UAs

On June 19, 2019, a deputy noted "a shakedown would be most useful" because he found "a garbage bag full of stuff[,]" during a search. (Pedro Declaration, ¶40, Exhibit 27, p. 12). Around that time, Sergeant Brown heard from a dorm deputy "some suspicion that inmates were

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

acting oddly…not sleeping," which was also flagged in the dorm diary. (Jones Declaration, ¶7, Exhibit 48, p. 15, line 9 to p. 16, line 7; Pedro Declaration, ¶40, Exhibit, p. 12).

Following up, on July 2nd, 2019 Sergeant Brown identified several individuals who were behaving suspiciously and demanded urine samples. (Jones Declaration, ¶7, Exhibit 48, p. 13, line 17 to p. 14, line 22). One individual gave a positive sample, and deputies found what they described as a "crack pipe" in searching his bunk. (Pedro Decl, ¶41, Exhibit 28).

The remaining three individuals refused to give samples and were disciplined. (Pedro Declaration, ¶41, Exhibit 28). Deputies searched their bunks, finding two needles. (*Id.*). Deputies removed all four men from Dorm 9 that day. (*Id.*, ¶33, Exhibit 24).

### 2.      July 3, 2019 - Shakedown of Entire Dorm

The next day, deputies conducted an unannounced search of the entirety of Dorm 9. (Pedro Declaration, ¶¶ 40, 42, Exhibit 27). All adults in custody moved out of the dorm and deputies went through the entire dorm, searching bunks and accessible areas. (Jones Declaration, ¶7, Exhibit 48, p. 10, line 8 to p. 13, line 12; Pedro Declaration, ¶33,40, 44, Exhibits 24, 27 and 29). There had been a previous full dorm shakedown about a month earlier, prior to Mr. Forrest's arrival in the dorm. (*Id.*, ¶42). Deputies did not uncover anything in addition to the contraband from the previous day. (*Id.*, ¶¶40, 42, Exhibit 27).

### 3.      July 3rd, 2019 to July 24th, 2019 – Searches and Discipline Continue

Deputies continued to search Dorm 9. On July 13th, deputies caught an individual smoking in the recreation yard, with four other people in the yard. (Pedro Declaration, ¶¶33, 40, 43, Exhibits 24 and 27). Deputies removed him from the dorm and searched his bunk and the bunks of the other four people, without finding any contraband of note. (*Id.*). A deputy flagged the other four individuals in the yard in the diary by name. (*Id.*).

Page 23 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Two days later, deputies caught one of those adults, Gangewer, with a syringe in the work crew van during an unannounced search and removed him. (Jones Declaration, ¶7, Exhibit 48, p. 17, line 1 to p. 18, line 23; Pedro Declaration, ¶¶33, 40, 44, Exhibits 24, 27 and 29). The same day a deputy searched bunks 1-5 where two of the adults from the yard, Pradith and Coffin, were assigned. (*Id.*). Two days later deputies compelled Pradith to give a urine sample which tested positive for drugs, and he was taken out of the dorm. (*Id.*). The day before Mr. Forrest's death, a deputy noted an incident he had while conducting bunk searches in Mr. Forrest's pod of beds. (*Id.*, ¶¶40, 45, Exhibit 27).

Given the July 3rd shakedown finding no additional paraphernalia and the discovery of the syringe in the van, and what Gangewer had told him about using outside, Sergeant Brown believed adults were using on work duty, so he instructed work deputies to watch workers closely and use searches outside the facility. (Jones Declaration, ¶7, Exhibit 48, p. 19, line 3 to p. 20, line 23).

Other adults in custody, including people Plaintiff cited in the First Amended Complaint, testified that deputies searched bunks and pods of bunks in Dorm 9 randomly and frequently before Mr. Forrest's death. (Jones Declaration, ¶¶30, 17, 18, 22, Exhibit 73; Exhibit 58, p. 6, line 15 to p. 7, line 23, p. 8, line 6 to p. 9, line 2; Exhibit 59, p. 4, lines 5-23, p. 5, line 17 to p. 6, line 1; Exhibit 63, p. 5, line 3 to p. 6, line 7). None of the individually named Sheriff's department defendants were involved in the ongoing searches, and no one communicated anything described above to any individually named defendant. (Pedro Declaration, ¶46).

### 4. Mr. Forrest's Calls with Mrs. Forrest.

Mr. Forrest and his wife spoke regularly. (Pedro Declaration, ¶49; Jones Declaration, ¶19, Exhibit 60, p. 4, lines 15-23). Mrs. Forrest was very familiar with Mr. Forrest's drug use,

Page 24 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

so much so she could tell by his voice if he'd been using. (*Id.*, Exhibit 60, p. 2, line 16 to p. 3, line 11). When Mr. Forrest complained of drowsiness, Mrs. Forrest thought nothing of it, assuming he was simply drowsy from his allergies. (*Id.*, Exhibit 60, p. 7, lines 2-11, p. 7, line 22 to p. 8, line 5 and p. 8, line 13 to p. 9, line 4). Ms. Forrest testified she had no idea Mr. Forrest was using either methamphetamine or heroin while in jail. (*Id.*, Exhibit 60, p. 4, line 15 to p. 6, line 7).

### R.    July 25, 2019

#### 1.    6:50 a.m. – 3:00 p.m. – Mr. Forrest Having Breathing Issues During Work Assignment

Mr. Forrest left Dorm 9 for work at 6:50 a.m.. (Pedro Declaration, ¶¶ 33, 50, Exhibit 24, 30). Work crew deputies strip searched Mr. Forrest and the rest of the crew before returning to Dorm 9 just before 3:00 p.m. (*Id.*).

Others working with Mr. Forrest that day remember he was having breathing issues, coughing, using his inhaler, and seeming visibly tired. (Pedro Declaration, ¶ 50, pp 7-8). One coworker told investigators after the fact that Mr. Forrest had used heroin in the work truck that morning, but seemed fine. (*Id.*). Another adult in custody said he saw Mr. Forrest doing "bumps" of what he believed to be heroin approximately fifteen to thirty minutes before Mr. Forrest approached deputies for help. (Jones Declaration, ¶17, Exhibit 58, p. 2, line 23 to p. 3, line 18 and p. 11, lines 8-23).

#### 2.    5:42 – 5:45 p.m. – Mr. Forrest in Respiratory Distress Before Approaching Deputies.

At approximately 5:42 p.m., Mr. Forrest was near his bunk, bent over at the waist with hands on his knees while a nurse was in the dormitory. (Pedro Declaration, ¶¶33, 55, Exhibits 24 35; Jones Declaration ¶38, Exhibit 76). After the nurse left, Mr. Forrest walked to the bathroom

Page 25 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

and into a stall, pausing multiple times to bend at the waist, visibly struggling to breathe. (Pedro Declaration, ¶54, Exhibit 34, R Dorm, 5:44:00 – 5:44:15, ¶52, Exhibit 32, Phone/Toilet 5:44:10 – 5:44:27. Mr. Forrest left the stall after fifteen seconds and walked to the indirect module and knocked, again stopping on the way to bend over and use his inhaler. (Pedro Declaration, ¶52, Exhibit 32, Phone/Toilet 5:44:27 – 5:45:12).

### 3. 5:45 p.m. - Deputies Maxwell and McClure Call for Nurse After Mr. Forrest Tells Them He Can't Breathe and Needs An Inhaler.

Deputy Jason McClure responded to Mr. Forrest's knock as he again used his inhaler. (Pedro Declaration, ¶53, Exhibit 32, Phone/Toilet 5:45:12 – 5:45:17). Mr. Forrest told Deputy McClure he needed a nurse and that he could not breathe. (*Id.*, ¶50, Exhibit 30, pp. 5-6). Deputy McClure immediately radioed for a nurse, then made a second call asking to bring an inhaler. (*Id*).

Mr. Forrest remained at the desk, leaning forward and using his inhaler, near Sergeant William Maxwell. (Pedro Declaration, ¶53, Exhibit 33, Desk/Entry 5:45:12 to 5:46:37; Jones Declaration ¶39, Exhibit 77). Another adult in custody nearby heard Mr. Forrest say he couldn't breathe and needed an inhaler around this time. (Jones Declaration, ¶22, Exhibit 64, p. 2, lines 3-15, p. 3, line 21 to p. 4, line 2).

### 4. 5:47 p.m. – Defendant Camille Valberg, RN Arrives

Defendant Camille Valberg, RN was not assigned to Dorm 9 but responded first, entering the dorm at 5:47 p.m.. (Jones Declaration, ¶41, Exhibit 79; ¶13, Exhibit 54, p. 3, line 22 to p. 4, line 7). Mr. Forrest visibly raised his inhaler as Nurse Valberg set up her cart behind him. (Pedro Declaration, ¶52, Exhibit 32, Phones/Toilets 5:47:05 – 5:47:11).

When deputies relayed Mr. Forrest needed an inhaler, Nurse Valberg responded she did not know if she had one on her cart, but would check. (Jones Declaration, ¶13, Exhibit 53, p. 4,

Page 26 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

lines 5-18; Pedro Declaration, ¶50, Exhibit 30).  As she looked, Sergeant Maxwell radioed for another nurse to bring an inhaler.  (Jones Declaration, ¶20, Exhibit 61, p. 4, line 18 to p. 5, line 24).  This is visible on video around 5:47:27 p.m. as Sergeant Maxwell raises his right hand  and ducks his head towards his microphone on his right shoulder.  (Pedro Declaration, ¶51, Exhibit 31).

After she confirmed she didn't have an inhaler, Nurse Valberg knelt next to Mr. Forrest, leaning in to assess him while she waited for another nurse.  (Jones Declaration, ¶13, Exhibit 54, p. 5, lines 2-25).  Mr. Forrest did not speak, and Nurse Valberg charted Mr. Forrest's breathing was not labored as expected but more shallow.  (Seale Declaration, ¶24, Exhibit 11, p. 80).  She described his affect as calm and, given his request for an inhaler, attributed his breathing pattern as that of an experienced asthmatic trying to avoid hurried breathing.  (Jones Declaration, ¶13, Exhibit 54, p. 5, line 10 to p. 7, line 17).  She attempted to take Mr. Forrest's pulse and oxygen readings, but could not keep the pulse oximeter on his finger.  (Seale Declaration, ¶24, Exhibit 11, p. 80; Pedro Declaration, ¶52, Exhibit 32 – Phones/Toilets 5:47:50 – 5:48:12).

### 5.  5:48 p.m. – Defendant Koh Metea, RN and Medication Aides Stephanie Stewart and Amy Hatton Arrive

Just over a minute after Nurse Valberg's arrival, Defendant Koh Metea, RN, arrived with Stephanie Stewart and Amy Hatton, two medication aides, and a separate medical cart.  (Jones Declaration, ¶¶21, 42, Exhibits 62, p. 2, line 18 to p. 3, line 12; Exhibit 80).  Nurse Metea moved to take Mr. Forrest's pulse, and Ms. Stewart unboxed a fresh inhaler and placed it on the counter.  (*Id.*, ¶¶12, 21, Exhibit 53, p. 12, line 24 to p. 13, line 5; Exhibit 62, p. 5, lines 2-19; Pedro Declaration, ¶53, Exhibit 32 at approximately 5:49:10 p.m. to 5:49:30 p.m.).

Nurse Valberg began setting up supplemental oxygen, opening a sealed mask and handing it to Nurse Metea as Nurse Metea secured the mask on Mr. Forrest's face.  (Jones

Page 27 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Declaration, ¶13, Exhibit 54, p. 8, line 21 to p. 9, line 18; Pedro Declaration, ¶51, Exhibit 31).

Ms. Stewart began recording information about Mr. Forrest. (Jones Declaration, ¶21, Exhibit 62, p. 4, lines 2-19, p. 5, lines 9-14).[14]  None of the nurses had any information that Mr. Forrest had used drugs. (Jones Declaration, ¶¶12-13, Exhibit 53, p. 16, lines 8-12; Exhibit 54, p. 12, lines 4-14).

### 6. 5:50 p.m. Nurse Metea Tells Deputies to Call 911

At 5:50 p.m., Nurse Metea told deputies to call 911 and Sergeant Maxwell moved into the indirect to make the call. ((Jones Declaration, ¶12, Exhibit 53, p. 11, lines 5-15; Pedro Declaration, ¶51, Exhibit 31, 5:50:00 p.m. to 5:50:15). Nurse Valberg visibly pointed to the fresh albuterol inhaler, Ms. Stewart handed it to Nurse Metea, and Nurse Metea moved the oxygen mask up to administer albuterol. (Jones Declaration, ¶13, Exhibit 54, p. 11, lines 19-23; Pedro Declaration, ¶52, Exhibit 32 – Phones/Toilets 5:50:00 – 5:50:35. Nurse Valberg made a chart entry for both the administration of supplemental oxygen and the attempts at the albuterol rescue inhaler at 17:49. (Jones Declaration, ¶13, Exhibit 54, p. 10, line 13 to p. 11, line 3; , Seale Declaration, ¶24, Exhibit 11, p. 80). Ms. Hatton stood by Mr. Forrest, holding him as the nurses tried to administer oxygen and albuterol. (Pedro Declaration, ¶ 55, Exhibit 35).

As nurses gave oxygen and albuterol, Sergeant Maxwell told the 911 dispatcher that Mr. Forrest "said he was having an asthma attack, he had his inhaler, he was trying to get puffs out of it, the difficulty breathing just got worse as the medical staff was trying to examine him, and then he just kinda passed out." (Jones Declaration, ¶23, Exhibit 64). Sergeant Maxwell did not say anything about drug use. (*Id.*).

---

[14] Despite a diligent search, Defendants have not been able to locate these notes.

Page 28 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*/// /// ///*

*/// /// ///*

### 7.    5:51 p.m. – 6:01 p.m. – Medical Staff Initiate and Continue CPR/Basic Life Support

At 5:51 p.m., approximately four minutes after nurses first began treating Mr. Forrest for what they understood to be an asthma attack, Mr. Forrest had become unresponsive, was not breathing, and did not have a pulse.  (Declaration of Koh Metea ¶5).  They lowered Mr. Forrest to the floor as Nurse Valberg grabbed an automated external defibrillator (AED).  (Pedro Declaration, ¶55, Exhibit 35).  Defendant Jami Wheeler, RN, arrived shortly after deputies began chest compressions, and nurses and medication aides gave external ventilation through rescue breathing and bag-valve mask ventilation.  (Jones Declaration, ¶43, Exhibit 81).  Nurse Wheeler did not hear anything about heroin use or narcan at that time.  (Jones Declaration, ¶14, Exhibit 55, p. 4 (61:1 – 62:1)).

Deputies and jail medical staff continued basic life support with chest compressions and external bag mask ventilation, pausing to apply two different AED machines, which did not advise a shock.  (Pedro Decl,, Ex 32, Seale Decl, Ex 7, p. 80)  Everyone understood Mr. Forrest to have collapsed due to his asthma deterioration – none of the nurses had any information as they gave BLS that suggested Mr. Forrest had taken opiate/opioids.  (Jones Declaration, ¶12, Exhibit 53, p. 14, line 23 to p. 15, line 12).  Nurse Jacob Diamond arrived at approximately 6:00 p.m. and took over chest compressions.  (*Id.*, ¶44, Exhibit 82).

### 8.    6:01 – Portland Fire & Rescue Arrive and Begin ALCS

Portland Fire & Rescue first responders, including Dennis Bell, arrived at approximately 6:01 p.m.  (Pedro Declaration, ¶55, Exhibit 35, Jones Declaration, ¶45, Exhibit 83).  Mr. Bell's team had no information about possible opiate/opioid use on arrival.  (Jones Declaration, ¶24,

Page 29 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit 66, p. 5, lines 2-12). Mr. Bell began to set up intubation and other Portland Fire staff set up an electrocardiogram indicating Mr. Forrest was without a detectable heart rhythm and without a pulse. (Jones Decl, ¶¶24-25, Exhibit 66, p. 2, lines 9-22, Exhibit 67). Two minutes after arrival, at 6:03 p.m., no one from Portland Fire had administered naloxone. (*Id.*, ¶24, Exhibit 66, p. 5, line 2 to p. 7, line 18).

### 9. 6:04 – Delontae Dickinson Approaches Deputy

At approximately 6:04:28, a man gets up and walks over to a deputy monitoring the dorm. (Pedro Declaration, ¶54, Exhibit 34 - Right Dorm 6:04:25 – 6:04:30). The person assigned to that bunk, Delontae Dickinson, later pled guilty to unlawful delivery of heroin and conspiring to supply contraband into Inverness Jail. (Pedro Declaration, ¶¶35, 44, Exhibits 25, 29; Jones Declaration, ¶27, Exhibit 69).

### 10. 6:05 – Portland Fire Administers Naloxone for First Time.

After speaking to Mr. Dickinson, the deputy walks directly to the paramedics. (Pedro Declaration, ¶52, Exhibit 32). Paramedics administered naloxone at 6:05:16 p.m., within a minute of that deputy approaching. (Jones Declaration, ¶25, Exhibit 67). Defendants Wheeler and Diamond remember the first mention that Mr. Forrest may have done heroin came after paramedics had arrived. (Jones Declaration, ¶14, Exhibit 55, p. 4 (page 62:2 to 62:15); Pedro Declaration, ¶ 50, Exhibit 30, pp. 12-13).

### 11. 6:08: AMR Arrives and Continues Care.

Portland Fire & Rescue staff tried to intubate Mr. Forrest and were unable to establish an airway. (Jones Declaration, ¶¶ 24, 26, Exhibit 66, p. 4, lines 1-22, Exhibit 68). Later arriving AMR administered epinephrine and a defibrillator, which did not advise a shock. (*Id.*, ¶26,

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

Exhibit 68).  AMR transported Mr. Forrest out of the facility around 6:25 pm but did not administer naloxone.  (*Id.*).

### 12. 6:47 p.m. – Mr. Forrest Arrives at Portland Adventist Emergency

Doctors at Portland Adventist saw a brief resumption of heart rhythm after releasing air from Mr. Forrest's chest cavity, later diagnosed as a collapsed lung.  (Jones Declaration, ¶28, Exhibit 71).  Physicians were unable to resuscitate him and stopped lifesaving measures at 6:55 pm.  (*Id.*).

### S. MCSO Investigation Following Mr. Forrest's Death

Sheriff's deputies began an investigation into the circumstances of Mr. Forrest's collapse. (Jones Declaration, ¶29, Exhibit 72, p. 5, lines 11-18).  Multnomah County Sheriff's detective Joshua Zwick noticed that adult in custody John Christian appeared under the influence during an interview that evening.  (*Id.*, ¶29, Exhibit 72, p. 2, line 11 to p. 4, line 20; Pedro Declaration, ¶50, Exhibit 30).  Deputies began investigating Mr. Christian as the potential source of drugs, and ultimately arrested and charged him with conspiracy and delivery of heroin into Inverness. *United States v. John Michael Christian*, USDC 22-CR-00337-IM, ECF 101, 123)[15].

There is no evidence that any individual defendants had any information about Mr. Forrest, had any involvement in Mr. Forrest's time in Dorm 9, or knew anything at all about Mr. Forrest or any issues with drugs in the dorm prior to his death.  (Pedro Declaration, ¶46).

### T. Body Scanner Review and Purchase

---

[15] Multiple other conspirators were charged in Oregon Circuit Court.

Page 31 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

No Oregon jail used a body scanner before 2017, and not every facility in Oregon uses one today. (Pedro Declaration, ¶¶55 – 61). The largest correctional entity in the state – the Oregon Department of Corrections - does not utilize body scanners. (*Id.*, ¶¶58 – 61).

Defendant Reese was the person with authority to purchase scanners, and he understood they are not foolproof. (Jones Declaration, ¶6, Exhibit 47, p. 2, line 15 to p. 3, line 9). Before making an outlay of hundreds of thousands of dollars, Sheriff Reese wanted more information about how the scanners performed in other jails. (*Id.*, ¶6, Exhibit 47, p. 9, line 14 to p. 12, line 18). Former Chief Deputy of Corrections Michael Shults' 2017 email cited in the First Amended Complaint (ECF 17, ¶ 54) identifies some of the concerns on costs, efficacy, and the effect of a "false positive" that the Sheriff's Office was considering. (Pedro Declaration, ¶64, Exhibit 39).

The rate of false positives or inconclusives is important because of the significant restrictions for an adult in custody. The resultant isolation - in a cell for a period of hours or days with no plumbing or personal effects and close supervision – is substantial. (Pedro Declaration, ¶ 18, Exhibit 17, pp. 13-25). See also OAR 291-011-0025(3), ODOC 40.1.11.

Further, the alternative to placing a person in a dry cell – transport to a medical facility for imaging or intrusive search – is a substantial undertaking. (Pedro Declaration, ¶17). A medical transport requires minimum one deputy accompany the person to the medical facility and stay with them for the entirely of their time. (*Id.*). Given these realities, whether other facilities were seeing false positives and at what rate and impact to the adults in custody was a consideration.

Even scanner manufacturers recognize limitations. (Pedro Declaration, ¶¶ 4-6). In 2017 and 2018 the Sheriff was still determining issues like machine size, facility modification, power

Page 32 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

requirements, and training requirements for staff. (Jones Declaration, ¶14, Exhibit 55, p. 4, line 23 to p. 5, line 25, p. 4, lines 6-22, p. 6, line 1 to p. 7, line 14). The Sheriff did not have sufficient information on performance of the scanners to make the purchase before 2019. (Pedro Declaration, ¶64, Exhibit 39).

### U.    Funding Sources and Purchasing Decisions

Plaintiff will likely argue the Sheriff's Office had funds at the end of fiscal years 2018 and 2019 to purchase body scanners at Inverness. Though the Sheriff has authority on how to spend the Board-allocated budget, the Sheriff cannot commit hundreds of thousands of dollars on a whim. The Sheriff must confirm there are actually dollars available for purchase in the budget, and must follow Oregon law for local budgeting and for public contracting and procurement. (Declaration of Peter Schlimpert, ¶10).

The Sheriff's Office budgets for fiscal years 2018 and 2019 did not include specific asks for body scanners for either MCDC or MCIJ, instead funding other priorities and needs. (Schlimpert Declaration, ¶¶8-9). The Sheriff's Office was not able finalize the purchase of scanners until fiscal year 2020, when there were sufficient capital budget dollars for the purchase in amounts allocated by the Board, and when Multnomah County Sheriff's Office fiscal staff confirmed that cooperative use of a competitively bid Clackamas County contract met state and local procurement requirements. (*Id.*, ¶10).

### V.    Necessary Procedures for Bringing Scanners Online

The Sheriff's Office did not immediately begin using scanners after the Sheriff authorized the purchase. (Pedro Declaration, ¶60)[16]. There was additional time to allow for

---

[16] This evidence is offered for the limited purpose of demonstrating the process for installation. Fed. R. Evid 105.

Page 33 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

installation, receipt of a radiation exemption, and manufacturer training on use and interpretation. (Pedro Declaration, ¶¶61). Throughout this entire time, MCSO was utilizing search policies described above. (Jones Declaration, ¶6, Exhibit 47, p. 13, lines 2-16; Pedro Declaration ¶61).

### W.    Jail Phone Call Volume

One of Plaintiff's allegations pertains to failing to surveil specific calls. (ECF 17, ¶111(i)). While non-legal jail calls are subject to monitoring, the Sheriff's office cannot monitor every call. (Pedro Declaration, ¶62). As an example, in July, 2019 alone there were more than 41,000 calls from MCDC and MCIJ totaling over 408,000 minutes. (*Id.*, ¶63, Exhibits 37 and 38).

### X.    Expert Review and Reporting

Plaintiff alleged "if [Mr.] Forrest had received timely and appropriate medical care, he would not have died" (ECF 17, ¶119). Plaintiff demurred on additional details until expert disclosures. (Jones Declaration, ¶30, Exhibit 73). Plaintiff did cite the state medical examiner's report listing the cause of death as combined toxic effects of heroin and methamphetamine, with bronchial asthma as a significant condition. (*Id.*).

On January 31st, 2023 plaintiff provided eight reports, three from medical doctors stating Mr. Forrest died of an overdose of heroin and methamphetamine, that administering naloxone was the standard of care, and administering naloxone would have prevented Mr. Forrest's death. (Jones Declaration, ¶31). One doctor opined naloxone was the only intervention that could have affected the outcome and "all other measures, such as lying the patient down, defibrillator application, and CPR are essentially useless in the absence of respirations in the presence of a Narcotic overdose." (*Id.*). Dr. Freedman opined "by the time Nurse J. Diamond arrived on the

Page 34 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

scene, the opportunity to affect the results via Narcan had passed." (Jones Declaration, ¶34, Freedman Report, p. 4)[17].

Defendants had medical doctors review the care and circumstances of Mr. Forrest's death. These doctors, along with a nurse with experience in corrections health, opine the nurses provided appropriate care in their initial assessment and treatment of an asthma attack, and in their response to Mr. Forrest's cardiac arrest, and that administering naloxone would not have changed the outcome. (Declarations of L. Keith French, Kathy Wild, Don Sullivan).

## IV.    SUMMARY OF CLAIMS

Plaintiff brings three claims under 42 U.S.C §1983 and three state law claims, naming eight defendants and listing more than twenty theories of wrongdoing, in particular:

Eighth Amendment – Defendants Reese, Jeffrey Wheeler, Alexander, (the "Individual Sheriff Defendants"). Plaintiff claims these individuals were "aware of" policy failings alleged in Paragraph 111 and "allowed, approved of, and ratified[18]" each of them. Plaintiff also alleges these defendants inflicted cruel and unusual punishment on Mr. Forrest by failing to purchase body scanners at Inverness following a 2015 overdose death at MCDC, a different facility.[19]

Eighth Amendment – Defendants Valberg, Metea, Wheeler, Diamond (the "Individual Nursing Defendants"). Plaintiff claims four nurses inflicted cruel and unusual punishment by

---

[17] The other five reports came from a nursing expert, an EMT, a neuropsychologist, and two former jail command staff from the state of Washington. Defendants reserve their rights to object to some or all of Plaintiff's experts, and portions of all expert materials offered or quoted above are for purposes of Fed. R. Civ. P 56 motions.
[18] ECF 17, ¶126.
[19] Id., ¶127.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

failing to administer naloxone.[20]    Administering naloxone is the only treatment Plaintiff's experts identified that would have resulted in a different outcome. (Jones Decl, ¶¶29 – 32)

Eighth Amendment - Multnomah County – *Monell*.[21] `There are five groups of alleged policy-level failings:[22] (1) hiring medical staff "indifferent to the medical needs" of adults in custody,[23] (2) failure to train medical staff on overdose detection and response,[24]  (3) failure to train deputies on overdose detection and response,[25] (4) deficient policy of not purchasing and using full body scanners before 2019,[26] and (5) deficient facility security at Inverness jail.[27] There are also allegations of unspecified failures "to take appropriate measures" after an overdose in jail.[28]

ORS 30.265 et seq – Multnomah County – State law claim under the Oregon Tort Claims Act ("OTCA") mirroring allegations against Multnomah County under 42 U.S.C. §1983.[29]

ORS 30.265 – wrongful death – "gross negligence/reckless misconduct" Restating OTCA claim with reckless mental state to bar any consideration of comparative fault.

ORS 30.265 – wrongful death – negligent hiring and retention.  OTCA claim that Multnomah County negligently hired and retained Defendant Valberg because another lawsuit

---

[20] *Id.*, ¶¶117 – 118.
[21] Plaintiffs also name Sheriff Reese in both his individual and official capacity.  Claims against the Sheriff in his official capacity are equivalent to claims against Multnomah County under 42 U.S.C. §1983.
[22] ECF 17. ¶111, sub k, m.
[23] Id. ¶111, subparagraph n.
[24] *Id.* ¶111, sub k, m.
[25] *Id.* ¶111, sub. g, j, l.
[26] *Id.*, ¶111, sub. f.
[27] *Id.*, ¶111 sub. a, b, c, d, e, f, h, i.
[28] *Id.* ¶111, sub. o, p.
[29] *Id.*, compare  ¶111 with ¶132.

Page 36 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

had been filed (para 86) about her care at a different jail[30], and she had filed for a protective order against the spouse of a coworker.[31]

## V.    SUMMARY JUDGMENT STANDARD

This Court outlined the standard in *Lund v. United States*, 2022 WL 19039088 1, 4 (D. Or., Dec 7, 2022) and *Kunzetov v. Zamrippa*, 2002 WL 5244251 1, 3-4 (D. Or Oct 6, 2022)(internal citations omitted).  Any inferences to be drawn from any record evidence "cannot be mere speculation, intuition, or guessing." *Poppell v. City of San Diego*, 149 F.3d 951, 954 (9th Cir. 1998).

## VI.    ARGUMENT

### A.    42 U.S.C. §1983 – Eighth Amendment Claims

#### 1.    Eighth Amendment Is A Demanding Standard for Plaintiffs.

The Eighth Amendment prohibits jails from inflicting cruel and unusual punishment on people. *Helling v. McKinney*, 509 U.S. 25, 31-32, 113 S.Ct. 2475 (1993).  The Eight Amendment "is not an easy [standard]" for a plaintiff to satisfy; it is neither "a basis for broad prison reform" nor a guarantee of comfortable amenities.  *Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002).

A condition or medical care giving "the minimum civilized measure of life's necessities" does not violate the Eighth Amendment.  *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981).

 Plaintiff alleges nurses and staff inflicted punishment on Mr. Forrest through grossly inadequate medical care and inhumane conditions of confinement.  *Bearchild v. Cobban*, 947

---

[30] *Id.*, ¶86.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

F.3d 1130, 1140 (9th Cir. 2020). Only conditions or care "incompatible with evolving standards" of society, or that cause "unnecessary and wanton infliction of pain" are so severe as to inflict cruel and unusual punishment. *Estelle v Gamble*, 429 U.S. 97, 102-103, 97 S.Ct. 285 (1976).

Jail administration is difficult. It is "committed to the responsibility of the [legislative and executive] branches[,]" and courts recognize "separation of powers concerns counsel a policy of restraint." *Hoffman v. Preston*, 26 F.4[th] 1059, 1072 (9th Cir. 2022)(withdrawn on other grounds), quoting *Turner v. Safley*, 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Courts recognize this difficulty and exercise this restraint in three ways relevant in this case.

First, courts look to why the policies are in place. The Eighth Amendment protects against only conditions or treatment "totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392 (1981). A course of action justified by legitimate penological reasons, therefore, does not violate the Eighth Amendment. While *Turner* does not supply the rule, courts still consider *why* policies exist to assess Eighth Amendment claims. *Chappell v. Mandeville*, 706 F.3d 1052, 1059 (9th Cir. 2013), *Berg v. Kincheloe*, 794 F.2d 457, 462 (9th Cir. 1986).

Second, the risk must be certain and it must be grave beyond any norm. *Hines v. Youseff,* 914 F.3d 1218, 1229 (9th Cir. 2019), *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970 (1994). Some likelihood of harm is not enough. *Hines*, 914 F.3d at 1229. Further, some risk is not enough - the risk must be "so grave" it "violates contemporary standards of decency" to even "expose *anyone unwillingly* to such a risk[,]" even for a moment. *Id.* (emphasis partially added), quoting *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475 (1993).

---

[31] *Id.*, ¶90.

Page 38 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Third, people must have a culpable state of mind. The Eighth Amendment "is not implicated by a lack of due care or an official causing unintended injury[.]" *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668 (1986). It applies to "obduracy and wantonness, not inadvertence or error in good faith." *Somers v. Thurman*, 109 F.3d 614, 622 (9th Cir 1997). An individual defendant must know of facts suggesting a serious and excessive risk, must subjectively infer that risk, and must disregard it nevertheless. *Farmer,* 511 U.S. at 837. An individual must act with a reckless state of mind "analogous to how that phrase is used in criminal law." *Simmons v. G. Arnett*, 47 F.4th 927, 934 (9th Cir. 2022), quoting *Farmer*, 511 U.S. at 839.

Plaintiff asks this Court to go further than any Court before. Plaintiff claims the County, the Sheriff, and two facility commanders inflicted cruel and unusual punishment when, despite no personal knowledge, they did not stop Mr. Forrest from obtaining and consuming drugs in violation of state and federal law. Plaintiff also claims individual County nurses that are visibly giving oxygen and albuterol and administering CPR were not trying to help him, but were inflicting punishment with a state of mind approaching criminal recklessness.

### 2. Individual Sheriffs Defendants are Entitled to Summary Judgment

#### a. *Reese, Alexander, and Jeffrey Wheeler Had No Personal Involvement with Mr. Forrest's Death.*

42 U.S.C. §1983 requires personal involvement. *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir. 1998), citing *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir.1980). This is the rule for facility commanders and the sheriff also – they are not liable if they neither personally participated in nor directed a violation. *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680 (9th Cir. 1984), *Peralta v. Dillard*, 744 F.3d 1076, 1985 (9th Cir. 2014).

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

This ends the case for Sheriff Reese and Defendants Alexander and Jeffrey Wheeler. None of these individually named defendants set in motion, or refused to stop, the acts of others that they knew would cause an Eighth Amendment violation. *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018). They must be dismissed.

> **b.** **Plaintiff Cannot Demonstrate Subjective Indifference by Any Named Sheriff's Office Defendant.**

Plaintiff will argue these defendants could have purchased body scanners or made policy changes that could have allowed work drew or dorm deputies to detect the drugs Mr. Forrest obtained and took, and therefore could had prevented his death. This ignores intent.

An individual is only liable for a third party's actions under 42 U.S.C. §1983 when the individual has "at least the same level of intent as would be required" for a direct claim. *Peck v. Montoya*, 51 F.4th 877, 890-891 (9th Cir. 2022), citing *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012). No individual Sheriff's office defendant was aware that anyone in Inverness Dorm 9 was at a substantial risk of serious harm because of drugs being smuggled into that facility. *Strizich v. Batista*, 2022 WL 823587 1, 2 (9th Cir. March 18, 2022).

Drug smuggling and use in jails are "intractable problems." *Overton v. Bazzetta*, 539 U.S. 126, 134, 123 S.Ct. 2162 (2003). They are but one of the problems jails face that are "not capable of easy solutions." *Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861 (1979). Jail officials are not strictly liable under the Eighth Amendment for a drug overdose in a jail because they are aware this problem exists. Rather, there must be a particularized, longstanding, and extreme risk in *their* jail facility before liability can attach.

Multnomah County's rates of death from drug/alcohol were a fraction of national levels. Third party reviews did not raise concerns. Training specifically identified opiate signs and

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

responses and nurses are always onsite for backup with narcan. Deputies were searching Dorm 9 and removing people in the months beforehand.

Further, there are no facts from which the individual Sheriff's defendants could form the requisite subjective knowledge. There is no evidence Sheriff Reese or Deputies Alexander and Jeffrey Wheeler knew about any problem in Dorm 9. There is no evidence anyone communicated anything to them. There is no triable issue as to the individual Sheriff's defendants.

> ### c. The Record Does Not Satisfy Eighth Amendment Requirements for Objective Risk.

The conditions at Inverness must have been so grave as to deprive Mr. Forrest of "'the minimal civilized measures of life's necessities'" and to create a "substantial" risk to his health and safety to meet the objective component. *Norbert v. City and County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021). Drugs do not create the same generalized and indiscriminate risk of harm as an environmental hazard. *Cf. Helling*, 509 U.S. at 28 (involuntary exposure to tobacco smoke). Drugs create risks primarily for people that voluntarily consume them.

An adult in custody's voluntary consumption of drugs that are prohibited by law and jail rules is flatly inconsistent with punishment. Multiple circuits, prior to 2019, reached this conclusion; an adult in custody that voluntarily encounter a risk cannot sue under the Eighth Amendment for injury resulting from that risk. *Haas v. Weiner*, 765 F.3d 123, 124 (8th Cir.

/// /// ///

/// /// ///

/// /// ///

/// /// ///

Page 41 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1985), *Christopher v. Buss*, 384 F.3d 879, 882-883 (7th Cir. 2004), *Legate v. Livingston*, 822

F.3d 207, 210-211 (5th Cir 2016)[32]. The same rational applies here.

Indeed, more than a generalized risk is required even in recognized "failure to protect"

cases. Jails and prisons are known to house people that are violent, as well as people that can

become suicidal. *Hudson v. McMillan*, 468 U.S. 517, 525, 104 S.Ct. 3194 (1984), *Conn v. City

of Reno*, 591 F.3d 1091, 1095 (9th Cir. 2010) (reinstated at 658 F.3d 897 (9th Cir. 2011)). That

does not make jails liable for any assault or suicide that occurs.

Rather, failing to protect from assault requires specific facts for the objective factor, like

tensions between gangs or specific threats to a specific person. Compare *Green v. Gilbert, 830

Fed. Appx. 543, (9th Cir. 12/2/20)*, *Mickens v. Stafford Creek Correction Center*, 132 Fed. Appx

691 (9th Cir. 2005), citing *Berg*, 794 F.2d at 459, with *Cortez v. Skol*, 776 F.3d 1046, 1051-1053

(9th Cir. 2015). For a suicide, there must be facts showing a "heightened risk" for a given person

through specific behaviors. *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1018 (9th Cir.

2010).

Putting aside the separate issue of Mr. Forrest volitionally taking the drugs, the

generalized risk of drugs does not satisfy the objective prong for an Eighth Amendment claim.

Even today Oregon jails and prisons do not uniformly use body scanners despite the generalized

known risk of contraband.

---

[32] The Sixth Circuit recently found an Eighth Amendment claim against individual defendants
could proceed past Rule 12(b)(6) motions because the allegations were not "a run of the mill
drug overdose case." *Zakora v. Chrisman*, 44 F.4[th] 452, 474 (6th Cir. 2022). The complaint
alleged individual defendants knew decedent was a heavy drug user, that other prisoners told
individual defendants precisely how drugs were coming in before decedent's death, that two
people in the decedent's 16 person dorm overdosed the day prior, and that individual defendants
took no action whatsoever. *Zakora*, 44 F.4[th] at 474-475.

Page 42 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### d.  No Causal Link Between any Individual Sheriff's Office Defendant and Mr. Forrest's Harm.

A supervisory defendant's wrongful conduct must be causally linked to the violation. *Felarca v. Birgeneau*, 891 F.3d 809, 819-820 (9th Cir. 2018).  Facts showing the link "must be individualized and focus on the duties and responsibilities of each individual defendant[.]" *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

Neither Sheriff Reese nor the facility commanders set in motion or failed to terminate any acts that they should have known would cause a constitutional injury. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  Defendant Jeffrey Wheeler in particular, given he had no duties or responsibilities at Inverness. *Felarca*, 891 F.3d at 820.  The ultimate harm that befell Mr. Forrest came from his own volitional drug use, not from an individual defendant's infliction of that harm.  There is no connection between any act by any deputy in Dorm 9 and the actions of any individual defendant, and thus the claim must fail. *Id.* at 820-821.

#### e.  Qualified Immunity Bars a Claim Against Sheriff Reese or Chief Deputies Alexander and Wheeler.

Qualified immunity asks: (1) whether the individual defendant violated the Eighth Amendment; and (2) whether every reasonable official in that position would realize what they were doing violated the Eighth Amendment. *O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021).

The second question asks whether the law was "clearly established" by then-existing law. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600-601 (9th Cir. 2019).  That question is "a question of law that only a judge can decide." *Simmons*, 47 F.4th at 934, citing *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).  Courts may answer in either sequence, mindful to "think hard, and think again" before addressing the first if immunity attaches under the second. *District*

Page 43 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*of Columbia v. Westby*, 138 S.Ct. 577, 589, fn 7 (2018), quoting *Camreta v. Greene*, 563 U.S. 692 (2011).

For deliberate indifference cases, then-existing law must be specific "to the context of the case" and "sufficiently clarified" that a risk is "substantial enough to require immediate attention." *Horton*, 915 F.3d at 600-601 citing *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002). If an individual defendant could know all facts "yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high" they are immune. *Id*.

None of the individual Sheriff's defendants could reasonably have concluded the risks of a fatal overdose at Inverness were sufficiently grave and sufficiently certain. *Estate of Ford*, 301 F.3d at 1049. Second, there is no clearly established rule that would have put these defendants on notice that their actions with respect to Dorm 9 at Inverness violated the Eighth Amendment. *Horton*, 915 F.3d at 601-602.

### 3. Eighth Amendment – Defendants Valberg, Metea, Jami Wheeler, and Diamond

Eighth Amendment claims against nurses are governed by "subjective indifference." *Sandoval v. County of San Diego,* 985 F.3d 657, 667-668 (9th Cir. 2021). Each nurse must know the objective facts demonstrating a serious medical need, and must subjectively infer the risks from that need and disregard them. *Id.* This is critically important. If an individual nurse "*should* have been aware of a medical risk to [Mr. Forrest]" but "in fact was not," that nurse did not violate the Eighth Amendment. *Id.* (emphasis in original)(cleaned up).

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

### a. Plaintiff's Expert Reports Demonstrate Jacob Diamond is Not Liable under 42 U.S.C. §1983.

The complaint alleges Jacob Diamond provided constitutionally inadequate medical care. (ECF 17, ¶118). Plaintiff's expert submissions say there is nothing Nurse Diamond could have done to change the outcome. 42 U.S.C. §1983 require proximate and legal causation. *Lemire v. California Dept. of Corrections and Rehabilitation*, 726 F.3d 1062, 1074 (9th Cir. 2012). Nurse Diamond must be dismissed.

### b. Nurses Valberg, Metea, and Wheeler were not Indifferent.

Neither "lack of due care" nor "inadvertent failure to provide adequate care" nor "medical malpractice" is indifference. *Fraihat v. U.S. Immigration and Customs Enforcement*, 16 F.4th 613, 637 (9th Cir. 2021). "[E]ven gross negligence, does not suffice." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). Only people that ignore serious needs with "subjective recklessness analogous to how that phrase is used in criminal law" are inflicting punishment. *Simmons*, 47 F.4th at 934, citing *Farmer*, 511 U.S. at 839 (cleaned up).

A serious need means a condition that could result in significant injury or wanton infliction of pain. *Lemire,* 726 F.3d 1081. Symptoms of a drug overdose – sweating, disorientation, tremors – can constitute a serious medical need. *Sandoval*, 985 F.3d at 662-663. So too can symptoms of an asthma attack like difficulty breathing, chest tightness, coughing, and anxiety. *Clement v. Gomez,* 298 F.3d 898, 905 (9th Cir. 2002), *Pietrafeso v. Lawrence County, S.D.,* 452 F.3d 978, 980 (8th Cir. 2006), *Harrison v. Ash*, 539 F.3d 510, 519 (6th Cir. 2008).

There is no case that has "fleshed out" when a given constellation of symptoms becomes "sufficiently substantial for Eighth Amendment purposes." *Estate of Ford*, 301 F.3d at 1051. Defendants stipulate for purposes of this motion that Mr. Forrest telling deputies he needed an inhaler and had difficulty breathing met the objective prong.

Page 45 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

Plaintiff's claim fails because nurses weren't subjectively reckless.  They responded to calls that Mr. Forrest was having trouble breathing and needed an inhaler.  They saw him bent over in a tripod position, carrying an inhaler, when they arrived.  He was having difficulty speaking and was taking short, shallow breaths that an experienced asthmatic patient might use to control his breathing.  These symptoms are recognized by nurses, by clinicians who care for asthmatic patients, and documented in peer-reviewed literature as symptoms of an acute asthma attack and respiratory distress.  See French Declaration, Exhibit 2, p. 14; Sullivan Declaration, Exhibit 6, p. 6, citing Nat'n Library of Medicine, "Tripod Position."

No one said anything to nurses about Mr. Forrest using heroin.  Plaintiff will presumably offer evidence about drug use in Dorm 9 (ECF 17, ¶43), and that inmates yelled out or told deputies Mr. Forrest had used heroin. (ECF 17, ¶99).   Even accepting this as true – that there were adults in custody saying that Mr. Forrest had used heroin - there is no evidence any of the nurses knew of a drug smuggling ring, no evidence they heard anything about heroin as they tried to save Mr. Forrest's life, and no evidence any nurse appreciated a risk of a heroin overdose and disregarded it.  (Jones Declaration, ¶12, Exhibit 53, p. 16, lines 8-12).

Plaintiff will presumably concede Mr. Forrest's medical situation was an emergency.  Failing to give *any* life-saving measures in an emergency can constitute indifference.  *Lemire*, 726 F.3d at 1082-1083.   Affirmatively instructing others *not* to call paramedics after a patient begins seizing can be indifferent.  *Sandoval,* 985 F.3d at 671.  The video and testimony shows us that's not what happened.

Nurses *did* care for Mr. Forrest.  They *did* tell deputies to call 911 within minutes.  When Mr. Forrest went into cardiac arrest, nurses and deputies *did* give him chest compressions and ventilation, and *did* attempt to use a defibrillator.  There is video evidence showing them doing

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

all these things, and a recording of the call to first responders that talks about asthma, not drugs. What people did was the antithesis of indifference.

Even assuming Mr. Forrest's symptoms could have been caused by something other than asthma, trying to treat asthma and then giving CPR/ventilation/defibrillation after Mr. Forrest heart stopped is certainly reasonable.[33]   Even accepting Plaintiff's theory, making attempts to ascertain the reason for symptoms and then misdiagnosing them is negligent, not indifferent. *Sandoval*, 985 F.3d at 680.  Nurses don't inflict cruel and unusual punishment when they "responded reasonably to the risk, *even if the harm ultimately was not averted*."  *Farmer*, 511 U.S. at 844. (emphasis added).

Plaintiff's claim is medical negligence, not deliberate indifference.  See *Estelle, v Gamble*, 429 U.S. at 106 (negligence in diagnosing or treating does not violate Eighth Amendment).  Defendants Valberg, Metea, Jami Wheeler, and Diamond are not liable.

      c.      ***The Nursing Defendants are Immune from Suit under 42 U.S.C. §1983.***

The same standard described above applies to claims against the nurses; Plaintiff must identify the case that, as of July, 2019, would tell every reasonable nurse what they were doing violated the Eighth Amendment.  *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088 (2012).

*Lemire* put nurses on notice they must provide some lifesaving measures - specifically cardiopulmonary resuscitation – to patients in an emergency situation.  *Lemire*, 726 F.3d at 1083.

---

[33] When Portland Fire & Rescue arrived, they knew the same constellation of facts – their patient was in a jail, was not breathing, had no pulse, and was unconscious.  Even with that information, Portland Fire did not immediately administer naloxone. They didn't administer naloxone for three minutes, only doing so *after* Mr. Dickinson approached the deputy who then went to speak to the fire & rescue staff.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

Cases involving care over hours or days do not fit the context of this case, as is required for the analysis. *Horton*, 915 F.3d at 600-601.

There is no case telling nurses treating Mr. Forrest with albuterol and oxygen before his heart stopped, or giving continuous BLS/CPR when he coded was an indifferent response. Each nurse is entitled to qualified immunity on the second question.

### 4. Eighth Amendment Claim – Multnomah County

#### a. *Requirements of Monell claim*

Multnomah County[34] is liable under 42 U.S.C. §1983 only when it is the 'moving force' behind a violation. *Monell v. Dept. of Soc. Serv. of N.Y.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2036 (1978). Plaintiff alleges Multnomah County inflicted cruel and unusual punishment through policies or practices, (ECF 17, ¶111) and by ratifying a violation.  (ECF 17, ¶¶ 126 - 128). *Gillette v. Delmore,* 979 F.2d 1342, 1348-1349 (9th Cir. 1992). *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). The municipal policy or practice must be casually linked to the deprivation as the proximate and "but for" cause. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1146 (9th Cir. 2012).

The "moving force" standard is demanding in order to ensure connection between policy and harm, as "'if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind any such harm." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985). The temptation to apply a prohibited *respondeat superior* analysis is greatest, and *Monell* claims at their most tenuous, in the 'failure to train' theories. *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct 1350 (2011), ECF 17.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

A municipal body is not capable of subjective indifference. *Farmer*, 511 U.S. at 841.

An objective standard applies, shown through a prior pattern of deficiencies that serves as 'a

functional equivalent' of a conscious policy – i.e. the corporate equivalent of intent. *Connick*,

citing *City of Canton v. Harris*, 489 U.S. 378, 395, 109 S.Ct 1197 (1989) (O'Connor, J.,

concurring). A less stringent standard "would result in *de facto respondeat superior* liability on

municipalities [.]" *Id.,* at 392, 109 S.Ct. 1197.

A *Monell* claim "may not be predicated on isolated or sporadic incidents." *Trevino v.*

*Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, an informal practice is not sufficient - that

practice or custom must have led to a demonstrable "pattern of similar constitutional violations"

to show a "conscious disregard" to an ongoing problem of constitutionally tortious conduct.

*Connick*, 561 U.S. at 62-63.

### b.  *No Monell Claim for Hiring Practices.*

The entirety of the claim (ECR 17, ¶111(n)) is based on Nurse Valberg. There is no

evidence of prior hiring decisions demonstrating an obvious deficiency, no evidence

policymakers were involved in this hiring decision, and no evidence why a hiring decision – a

purely administrative action – is cast as a general statement of policy.

As discussed in greater detail below, there is no evidence to draw the requisite causal link

between Nurse Valberg's hiring/retention and Mr. Forrest's death. The allegations in Paragraph

90 have no bearing whatsoever on Ms. Valberg's provision of care. This claim is a conclusory

allegation with no factual support, and subject to dismissal.

---

[34] Sheriff Reese is named in his "official capacity" in the First Amended Complaint. Multnomah
County is a defendant and Sheriff Reese as an official capacity defendant is redundant. *Ctr. for
Bio-Ethical Reform, Inc. v. Los Angeles Cty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

### c. *Failure to Train Medical Staff Lacks Factual Basis.*

There are no alleged deficiencies in nurse training in drug recognition or administration of naloxone. (ECF 17, ¶111(k), (m)). Responding to patients with symptoms of drug impairment or intoxication is part of training for any Oregon nurse, and policy circulated before this incident gave additional specific guidance for opioids and for the administration of naloxone/narcan. Third party reviews of health policies and operations did not identify any problems with nurse training.

There is also no longstanding pattern of violations owing to training problems. As required by Rule 11, Plaintiff pled the specific facts of prior deaths in custody they relied on for their practice claim. *Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011). Multnomah County does not minimize any death in custody, but Plaintiff's "rich history" rhetoric is false. Deaths in custody are the exception, not the rule.

In-custody overdose death rates in the sixteen year period Plaintiff relies on were substantially below national averages for jails and for prisons. These rates are relevant and show no longstanding problems with overdose deaths in Multnomah County. *Boncher ex rel Boncher v. Brown County*, 272 F.3d 484, 486-487 (7th Cir. 2001). There are no facts showing wrongdoing, deficiencies, or failures certain to lead to an Eighth Amendment violation.

### d. *No Claim for Failure to Train Sheriff's Staff.*

The same is true for sheriff's deputy training. (ECF 17, ¶111(g), (j), (l). Deputies did receive training on drug overdose recognition and response. Contrary to Plaintiff's allegations, deputies *were* identifying people in Dorm 9 and compelling urinalysis, searching, and disciplining. Deputies also know nurses are available for calls at all times. Finally, the lack of

Page 50 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

longstanding documented problems at Inverness detailed in the previous section bar a practice/custom claim based on deputy training.

### e. *No Claim for Deficient Security Policies or Procedures.*

The majority of the *Monell* claims are that Inverness jail security was so lax as to constitute cruel and unusual punishment. (ECF 17, ¶111 (a), (b), (c), (d), (e), (f), (h), (i)[35]

### f. *No Policy or Practice was "Moving Force" Behind an Eighth Amendment Violation.*

Plaintiff's case theory is Mr. Forrest died because he ingested drugs that he obtained in jail, contrary to jail rules and state/federal law. As discussed above, multiple circuits have held a jail is not inflicting cruel and unusual punishment when a person in custody harms themselves as a result of their own voluntary action. *Haas,* 765 F.3d at 124, *Christopher,* 384 F.3d at 882-883, *Legate*, 822 F.3d at 210. This is no different, and made worse given Mr. Forrest's volitional use of drugs was contrary to Multnomah County's policies and efforts to stop drugs from coming into the facility.

### g. *No Claim Against Policies Drawn with Legitimate Purposes.*

The First Amended Complaint does not cite any policy. Neither of Plaintiff's expert reports identifies a formal policy as the basis for the *Monell* claim. Plaintiff's formal policy claim is that using strip searches, dorm searches, pat searches, mail searches, and other security measures rather than immediately purchasing a body scanner was objectively indifferent.

Again, there are no longstanding problems at Inverness with fatalities or serious injuries suggesting search and security was inadequate. The record also indicates body scanners were

---

[35] Plaintiff also alleges Multnomah County failed to take "appropriate measures" to prevent overdoses following a death. (ECF 117, ¶111(o)(p). These unspecified allegations should be dismissed as speculative and lacking a factual basis given the record evidence.

Page 51 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

not (and are not) the standard – they are not used in every secure facility in Oregon, including in state prisons.

Plaintiff's claim body scanners would have detected the drugs Mr. Forrest ingested that day is speculative, unsupported by evidence in Plaintiff's expert reports. Finally, the record shows the Sheriff's Office had legitimate concerns including false positives and their effect on people in custody and staffing without more information on scanners. *Chappell*, 706 F.3d at 1059, *Berg,* 794 F.2d at 462. There is no basis to find a formal policy of Multnomah County was constitutionally inadequate or indifferent.

### h. *No Evidence of Unconstitutional Security Measures.*

Plaintiff will presumably offer evidence to substantiate their allegations that Dorm 9 inmates knew about a drug smuggling ring, and individual deputies were indifferent because they knew or should have known. ECF 17, ¶¶ 40 – 44.

Even if an individual deputy acted with indifference, that would be a claim against that deputy, not the municipality. *Menotti v. City of Seattle*, 409 F.3d 1113, 1151 (9th Cir. 2005). Ignoring contraband would be contrary to Sheriff's office policy, precluding a *Monell* claim. See *Dickerson v. City of Portland*, 2020 WL 7391267 1, 7 (D. Or. 12/16/20), citing *Cavanaugh v. Cty of San Diego,* 3:18-CV-02557-BEN-LL, 2020 WL 6703592 at 39 (S.D. Cal 11/12/20)(no *Monell* claim if the "allegedly wrongful conduct involved violating [municipal] policies").

Even so, deputies weren't ignoring contraband, and the fact individual deputies did not catch all contraband doesn't make the County indifferent. There is no evidence of a pattern of constitutional violations with contraband at Inverness to sue Multnomah County under 42 U.S.C. §1983.

Page 52 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## i.    *No Ratification Theory*

A ratification theory requires "a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker ... [or] … a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). A line supervisor reviewing a discretionary decision is not sufficient, nor is any supervisory action in the face of a decision that is not a general statement of policy. *Id.* There must be a delegation of policymaking authority to the ratifying person. *Christie v. Iopa*, 176 F.3d 1231, 1237 (9th Cir. 1999).

There is no evidence that the policymaker – Sheriff Reese – took any such action. As discussed above, he was not personally involved in any of the events preceding Mr. Forrest's death. Further, there were no actions taken purporting to be statements of policy of the County as a whole.

## B.    STATE CLAIMS

### 1.    Discretionary Immunity for Policy-Level Decisions on Jail Safety and Security

ORS 30.265(6)(c) immunizes public bodies from claims "based upon the performance of or the failure to exercise or perform a discretionary function." *Westfall v. State ex rel Oregon Dept. of Corrections*, 355 Or. 144, 157, 324 P.3d 440 (2014). A function is discretionary if it: (1) involves exercise of judgment (2) the function takes place at a high level of public authority, and (3) the function is exercised by a person with requisite authority. *Carillo v. City of Portland*, 2022 WL 4243460 1, 7 (D. Or June 3, 2022), citing *Ramirez v. Hawaii T & S Enterprises, Inc.*, 179 Or. App. 416, 419 (2002).

Page 53 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Michael Reese was the Sheriff with authority over Inverness, responsible for policies and training of the Corrections Division, and with authority to approve capital improvement purchases like body scanners. Dr. Seale was the head of the Health Department-Corrections Division at all relevant times, with authority to set policy for the division including training.

Several of Plaintiff's negligence claims are directed towards decisions by Sheriff Reese and Dr. Seale that are immune. In particular, decisions on whether or not to purchase a body scanner (ECF 17, ¶¶ 45 - 84, 132(j)(k)) are immune, as the Sheriff was making policy choices based on both financial and operational concerns. Decisions on how to conduct internal training for deputies and nurses are similarly immune (ECF 17, ¶132 (l), (o), (p), (q), (r)).

### 2. Apparent Authority Immunity Bars Policy-Level Claims.

ORS 30.265(6)(f) immunizes public bodies from claims arising out of an act or omission done "under apparent authority of a law, resolution, rule or regulation that is unconstitutional, invalid or inapplicable." The immunity attaches if the public body proceeds under a reasonable interpretation of the applicable law, resolution, rule, or regulation, even if that interpretation is later determined to be incorrect. *Cruz v. Multnomah County*, 279 Or. App. 1, 18, 381 P.3d 856 (2016).

The policy-level decisions Plaintiff challenges regarding body scanners, security, and training are immune. OSSA audited Inverness policies and practices and inspected the facility every twenty-four months, and informed the Sheriff's office that it was submitting its findings to the Oregon Department of Corrections inspectors as to whether Inverness met statutory standards for local correctional facilities. ORS 169.070(3). Further, each year a grand jury statutorily charged with reviewing conditions and management at Inverness raised no concerns with the absence of a body scanner or the security measures at the jail. ORS 132.440(2). It was (and is)

Page 54 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

reasonable for Multnomah County to assume these reviews demonstrated that Multnomah County met standards for security without a body scanner and therefore is entitled to immunity.

So too for training. Multnomah County deputies all carried requisite certification from DPSST which required completing academy training that included training on responding to drug intoxication and response. ORS 181A.520(1)(a), §44, OAR 259-008-0085(2), (7). Nurses must have required licensure from the state Board of Nursing, with prerequisite education covering drug overdose recognition and treatment, in particular opioids and naloxone. ORS 678.021, OAR 85, Division 31. Nurses had used naloxone in the past in the jails and there was no longstanding pattern of fatal or near-fatal overdoses at Inverness. It was reasonable for the County to assume that compliance with state standards for each profession, including training on drug overdose signs and responses, did not require additional or different training. Any deficiency in training would be immune.

### 3. Summary Judgment is Warranted on Negligence Claims as Pled

Under Oregon law a wrongful death claim requires a plaintiff prove the death would not have occurred but for the particular negligent conduct. *Joshi v. Providence Health Systems, Inc.*, 342 Or 152, 164, 342 P.3d 1164 (2006). One makes this determination by looking to each specification of conduct and, without giving regard to the legal effects, asking whether the death would have occurred if that conduct was removed. *Id.* at 158, citing *Sandford v. Chevrolet Division of General Motors*, 292 Or 590, 606, 642 P.2d 624 (1982). At the summary judgment stage, there must be evidence that can be offered in an admissible form that would allow a juror, without resorting to speculation or guesswork, to infer there is a "reasonable probability" that death would not have occurred but for the specified wrongful conduct. *Id.*, at 158. A "substantial possibility" is not enough. *Id.* at 164.

Page 55 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

Multnomah County respectfully moves against all specifications of negligence, based upon the record evidence discussed above. Plaintiff has provided expert witness reports pursuant to Fed. R. Civ. P 26(a), and is presumably prepared to offer those reports to satisfy their burden under Fed. R. Civ. P 56. Subject to objections to portions thereof, Multnomah County may concede one or more triable issues of fact exist after those submissions. However, two central theories that are expressly pled must be dismissed.

### 4.      No Negligent Hiring Claim as a Matter of Law

Negligent hiring and retention claims look to whether a given employee had "known dangerous propensities" or that a reasonable inquiry would've revealed dangerous propensities. *Branford v. Washington County*, 2019 WL 1957951 1, 19 (D. Or May 2, 2019), citing *Chesterman v. Barmon*, 82 Or.App. 1, 4, 727 P.2d 130 (1986).

Plaintiff claims Camille Valberg was "dangerously unfit" for the job of nurse[36] because: (a) at the time of Mr. Forrest's death, she was a named defendant in a different lawsuit in a different facility in a different county with a different employer,[37] (b) her political views made her biased against patients of color like Mr. Forrest (ECF 47, p. 6), and (c) she had a relationship with a co-worker and filed for a protective order. (ECF 17, ¶90).

As to the latter two theories, they do not show she was dangerous to any patients. Plaintiff does not dispute Ms. Valberg was at all times licensed by the State of Oregon Board of Nursing. Potential workplace friction due to political views or romantic involvement with co-

---

[36] ECF 17, Response to Interrogatory No 6(e), ECF 47, p. 6.
[37] Plaintiff cannot use the filing of the suit, which happened after Ms. Valberg began working, to sustain the hiring claim. (ECF 17,¶¶ 86, 89). Plaintiff appears to concede this point. (ECF 47, p. 6).

Page 56 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

workers does not make Ms. Valberg a danger to patients, nor support a reasonable inference of such.

As to the former, the allegations in *Nordenstrom et al v. Corizon et al* were against a variety of defendants. Ms. Valberg contested the allegations against her, with nothing substantiated at the time of Mr. Forrest's death. The case also had a protective order in place as of April, 2019 substantially limiting accesses to information. See *Nordenstrom, et al v. Corizon, et al*, 18-CV-01754-HZ, ECF 18. Allegations do not permit a reasonable inference that Nurse Valberg was a danger to patients when performing her job at Inverness jail.

Where all three theories fail is causation. Plaintiff is suing other nurses for deliberate indifference and medical negligence. If Nurse Valberg were removed from the picture entirely, Plaintiff's claim – that Mr. Forrest died because of poor medical care – would be exactly the same. Her hiring and retention cannot be a "but for" cause. *Joshi*, 342 Or at 158.

### 5. No Negligence Claim for Lack of Body Scanners

Plaintiff's security allegations pertain almost exclusively to body scanners, claiming any reasonable jail in Oregon would have a scanner in place no later than July, 2019, and that scanners would have detected the drugs Mr. Forrest acquired. The premise is flawed factually and legally.

The first problem is the absence of a standard. Scanners were not industry standard in 2019. They are not in use at every correctional facility in Oregon, including in Oregon state prisons. Plaintiff's submittals do not reference a standard requiring body scanners or that the absence of body scanners was (or is) below the standard of a reasonable jail. A juror could not infer unreasonable conduct from these facts.

Multnomah County Attorney
501 S.E. Hawthorne Blvd., Ste. 500
Portland, Oregon 97214
(503) 988-3138

Nor could a juror infer negligence from Multnomah County installing a scanner after Mr. Forrest's death. Even if an inference could be drawn that installing the scanners earlier would have made Mr. Forrest's death less likely, that evidence is inadmissible for that purpose. Fed. R. Evid. 407. This evidence cannot be considered at summary judgment, as it could not be offered in an admissible form as to a negligence claim. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016).

The final problem is, like the negligent hiring, the necessary causal inference. There is no evidence that shows Mr. Forrest's death would not have occurred if there was a body scanner. While Plaintiff need not show the causal link with certainty, there must still be a "reasonable probability" that the conclusion flows from the "evidentiary datum." *Poppell*, 149 F.3d at 954. The record does not support that inference.

## VII.   CONCLUSION

Defendants respectfully request this Court grant summary judgment in their favor and grant such relief as permitted by law.

DATED this 16th day of June, 2023.

Respectfully submitted,

JENNY M. MADKOUR, COUNTY ATTORNEY
FOR MULTNOMAH COUNTY, OREGON

*/s/ B. Andrew Jones*
B. Andrew Jones, OBS No. 091786
Deputy County Attorney
Veronica R. Rodriguez, OSB No. 181818
Assistant County Attorney
  *Of Attorneys for Defendants*

Page 58 – DEFENDANTS' MOTION FOR SUMMARY JUDGMENT