**Joseph E. Piucci OSB No. 135325**
**Stephen V. Piucci OSB No. 821056**
Piucci Law, LLC
900 SW 13th Ave., Ste. 200
Portland, OR 97205
Tel: 503-228-7385
Fax: 503-228-2571

**Drake Aehegma, OSB No. 132905**
Drake Aehegma Attorney at Law LLC
PO Box 8404
Portland, OR, 97207
Tel: 503-208-5717
Fax: 503-914-1472

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THE ESTATE OF RICHARD JASON FORREST,** Van Loo Fiduciary Services, LLC, Personal Representative,<br><br>Plaintiff,<br><br>v.<br><br>**MULTNOMAH COUNTY**, a political subdivision of the state of Oregon; **MICHAEL REESE**, Multnomah County Sheriff, **CAMILLE VALBERG, KOH METEA, JAMI WHEELER, JACOB DIAMOND, STEVEN ALEXANDER,** and **JEFFREY WHEELER,** acting in concert and in their individual capacities,<br><br>Defendants. | Case No. 3:20-cv-01689-AR<br><br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **I.** | INTRODUCTION | 8 |
| **II.** | FACTUAL BACKROUND | 9 |
| | **A.** The Multnomah County Sheriff's Office | 9 |
| | **B.** The Multnomah County Health Department | 9 |
| | **C.** Richard Jason Forrest | 10 |
| | **D.** Multnomah County's obligation to maintain a safe, drug-free environment within its jails | 11 |
| | **E.** The history of drug overdoses and deaths in Multnomah County jails | 13 |
| | **F.** Multnomah County allowed AICs unfettered access to drugs within Inverness Jail Dorm Nine | 14 |
| | **G.** Jason's overdose and death within Inverness Jail | 18 |
| | **H.** Jason's cause of death was an overdose | 21 |
| | **I.** Multnomah County allows AICs unfettered access to drugs to this day | 22 |
| **III.** | LEGAL STANDARD | 24 |
| **IV.** | ARGUMENT | 24 |
| | **A.** Defendant Nurses Valberg, Metea, and Wheeler were deliberately indifferent to Jason's serious medical needs | 24 |
| | i. Defendant Nurses knew of Jason's recent drug use | 25 |
| | ii. Nurse Valberg was deliberately indifferent to Jason's serious medical needs | 26 |
| | a. Nurse Valberg had a history of deliberate indifference to overdosing AICs | 26 |
| | b. Nurse Valberg harbored racial animus against Black people like Jason | 27 |
| | c. When Jason overdosed, Nurse Valberg was deliberately indifferent to his serious medical needs | 29 |
| | iii. Nurse Metea was deliberately indifferent to Jason's serious medical needs | 32 |
| | iv. Nurse Wheeler was deliberately indifferent to Jason's serious medical needs | 33 |

Page 2 -    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

      v.    Defendants' deliberately indifferent medical care was the cause of Jason's death ................................................................................................................34

     vi.    Defendant Nurses Valberg, Metea, and Wheeler are not entitled to qualified immunity ..............................................................................................35

          a.   Jason's constitutional right to adequate medical care was clearly established when he was incarcerated at Inverness Jail ....................36

**B.** Genuine disputes of material fact exist with respect to Plaintiff's Monell claim against Multnomah County ................................................................................38

      i.    Constitutional Rights at Issue ........................................................................38

     ii.    The *Monell* deliberate indifference standard is objective ..............................39

    iii.    Sources of *Monell* Liability ..........................................................................39

     iv.    Jason was deprived of two constitutional rights under the Eighth Amendment ....................................................................................................41

**C.** Multnomah County had policies, customs, and practices that give rise to *Monell* liability ..........................................................................................................41

      i.    Multnomah County had a policy, custom or practice of allowing AICs unfettered access to illegal drugs and narcotics ................................................41

     ii.    Multnomah County had a policy, custom or practice of failing to monitor and supervise AIC work crews at Inverness Jail ..........................................42

    iii.    Multnomah County had a policy of not conducting random or proactive searches to detect drugs or monitor potential criminal activity ....................43

     iv.    Multnomah County had a policy, custom or practice of failing to train jail deputies on drug detection, drug use, and drug overdose by AICs.................45

      v.    Multnomah County had a custom or practice of delaying the purchase and implementation of drug-detecting body scanners ...........................................45

          a.   Neither qualified nor discretionary immunity applies to this *Monell* claim.......................................................................................................49

     vi.    Multnomah County had a policy of not authorizing corrections officers to administer Narcan to overdosing AICs............................................................49

    vii.    Multnomah County had a custom or practice of failing to train medical staff as to its own Narcan administration policy ........................................................50

**PIUCCI LAW**
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

      **viii.**    Multnomah County had a custom or practice of not administering Narcan to overdosing AICs ........................................................................................52

      **ix.**    After Jason's death, Multnomah County ratified its custom of not administering Narcan to overdosing AICs...........................................53

**D.** Genuine disputes of material fact exist with respect to Plaintiff's claim against Defendant Reese ....................................................................................................55

      **i.**    A sufficient causal connection exists between Defendant Reese's yearslong delay in purchasing body scanners and Jason's death ....................................56

      **ii.**    Defendant Reese is not entitled to qualified immunity...................................57

**E.** Plaintiff's negligent hiring and retention claim is supported by substantial Evidence........................................................................................................................58

      **i.**    Multnomah County negligently hired Nurse Valberg ....................................58

      **ii.**    Multnomah County failed to timely terminate Nurse Valberg before Jason died.......................................................................................................................59

      **iii.**    The applicable causation standard to this and all of Plaintiff's negligence claims is "substantial factor." ..........................................................................60

      **iv.**    Multnomah County's negligent hiring and retention of Nurse Valberg meets any causation standard .......................................................................................61

**F.** Multnomah County is not entitled to summary judgment on Plaintiff's gross negligence claim ..........................................................................................................62

**G.** Multnomah County is not entitled to summary judgment on Plaintiff's negligence claims .............................................................................................................................62

      **i.**    Multnomah County is not entitled to discretionary immunity.........................63

            **a.**    The failure to train allegations do not involve high-level policy decisions subject to discretionary immunity.........................................63

            **b.**    The body scanner allegations are not subject to discretionary immunity because a public body does not have the discretion to do nothing ......64

**V.**    CONCLUSION.................................................................................................................65

**PIUCCI LAW**
**900 SW 13ᵗʰ Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ........................................................ 36

*Ashley v. Sutton*, 492 F. Supp. 2d 1230, 1238 (D. Or. 2008) ......................................... 40

*Babler Bros., Inc. v. Pacific Intermountain Express. Co.*, 244 Or 459, 464 (1966) ..................... 61

*Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) ..................................................... 55

*Block v. Rutherford*, 468 U.S. 576 (1984) .................................................................. 57

*Burke v. County. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009) ................................... 38

*Castro v. Cty. Of Los Angeles*, 833 F.3d 1068 (9th Cir. 2016) ....................... 25, 37, 39, 40

*City of St. Louis v. Paprotnik*, 485 U.S. 112, 130 (1988) ................................................ 40

*Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) ........................ 36

*Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) .................................................... 37

*Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) .................................................. 36

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) ............................................................ 39

*Coolbaugh v. Luisiana* 525 U.S. 819 (1998) ............................................................... 40

*Estate of Vela v. Cty. of Monterey*, 2018 WL 4076317 .................................................. 39

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ............................................................ 36, 38

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ................................................... 25, 32, 55

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ...................................................... 57

*Fisher v. Huck*, 50 Or. App. 635, 649 (1981) ............................................................... 62

*Frary v. County of Marin*, 81 F. Supp. 3d 811, 825–30 (N.D. Cal. Feb. 25, 2015) ................... 36

*Fricano v. Lane Cty.*, 2018 WL 2770643 (D. Or. June 8, 2018) .................................. 25, 38, 40

*Gibson v. County of Washoe*, 290 F.3d 1196 (9th Cir. 2002) ................................. 40, 41, 42

*Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021) .......................................... 37

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) .......................................................... 35

*Helling v. McKinney,* 509 U.S. 25, 36 (1993) ........................................................... 38, 39

*Henry v. County of Shasta* 132 F.3d 512 (9th Cir. 1997) ............................................... 40

*Hill v. Garner*, 277 Or. 641, 646 (1977) .................................................................... 62

*Hope v. Pelzer*, 536 U.S. 730, 737–38, (2002) ............................................................ 38

*Hudson v. Palmer*, 468 U.S. 517 (1984) ..................................................................... 57

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

*Hughes v. Wilson*, 345 Or. 491, 496 (2008)....................................................................... 64

*Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)...................................................... 37

*Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998)........................................ 36

*Jessop v. City of Fresno*, 936 F.3d 937 (9th Cir. 2019)...................................................... 35

*Jessop v. City of Fresno, Calif.*, 140 S. Ct. 2793 (2020) .................................................... 35

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) ................................................... 25, 38

*Johnson v. Corizon Health, Inc.*, 2015 WL 1549257 ................................................... 39, 40

*Johnson v. Tillamook Cty.*, 2016 WL 11383939 ................................................................ 35

*Joshi v. Providence Health Sys. of Oregon Corp.*, 342 Or 152 (2006) .............................. 61

*Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995) .............................................................. 36

*Leatherman v. Tarrant County. Narcotics Intel. &Coordination Unit*, 507 U.S. 163, 166-167

   (1993)....................................................................................................................... 49

*Lochard v. Vosika*, 267 Or. 213 (1973) .............................................................................. 62

*Lolli v. County. of Orange*, 351 F.3d 410 (9th Cir. 2003) .................................................. 35

*McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991) .................................................. 25

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248 (9th Cir. 2016) ................................. 39

*Monell v. Department of Social Services* 436 U.S. 658, 694 (1978) .................................. 38

*Mosley v. Portland School Dist.* No. 1J, 315 Or. 85, 92 (1992)................................... 63, 64

*Nordenstrom v. Corizon Health, Inc.*, 2021 WL 2546275, at *10

   (D. Or. June 18, 2021) ..................................................................... 26, 31, 37, 58

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)................................................................. 35

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).................................................. 40

*Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th  Cir. 2003) ........................................ 24

*Ramirez v. Hawaii T&S Enters., Inc.*, 179 Or. App. 416, 419 (2002) ............................... 63

*Sandoval v. City of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) ......................... 36, 37, 58

*Shadrick v. Hopkins Ct., Ky.*, 805 F.3d 724, 738–39 (6th Cir. 2015)....................... 40, 45, 52

*Starr v. Baca* , 652 F.3d 1202, 1207 (9th Cir. 2011) .......................................................... 56

*Tolan v. Cotton*, 572 U.S. 650 (2014)................................................................................ 35

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1143 (9th Cir. 2012)................................................ 39

*Turner v. State ex rel. Dep't of Transp.*, 270 Or. App. 353, 363 (2015) ............................ 64

*United States v. Colon*, 246 F. App'x 153, 156 (3d Cir. 2007) .......................................... 58

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

*Westfall v. State*, 355 Or. 144, 157 (2014) ................................................................................ 63

*White v. Pauly*, 137 S. Ct. 548, 551 (2017) ............................................................................ 36

*Wilk v. Neven*, 956 F.3d 1143, 1147  (9th Cir. 2020) ........................................................ 24

*Zakora* v. *Chrisman*, 44 F.4th 452 (6th Cir. 2022) ........................................................ 39, 41, 55

**Statutes**

ORS 30.265 ................................................................................................................ 49, 63, 64

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................ 24

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

## I.    INTRODUCTION

This is an action alleging civil rights claims against Multnomah County and its then sheriff, Michael Reese, for the willful and deliberately indifferent failure to protect Richard Jason Forrest ("Jason") from heroin and methamphetamine which was rampantly available within Inverness Jail Dorm Nine over the summer of 2019. Jason died  from an overdose of these two drugs on July 25th, 2019.[1]

This action also alleges civil rights claims against Multnomah County Corrections Health Nurses Camille Valberg, Koh Metea, and Jami Wheeler, for their willful and deliberately indifferent delay and denial of essential medical treatment to Jason. Each of these nurses watched Jason suffer the classic symptoms of an opioid overdose and not one of them gave him Narcan, the overdose-reversing drug that was within arm's reach.[2] Instead, they watched him slowly die.

Finally, this action alleges negligence and gross negligence claims against Multnomah County, and a separate claim for the negligent hiring and retention of Nurse Camille Valberg, the lead nurse in this case who had not only a history of deliberate indifference to overdosing inmates but also racial animus towards black people like Jason.

Plaintiff agrees that summary judgment is appropriate as to Defendants Stephen Alexander, Jeffrey Wheeler, and Jacob Diamond.

---

[1] Piucci Decl., Ex. 105, p. 1. Unless otherwise stated, all exhibits referred to in this response are exhibits to the Piucci Declaration. Likewise, all deposition transcripts are attached alphabetically as Exhibits A, B, C, etc., to the Piucci Decl., and are referred to by the witness' name and appropriate citation, *e.g.* Alexander Dep at __. Declarations of experts are referred to by the expert's name and the page number of the expert report attached to the declaration, *e.g.* Freedman Expert Report, at __.
[2] Freedman Expert Report, at 4-7; Nahid Expert Report, at 2-5; Malaer Expert Report, at 19-21, 26; Poetter Expert Report, at 8-9.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

## II.    FACTUAL BACKROUND[3]

### A.  The Multnomah County Sheriff's Office

The Multnomah County Sheriff's Office ("MCSO"), led by Sheriff Michael Reese from 2016 through 2022, is the law enforcement agency responsible for operating Multnomah County jails. As such, MCSO is responsible for the safety and security of its Adults in Custody ("AICs"), along with the conditions of confinement within the jails. [4] Nicole Morrisey-O'Donnell is the current elected sheriff.

In 2019, MCSO operated two adult jails – the Multnomah County Detention Center ("MCDC" and Inverness Jail. MCDC is a maximum-security facility located in downtown Portland. Inverness Jail ("Inverness") is a medium-security facility located at 11540 NE Inverness Drive, Portland, OR, 97220.[5] Inverness is a dormitory style jail. Dorm Nine – the dorm Jason was housed within from June 10th, 2019, until his death on July 25th, 2019 – was the "work crew dorm," consisting of AICs assigned to work either within the jail or within the community on its outside "work crew," typically performing roadside clean-up for other local governmental agencies.[6]

### B.  The Multnomah County Health Department

Multnomah County Health Department Corrections Health ("MCHD"), led at the time by Dr. Michael Seale, is the sole entity that provides medical care for AICs within Multnomah County jails.[7] Per the County, AICs have a right to healthcare provided by qualified and

---

[3] To avoid redundancies and aid the Court's analysis of the issues presented in this response, the following "Factual Background" includes contextual facts a detailed overview of the events that occurred on July 25th, 2019, leading to Jason's death. In Plaintiff's "Argument" section, *infra* at IV, Plaintiff adds additional facts and evidence from the summary judgment record particular to each claim.

[4] Morrisey-O'Donnell Dep at 18:14-17; 19:3-20:2. The term "Adult in Custody" or "AIC" is inclusive of both pretrial detainees and post-conviction inmates. Jason was an inmate.

[5] Decl. of Brandon Pedro in support of Defendant's Motion for Summary Judgment ("Pedro Decl."), ¶ 4.

[6] Brown Dep at 33:13-17, 42:7-44:6.

[7] Propert Dep at 33:24-34:7; Seale Dep at 15:10-24.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

competent nurses, and MCHD is responsible for providing 24-hour emergency medical care.[8]
MCHD alone is responsible for supervising its Corrections Health nurses.[9]

At the time of Jason's overdose and death at Inverness, nurses comprised most of the
medical staff, provided most of the medical care to AICs, and were the only individuals
authorized to administer naloxone within the jails.[10]

### C.  Richard Jason Forrest

Jason Forrest was a 37-year-old African American man from Portland, Oregon.[11] He is
survived by his wife, Chrystal Forrest, their son Sir Jacyon "JJ" Forrest (nine), and his stepson
Marcus Heagle (nineteen).  Jason suffered from polysubstance use disorder, with the
predominant substances being methamphetamine and heroin. Nonetheless, he had the
foundational basis necessary for a successful recovery – the unwavering support of his wife,
Chrystal, and her extended family, and from personal friends. He also had a strong desire to be a
good father.[12] Jason had periods of extended sobriety lasting months to a year while out of
custody, and periods of clinically significant remission within a "controlled environment" – that
is, while incarcerated.[13]

From mid-2018 to 2019, Jason's addiction worsened.[14] He overdosed in the community
on March 1st, 2019, and was revived when paramedics administered Narcan. He overdosed again
on April 4th, 2019, again receiving Narcan from paramedics.[15] In this context, Chrystal Forrest
contacted Jason's Post-Prison Supervision officer ("P.O.") and intentionally provided him with
information that would lead to Jason's arrest, "because his drug addiction was getting super bad,
and I was scared for him and I was scared for myself. I thought I was going to lose him."[16]

---

[8] Propert Dep at 37:16-19; Ex. 50.
[9] Id. at 35:7-10.
[10] Ex. 48; Seale Dep at 38:6-9; Stewart Dep at 16:1-5.
[11] Ex. 201.
[12] Woods Expert Report, at 1-2.
[13] Id. at 30, 50.
[14] Forrest Dep at 124:3-7; 126:17-19.
[15] Woods Expert Report, at 28.
[16] Forrest Dep at 103:23-104:9

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Jason was arrested and placed into MCSO custody on April 29th, 2019. He was
transferred to Inverness Jail Dorm Nine on June 10th. [17] Throughout his incarceration, Chrystal
Forrest repeatedly contacted Jason's P.O., asking for help getting him into treatment.  On July
12th, 2019, she wrote:

> I am wondering how are we to know if [Jason] will have a bed come Oct. 25 if he
> is not put on a list? Can you get him into the mentor program? I'm just worried
> come Oct 25th he will be walking out to the street again.

On July 16th, the P.O. replied,

> I am working on getting an eval completed and I'll be looking to get him on the
> waitlist at [Volunteers of America] with the hopes he may be released and enter
> [treatment] directly. If you want to check in, [check in] in early September, I can
> let you know where things are.[18]

Jason wanted treatment too. He wrote to Chrystal on June 21st:

> Just so there is no doubt in your mind[,] I'm still going to do treatment… Hopefully
> this time after treatment I'll be able to come home to my family[.] If I need to go to
> another program back to back I'll do that but I won't ask you if I can come if I feel
> like there might be the slightest chance that I'll use.[19]

Instead of treatment, and unbeknownst to his wife, Jason had unfettered access to heroin and
methamphetamine within Inverness Jail Dorm Nine.[20] He died of an overdose on July 25th, 2019.

### D.  MCSO's obligation to maintain a safe, drug-free environment within its jails.

MCSO is solely responsible for the internal and external security of its jail facilities. It is
responsible for and controls the following:

- MCSO controls who enters and exits the facilities.[21]

- MCSO controls what enters and exits the facilities, except when it fails to do
  so.[22]

- MCSO is responsible for keeping contraband out of its jail facilities.[23]

---

[17] Pedro Decl., ¶ 30, Exhibit 23.
[18] Ex. 202, p. 8-9.
[19] Ex. 203 ,p 7.
[20] Forrest Dep at 191:15-193:7
[21] Morrison Dep at 17:8-10; Alexander Dep at 24:20-22; Peterson Dep at 25:9-11.
[22] Morrison Dep at 17:11-13 ("To the extent possible, yes.").
[23] Morrisey O'Donnell Dep at 19:7-10; Morrison Dep at 17:13-16.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

- MCSO is responsible for keeping illegal drugs and drugs of abuse out of its jail facilities.[24]

- MCSO is responsible for keeping illegal drugs and drugs of abuse away from its AICs.[25]

Within Multnomah County jails – per Multnomah County Sheriff Nicole Morrisey O'Donnell, Inverness Jail Facility Commander Kurtiss Morrison, and others in MCSO leadership – AICs have a right to a drug-free environment.[26] The current and former sheriff agree: any amount of illegal drugs or drugs of abuse within Multnomah County jail facilities is unacceptable.[27]

This is particularly true as MCSO leadership also knows that a significant portion of AICs within its jail population suffer from drug addictions.[28] The agency would also routinely execute court-imposed sentences that authorized "early release to inpatient drug treatment," sentences based on the presumption that jails were a drug-free environment.[29]

As to why it is important for MCSO to keep illegal drugs and drugs of abuse out of its jails, MCSO leadership describes the reasons best:

Sherriff Reese:

"Having contraband inside the jail, whether it's illegal drugs or weapons, could jeopardize the safety of adults in custody and the staff."[30]

Sheriff Morrisey O'Donnell:

"[It is important] for the safety and security of all the adults in custody as well as those working there in both facilities."[31]

Inverness Facility Commander Morrison:

"[D]rugs… could be harmful for individuals in custody."[32]

---

[24] Morrisey O'Donnell Dep at 19:11:14; Morrison Dep at 17:17-19; Peterson Dep at 26:5-7. Reardon Dep at 16:13-16.
[25] Morrisey O'Donnell Dep at 19:15-23; Peterson Dep at 26:20-25.
[26] Morrisey O'Donnell Dep at 21:6-8 (Q: Would you agree that inmates at Multnomah County jails have a right to a drug-free environment? A: Yes.); Morrison Dep at 20:15-17 (same); Peterson Dep at 33:17-20.
[27] Reese Dep at 25-17:22 (Q. Is there any acceptable amount of illegal drugs or drugs of abuse within Multnomah County jail facilities? A: No.); Morrisey-O'Donnell Dep at 21:12-15 (same).
[28] Morrison Dep at 18:13-23; Reese Dep at 24:5-10; Morrisey O'Donnell Dep at 20:8-10; Jeffrey Wheeler Dep at 24:2-20.
[29] Morrison Dep at 18:24-19:6; Morrisey O'Donnell Dep at 20:15-18.
[30] Reese Dep at 23:20-22.
[31] Morrisey-O'Donnell Dep at 19:19-23.
[32] Morrison Dep at 18:1-12.

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

Chief Deputy Steven Alexander:

"[T]here is a potential that somebody could… use the substance and have an… altered state, and have some issues with taking those drugs[.]"[33]

**E.  The history of drug overdoses and deaths in Multnomah County jails.**

The above concerns of MCSO leadership are borne out by history and contradict Defendants' supposedly "low mortality rates."[34]

On February 2nd, 2013, AIC David Chilton died of a heroin overdose within MCDC.[35] On March 5th, 2015, Channing Lacey was booked into MCDC. When Lacey was arrested, she had concealed fentanyl within her vagina, which MCSO did not detect. Between March 7th and 9th, 2015, three AICs overdosed on the fentanyl Lacey had brought into MCDC.[36] Notably, a day prior to the final of these three fentanyl overdoses, Lacey pulled a small baggie containing white and pink pills out of her vagina in front of an MCSO deputy. A criminal investigation was authorized, but no wider measures were taken to find, confiscate, and destroy the drugs within MCDC.[37] Less than two weeks later, on March 21st, 2015, AIC Latina Brogdon overdosed on fentanyl and died.  Only then did MCSO take Lacey to a hospital for a body cavity search, again finding three containers with suspected drugs.[38] Even still, more drugs were available. The following day, Lacey herself exhibited signs of overdose and was again transported to the hospital.[39]

Only four months later, on July 17th, 2015, a 29-year-old AIC died within MCDC. Methamphetamine intoxication and probable opiate withdrawal were determined to be contributing factors to the death.[40]

---

[33] Alexander Dep at 26:6-21.
[34] Motion, ECF-59, at 12. Defendants achieve this low "rate" by inflating their booking numbers. Each unique "booking" includes each time the same person is booked, released, rearrested, etc., an important omission considering MCSO's population largely consists of the same small slice of society. (*e.g.* Jason's final booking was his 36th). Defendants may also wish to rescind their claim of "low mortality rates" after seven AICs died in the seven months that followed the filing of Defendants' Motion.
[35] Ex. 204.
[36] Ex. 26; Ex. 208.
[37] Ex. 207.
[38] Ex. 29.
[39] Ex. 205.
[40] Ex. 206.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

Less prominent episodes also abound. In her ten years working at MCDC, Defendant Metea responded to more than 10 "medical back-ups" involving drug overdoses. At least eight of these overdoses involved opioids.[41]

### F. Multnomah County allowed AICs unfettered access to drugs within Inverness Jail Dorm Nine.

*"There is not enough evidence to know who gave [Jason] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."[42]*

A rudimentary effort to smuggle drugs into Inverness Jail Dorm Nine had been successfully operating for at least three months leading up to Jason's death on July 25th, 2019.[43] The operation entailed AICs within Dorm Nine placing calls on the recorded jail phone lines to suppliers outside of the jail to arrange "drops" of drugs on the jail property.[44]

These "drops" entailed a person walking onto a publicly accessible area of Inverness Jail property and leaving medium-sized electric taped bindles of heroin, methamphetamine, and/or syringes for intravenous drug use.[45] The specific location was under or behind railroad ties near the front of the "work crew shed" at Inverness. From there, select members of the work crew would pick up the drugs, insert them in their anus, walk them into the jail, and distribute them within Dorm Nine.[46] Despite this area being accessible to the public and AICs alike, MCSO had no surveillance cameras that covered it.[47]

These drops of heroin, methamphetamine, and paraphernalia occurred two to three times per week for at least three months prior to Jason's death, involving multiple different smuggling groups utilizing the same exact strategy, and even continued for several weeks after he died.[48]

---

[41] Metea Dep at 23:1-15
[42] Ex. 3A, p. 1.
[43] *Id.*
[44] Brown Dep at 57:16-23.
[45] "Medium-sized" means approximately four inches long by one inch wide. Ex 3, p. 89.
[46] Ex. 3A, p. 1.
[47] *Id.*, Ex. 4, p. 9; Brown Dep at 57-1-15; Zwick Dep at 37:1-18.
[48] Ex. 3A, p. 1; Zwick Dep at 101:11-102:9; 48:17-49:1 ("When one group went down, another group learned from the first group, and then took over the business… That's how they kept it going.").

Page 14 -    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Within the dorm, the drug use was widespread, well known, and obvious.[49] An AIC described the blatancy of the drug distribution within the dorm:

> [T]he guy that disbursed it was right close to my bunk. And so everyone pays for it with commissary, with bags of chips or whatever else. And so it was obvious like -- this is the kind of thing that was upsetting. It was so out in the open, people when they dish out commissary, everybody would come in. And one [at a] time they'd pick up their chips and whatever else and they would walk straight over to the guy that was dealing it and throw chips right in front of them in front of the deputies and everything and so it was just kind of like -- it just seemed so out in the open.[50]

This type of exchange took place once or twice each week.[51]  Likewise, to those listening, the use of jail phones for ordering drugs was equally obvious. "I mean, you could hear people on phone calls, people talking about it all the time."[52]

It was also obvious which type of drugs were coming in each week. If it was a meth week, "You could just tell overnight, like, when people are up all night, it's hard to sleep because they're making noise, talking. The deputies have to get involved to, you know, come in and tell them to go to sleep or be quiet. When it's a heroin week, everyone's nodding off and sleeping it off, you know, as opposed to being awake and agitated."[53]

The jail deputies and supervisors knew AICs were doing drugs. "When we'd go into outside work crew, the deputies would pull off people that were obviously high or hadn't slept or couldn't keep it together… and would make them stay in the dorm for that day." [54] This was a once or twice a week occurrence. The sole reason was drug use.[55]

Deputies also explicitly talked to AICs about their drug use. One said, "If you're going to do your drugs, do it in the bathroom, don't let me see it."[56] About a week prior to Jason's death, another deputy walked up to one of the principal drug distributors who was high on heroin and

---

[49] Taylor Dep at 27:9-10. ("Out of the 60 people [in Dorm 9], probably 40 of them were all involved in doing drugs."); Robinson Dep at 24:20 ("When drugs were here, everybody knows it.").
[50] Taylor Dep at 29:10-21.
[51] *Id.* at 34:2-7.
[52] Robinson Dep at 27:6-28:3. ("Q: What did you hear people talking about? A: Just get the package, just get the package. And yeah, bring the package… And then afterwards… it's a go.").
[53] Taylor Dep at 106:4-14; Robinson Dep at 27:6-7 ("I just remember everybody being up all night and it was pretty obvious,")
[54] Taylor Dep at 37:18-22.
[55] *Id.* at 38:2-9 ("Q: Would it happen for reasons other than drug use…? A: No, only drugs.").
[56] Robinson Dep at 43:17-44:7

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

said, "You're high." The AIC mildly protested, and the deputy simply said, "No, I know you're high," and walked away.[57]

MCSO's records also show the extent of its knowledge. By June 10th, when Jason was transferred into Dorm Nine, MCSO had already documented a serious contraband problem in the dorm. Between May 24th and June 10th, the Dorm Nine Activity Diary[58] contains many entries regarding AICs routinely smoking tobacco, possessing tobacco or lighters, being transferred to another dorm for contraband possession, and one instance where a syringe was found within the "shoe base" of a toilet stall. [59] Notably, the syringe that Jason used to inject the drugs that killed him was found in this "shoe base" after his death. Meaning, MCSO knew the "shoe base" was a hiding spot for syringes for 59 days before Jason died and did nothing about it.[60]

Inverness Facility Commander Kurtiss Morrison acknowledged that the presence of tobacco, lighters, and syringes meant that a smuggling operation was underway and successful and that even by May 27th, the amount of contraband in Dorm Nine was unacceptable.[61]

As June progressed, the problem continued. The dorm was "bunked-in" twice for smoking in the bathroom.[62] On June 21st, a deputy wrote, "Something is going on in this dorm, two other inmates asked if there was something in this dorm that was making them itch and not sleep."[63] Still, MCSO took no steps to determine either how the contraband was entering the dorm, or to prevent its entry.[64]

---

[57] Taylor Dep at 38:10-39:3; 108:6-12.
[58] The "Activity Diary" also known as the "CIMS Diary," is where "deputies working the housing units can make notations on general dorm activities." Morrison Dep at 54:15-55-21.
[59] Ex. 43, p. 23 (May 24th: "This dorm has been frequently smoking tobacco in the restroom after being warned not to dally. A couple of days last week. Wednesday and today this week."; May 27th: "A strong odor of smoke was detected coming from the bathroom… inmate… was found to have tobacco[.]"; "two lighters were found"); Id. p. 21 (June 1st: "I saw [an] inmate… hiding something in a book… when he opened the book inside there was a lighter."; June 10th: "[Inmate] moved to Dorm 16 on disciplinary for possession of contraband."). Morrison Dep at 65:8-13; Ex. 10, p. 1-3; Ex. 43, p. 3.
[60] Morrison Dep at 65:8-13; Ex. 10, p. 1-3; Ex. 43, p. 3.
[61] Morrison Dep at 57:11-18; 59:25-61:23.
[62] Ex. 43, p. 14-17. (June 14th and 29th).
[63] Id.
[64] Morrison Dep at 72:13-74:5; Ex. 44.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

On July 2nd, the drug use became so obvious that four AICs were asked to submit to urinary analyses.[65] Three refused, which is treated the same as testing positive, and the one that did provide a sample tested positive for multiple drugs.[66] Searches of the four AICs' bunks revealed a "crack pipe" and two syringes.[67]

In the wake of these discoveries, MCSO conducted one single "shakedown" – a full search of the dorm – on July 3rd. Apart from this single "shakedown," MCSO made no further efforts to determine how the drugs were entering the dorm until after Jason died. "I felt we took care of it and solved the problem," work crew supervisor Sgt. Brown explained.[68]

The problem was not solved. AICs continued to smoke and get caught smoking.[69] AICs continued to test positive for drugs.[70] Even after an AIC was found with a syringe near the work crew truck on July 15th, nobody at MCSO dared to think that it could be the work crew that was the point of entry for the drugs.[71]

Even after an Inverness nurse saw a disheveled woman digging in the bushes next to the visitor parking lot the day before Jason died – which led MCSO to find more than five syringes buried in a hole – MCSO did nothing other than dispose of the syringes.[72] Even though the amount of documented drug use in Dorm Nine was "unacceptable" and "potentially dangerous," MCSO did nothing to investigate or interdict the drug smuggling operation until after Jason's death. [73]

---

[65] Brown Dep at 109:9-110:10.
[66] Morrison Dep at 74:23-25.
[67] Ex. 44, p. 1-2.
[68] Brown Dep at 116:25-117:1.
[69] Ex. 43, p. 9-10 ("There seems to be a lot of smoking going on in this dorm").
[70] Id., p. 8 (July 17th: "Inmate Pradith… took a random U/A. He failed this test.")
[71] Id., p. 9 ("Inmate Gangewer was found in possession of a syringe on the back of the work crew truck."); Brown Dep at 123:8-23; Morrison Dep at 84:11-85:5.
[72] Blasko Dep at 42:11-44:13, 46:20-47:14. Ex. 3, p. 17.
[73] Reese Dep at 44:2-8 ("unacceptable"); Morrison Dep at 41:15-21; 84:11-85:5; 87:8-15 ("potentially dangerous").

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

The investigation ultimately concluded, "There is not enough evidence to know who gave [Jason] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."[74]

### G.  Jason's overdose and death within Inverness Jail.

On July 25th, 2019, from approximately 6:35 am until 3:00 pm, Jason worked on the outside work crew under the supervision of MCSO deputies.[75]  In the morning, while in the work crew truck, he used heroin.[76]  After returning to Dorm Nine, Jason continued using heroin. Between approximately 5:15 and 5:40 pm, AICs witnessed Jason both snorting and injecting heroin at his bunk.[77]

Surveillance video and eyewitness testimony reveal that the events of Jason's death transpire as follows: at 5:44:50, Jason walks up to the deputy station, leaning over the counter to support himself. He knocks on the door behind the counter at 5:45:14. Deputy McClure comes out by 5:45:29 and Jason tells him that he can't breathe, and he needs a nurse.[78] Deputy McClure then radioed for a nurse. For the next 90 seconds, Jason continues leaning over the counter at the deputy station, struggling to breathe. He is holding an asthma inhaler in his hand.[79]

At 5:47:00, Deputies instruct him to sit down in a chair as the first nurse, Camille Valberg arrives.[80] When she arrives, Nurse Valberg is pushing an "RN Cart." An RN cart is different from the "emergency medical cart," but should be – and usually is – stocked with Narcan.[81]

---

[74] Ex. 3A, p. 1.
[75] Pedro Decl., ¶¶ 33, 50, Ex. 24, 30.
[76] Ex. 3, p. 21-23; Nodding or "on the nod" is a term used to describe the high of heroin that is often mistaken as being very tired. Malaer Expert Report, at 11.
[77] Taylor Dep at 24:14-18; 26:6-27:21 ("literally over the book I could just see them doing bumps from where I was sitting); Robinson Dep at 29:25-30:18.
[78] Ex. 18(b), 5:44:50-5:45:30; Ex. 20.
[79] Ex. 18(b), 5:45:31-5:47:00.
[80] Valberg Dep at 121:6-11.
[81] Ex. 18(b), 5:47:05; Hatton Dep at 66:18-67:4; J. Wheeler Dep at 57:5-13.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

Nurse Valberg and her cart arrive at Jason's side at 5:47:10. As the first nurse to arrive, Nurse Valberg was in charge of the response to his medical event.[82] For the next 40 seconds, she does not speak with him or attempt to speak with him. She does not attempt to get his vital signs or perform any assessment of him whatsoever. Instead, she speaks with a deputy and opens several drawers in her cart, looking for an inhaler.[83]

At 5:47:51, Nurse Valberg first approaches Jason.[84] She crouches down and places a pulse oximeter on his finger but never obtains his blood oxygenation level.[85] She noticed that his respirations were "not labored as expected", but were "more shallow."[86] Nevertheless, despite "reduced respiratory rate" and "shallow breathing" being the first listed objective symptoms of opioid overdose within the MCHD Narcan use policy, Nurse Valberg did not administer Narcan.[87]

At 5:48:20, Nurse Koh Metea, Certified Medication Aide ("CMA") Stephanie Stewart, and CMA Amy Hatton arrive at Jason's side, bringing with them an Emergency Medical Cart stocked with five unexpired doses of Narcan.[88] Immediately upon arrival, they noticed that Jason was unable to breathe and his complexion, including around the lips, was changing to gray.[89] Despite "not breathing" and "turning pale, blue, or gray, especially lips" comprising the first two of the listed "signs of an overdose" in an MCHD training video, neither Nurse Metea nor Nurse Valberg administered Narcan to Jason.[90]

By 5:49, Jason's arms slide from the deputy station and he begins to go limp. CMA Hatton grabs him to hold him upright in the chair. While holding him, Hatton could still feel him breathing, describing his breath as "slow" and "shallow."[91] For the next 150 seconds, Hatton

---

[82] Metea Dep at 46:16-47:1.
[83] Ex. 18(b), 5:47:11-5:47:50; Valberg Dep at 124:16-125:10.
[84] Ex. 18(b), 5:47:51; Valberg Dep at 124:22-125:1.
[85] *Id.* at 129:15-17, Ex. 58, p. 25.
[86] *Id.*
[87] Ex. 51; Valberg Dep at 131:10-11; 132:3-4.
[88] Ex. 18(b), 5:48:20; Hatton Dep at 68:13-69:8; Valberg Dep at 132:10-15; Ex. 52, p. 2.
[89] Metea Dep at 48:4-15.
[90] Ex. 146. CMAs were not authorized to administer Narcan. Stewart Dep at 16:1-5.
[91] Hatton Dep at 72:25-73:8.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

holds Jason as nurses Valberg and Metea continue to observe him suffer the classic objective symptoms of opioid overdose.[92] Nobody administers Narcan.

At 5:51:30, Jason is lowered to the floor at Nurse Metea's direction.[93] At this point, Nurse Metea explained that she never considered whether his symptoms were consistent with that of an opioid overdose "because he told [the]deputy that he's having an asthma attack."[94] "He had enough chance to talk to [the] deputy about his opiate [use]. He didn't report it."[95] Nurse Valberg explained that, despite recently being served as a defendant in a lawsuit regarding the death of a separate overdosing inmate, "I definitely did not consider using Narcan" on Jason.[96]

Once lowered to the floor, Jason is unresponsive to outside stimulus and had stopped breathing. His complexion is light gray.[97] Moments later, Nurse Jami Wheeler enters the room pushing an RN cart also stocked with Narcan.[98] Per Nurse Wheeler, no one person was in charge when she arrived, and nobody conveyed Jason's vital signs to her. [99] After observing his condition for 90 seconds, despite her realization that "he was clearly in need of blood pumping through his body and air going into his lungs," Nurse Wheeler also did not give Jason Narcan.[100]

Over the ten minutes between Nurse Wheeler's arrival and the arrival of Portland Fire Bureau paramedics at 6:01:45, at no point did any of the nurses make any effort to administer Narcan to Jason.[101] Not after a deputy posed the question, "does he need Narcan?" at approximately 5:56.[102]  Not after a different deputy asked AICs if he had overdosed.[103] And not even after AICs began yelling out – before Portland Fire arrived – that Jason had overdosed and

---

[92] Ex. 18(b), 5:49:00-5:51:30; Ex. 51; Freedman Expert Report, at 4-7; Nahid Expert Report, at 2-5; Malaer Expert Report, at 19-21, 26; Poetter Expert Report, at 8-9.
[93] Ex. 18(b), 5:51-30.
[94] Metea Dep at 51:19-24.
[95] Id. at 52:8-10.
[96] Valberg Dep at 146:12-19.
[97] Hatton Dep at 78:2-11; 73: 19-21.
[98] Wheeler, Jami Dep at 57:5-13
[99] Id. at 58:16-18; 59:11-13.
[100] Id. at 61:17-62:1.
[101] Ex. 18(b), 5:51:30-6:01:45. Hatton Dep at 88:6-11; 89:5-10; Valberg Dep at 146:12-19 ("I definitely did not consider using Narcan.").
[102] Stewart Dep at 42:1-43:6; 47:10-48:4 ("Q. Are you confident that Deputy Wilson's comment about Narcan was before PDX fire arrived? A. Yes.").
[103] Stewart Dep at 47:10-48:4.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

needed Narcan.[104] "I don't really pay attention to them quite frankly," Nurse Valberg explained.[105]

Portland Fire wrote that when they arrived at 6:01:45, "staff did state there is a chance that the [patient] did do heroin as well." [106]  Within minutes of arriving, Portland Fire administered intramuscular naloxone, but by this point it was too late.[107] Jason had died.

Nevertheless, the medical defendants are uncritical of their response. Nurse Valberg: "I think we did everything appropriately. Absolutely. I think this was one of the better codes I've ever been through."[108] Nurse Metea, in turn, blames Jason:

> **Q.    Knowing what you know now, should medical staff have immediately administered Narcan to Mr. Jason?**
>
> A:    Yes and no. Yes, after [reading] that autopsy report. No, because he has ample opportunity to provide us that information. He failed.[109]

Nurse Metea also admonished CMA Hatton for performing mouth-to-mouth resuscitation. "She told me to never do it again," Hatton explained, "because you don't know what disease somebody has."[110]

### H.  Jason's cause of death was an overdose.

Per the Multnomah County Medical Examiner, Jason's cause of death was the "combined toxic effects of heroin and methamphetamine."[111] Despite Defendants' attempt to disavow the conclusions of its own medical examiner, the medical evidence is clear:

<u>Forensic Pathologist Dr. Lindsey Harle:</u>

The cause of death for Mr. Forrest is acute toxic effects of heroin and methamphetamine… [Defendant's expert] Dr. French references published data (Jacobsen et al) to suggest that the levels of heroin metabolites in Mr. Forrest's

---

[104] Taylor Dep at 98:13:99:2; Teeter Dep at 13:22-14:14; Wheeler, Jami Dep at 62:7-10.
[105] Valberg Dep at 149:7-12.
[106] Ex. 54, p. 2-3.
[107] Freedman Expert Report, at 6; Nahid Expert Report, at 2.
[108] Valberg Dep at 142:22-24.
[109] Metea Dep at 72:23-73:6. Of course, Mr. Forrest was unable to speak when Nurse Metea arrived. Metea Dep at 48:14-25. ("Q. When you arrived was he able to speak? A. No.").
[110] Hatton Dep at 98:14-22.
[111] EX. 105, p.1.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

blood are not consistent with acute heroin overdose as the cause of death. When these data are reviewed in full, they show that the 6-MAM and morphine concentrations in Mr. Forrest are well within the ranges reported in acute overdose deaths…. [T]he history of asthma and his presentation prior to his collapse in no way rule out acute drug toxicity as the primary cause of death. Rather, the fatal levels of heroin metabolites and methamphetamine in his blood are the most likely cause of death; an associated acute asthma exacerbation is a contributory factor. [112]

Emergency Medicine Physician Dr. Samuel Freedman:

Patients experiencing respiratory failure from asthma have rapid heart rate in excess of 120 beats per minute, rapid breathing with rates in excess of 30 per minute, sweating, accessory muscle use in breathing, inability and unwillingness to lie supine, inability to speak even partial sentences. Mr. Forrest had none of these. His respirations appear slow, no heart rate was taken. In fact, Dr Seale reads Nurse Valberg's chart note as, "respirations not labored as expected, more shallow." This is not asthma.[113]

Pulmonologist Dr. Payam Nahid:

The signs and speed at which this event unfolds is unquestionably consistent with opioid overdose… The signs of a severe [asthma] exacerbation are near opposites of those of opioid overdose. Severe asthma exacerbations present with tachypnea (>30 breaths/min), tachycardia >120 beats/min, use of accessory muscles of inspiration (eg, sternocleidomastoid muscles), diaphoresis, inability to speak in full sentences or phrases, inability to lie supine due to breathlessness, and pulsus paradoxus (i.e., a fall in systolic blood pressure during inspiration). These signs are indicative of severe airflow obstruction (2). Further, asthma symptoms and exacerbations develop over the course of hours to days, and not within minutes as was the cadence of Mr. Forrest's rapid respiratory failure and collapse. [114]

### I.  Multnomah County allows AICs unfettered access to drugs to this day.

MCHD Records reveal two AIC overdoses in November of 2020. One on November 4th, the other on November 14th, in which Narcan was given and the AIC's breathing returned to normal.[115] In July of 2022, AIC Stephen Murphy died at MCDC with fentanyl present in his blood.[116]

---

[112] Harle Rebuttal Expert Report, at 1 ("When these data are reviewed in full, they show that the 6-MAM and morphine concentrations in Mr. Forrest are well within the ranges reported in acute overdose deaths").
[113] Freedman Expert Report, at 5.
[114] Nahid Expert Report, at 2-3
[115] Ex. 108, p. 6-7.
[116] Ex. 209, p. 6.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

The year 2023 confirmed the dramatic prevalence of drug availability to AICs within Multnomah County Jails. From May 2nd, 2023 through August 1st, 2023, six AICs died within the jails. A seventh death occurred in October, marking four that have died since Defendants filed their Motion for Summary Judgment in this case.[117]

Of the seven 2023 deaths, only two affirmatively do not involve the use of drugs in custody. The cause of the most recent death is still pending. The others are as follows:

- The May 13th death of Allen Walker was determined to be due to upper gastrointestinal hemorrhage, but fentanyl and methamphetamine were both found within his blood.[118]

- The June 16th death of Martin Franklin was a suicide by ligature handing, but "a small bag of white powder, consistent with that of illicit substances" was found within his cell.[119]

- The July 19th death of Josiah Pierce was due to fentanyl toxicity. Mr. Pierce, like Mr. Forrest, died at Inverness Jail from drugs he consumed while in custody. The day prior to his death, deputies had suspected Mr. Pierce of consuming illicit drugs within the jail.[120]

- The August 1st death of Clemente Pineda was due to a fentanyl toxicity within his cell at MCDC. [121]

As a result of this spate of deaths, MCSO began keeping a log of drugs discovered within each of its jails.[122] The log for MCDC – which only covers July 30th, 2023 through January 15th, 2024 – notes nine instances of drugs discovered within housing dorms.[123] That is, drugs possessed by and accessible to AICs.[124] The same list for Inverness jail logs 12 instances of drugs discovered within housing dorms, plus one syringe.[125] The contraband reports that detail these incidents include reports of daily drug use, opioid overdose and resuscitation by Narcan, an

---

[117] Ex. 183; https://www.wweek.com/news/courts/2023/10/27/another-person-has-died-in-custody-in-multnomah-county-jail/.
[118] Ex. 210, p. 4.
[119] Ex. 211, p. 5.
[120] Ex. 190, p. 1, 8.
[121] Ex. 192.
[122] Reardon Dep at 18:16-20:10.
[123] Ex. 171; Reardon Dep at 49:16.
[124] Id. at 24:5-9.
[125] Ex. 173.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

inmate swallowing 1.5 grams of fentanyl, AICs snorting meth, AICs high on meth, AICs peer

pressuring another to deal drugs, and more.[126]

MCSO agrees that to date, it has not successfully prevented illegal narcotics and drugs of

abuse from being accessible to AICs within its jails. In fact, methamphetamine and fentanyl were

found within a dorm at Inverness the week prior to Multnomah County's deposition on the

subject. MCSO's explanation is as follows: "There are drugs, in our facilities, yes."[127]

## III.    LEGAL STANDARD

Summary judgment is appropriate only when, "with the evidence viewed in the light most

favorable to the non-moving party, there are no genuine issues of material fact, so that the

moving party is entitled to judgment as a matter of law." *Wilk v. Neven*, 956 F.3d 1143, 1147

(9th Cir. 2020) (citation omitted); Fed. R. Civ. P. 56(a).  To withstand summary judgment, a

plaintiff's burden of proof is "not high."  *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th

Cir. 2003).  The plaintiff must (1) "make a showing sufficient to establish a genuine issue of fact

with respect to any element for which it bears the burden of proof," (2) show that "there is an

issue that may reasonably be resolved in favor of either party" and therefore should be resolved

by the finder of fact; and (3) "come forward with more persuasive evidence than would

otherwise be necessary when the factual context makes the nonmoving party's claim

implausible."  *British Motor Car Dist., Ltd. v. S.F. Automotive Indus. Welfare Fund*, 882 F.2d

371, 374 (9th Cir.1989).

## IV.    ARGUMENT

### A. Defendant Nurses Valberg, Metea, and Wheeler were deliberately indifferent to Jason's serious medical needs.

To prevail on a claim of medical deliberate indifference against an official sued in his or

her personal capacity, "a plaintiff must demonstrate that (1) she had a serious medical need, (2)

the official was deliberately indifferent to that need, and (3) this indifference caused her harm."

---

[126] Ex. 172.
[127] Reardon Dep at 50:16-51:5.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

*Fricano v. Lane Cty.*, 2018 WL 2770643, at *5 (D. Or. June 8, 2018) (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). A serious medical need is one that, without treatment, "could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991). Defendants stipulate that Jason had a serious medical need.[128] Plaintiff likewise stipulates that as a post-conviction inmate, Jason's claims fall under the Eighth Amendment.

The Eighth Amendment's subjective deliberate indifference standard makes officials liable if the official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Castro v. Cty. Of Los Angeles*, 833 F.3d 1068 (9th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Still, deliberate indifference may be inferred from the obviousness of the risk, despite the official's denial of her awareness. *Farmer*, 511 U.S. at 842. Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Jett*, 439 F.3d at 1096 (quoting *McGuckin*, 974 F.2d at 1059). "Whether an official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

### i. Defendant Nurses knew of Jason's recent drug use.

Jason's use of heroin and methamphetamine is well documented within the MCHD medical records from his final incarceration. At his intake on April 29th, 2019, the nurse noted that he was a daily intravenous methamphetamine user, and that he "appears to be coming off of meth."[129] On May 5th, Jason wrote the following in a medical request form: "Coming down from heroin cant slep an I still get protocol (sic). 1 week." When nursing staff saw him

---

[128] Motion, ECF-59, at 46.
[129] Ex. 58, p. 12-14.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

following this request, the nurse wrote, "client reports heroin use, 'a lot', uses IV, last use 4/29/19[.]"[130]

Defendants had access to Jason's medical records. Nurses Valberg and Wheeler had specific occasion to review his chart when they provided medication to him on June 14th (Wheeler), and June 20th, 21st, July 18th, 21st and 22nd (Valberg).[131] Of note, July 21st and 22nd are within days of Jason's death.

### ii. Nurse Valberg was deliberately indifferent to Jason's serious medical needs.

Nurse Camille Valberg was the first medical professional to arrive at Jason's side after he reported trouble breathing. As the first nurse to arrive, Nurse Valberg was in charge of the response to his medical event.[132] Her knowledge, background, and character therefore merit scrutiny.

### a. Nurse Valberg had a history of deliberate indifference to overdosing AICs.

From April of 2016 until her termination in July of 2017, Nurse Valberg worked for Corizon Health, Inc. as a nurse within the Clackamas County, Oregon jail.[133] On November 3rd, 2016, Nurse Valberg was working while a recently admitted AIC, Bryan Perry, was overdosing on methamphetamine. Over the seven-minute and 26-second period that Nurse Valberg was present in Mr. Perry's cell, she provided no meaningful care to him, watched him stop moving and die, and then walked out of the room never to return.[134]

Federal District Court Judge Marco Hernandez, applying the Eighth Amendment standard, summarized the specifics of Nurse Valberg's deliberate indifference in denying her Motion for Summary Judgment regarding Mr. Perry's death: [135]

---

[130] *Id.*, p. 17.
[131] *Id.*, p. 53-54.
[132] Metea Dep at 46:16-47:1.
[133] Ex. 137.
[134] Ex. 91A. Nurse Valberg is the nurse wearing a blue shirt in the video.
[135] *Nordenstrom v. Corizon Health, Inc., et al,* 3:18-CV-01754-HZ (D. Or.), ECF 115, at 26-27. (Internal citations omitted).

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

Nurse Valberg conducted her assessment of Mr. Perry around 11 pm. There is video evidence of the entire assessment. In her late entry chart note, Nurse Valberg said that Mr. Perry sat up on his own at the start of her visit,[136] but the video shows two deputies lifting Mr. Perry into a seated slumped position.[137] Nurse Valberg attempted to check his blood pressure while he was in this position. During this check Mr. Perry stopped moving.[138] A deputy in the cell stated at this point Mr. Perry's "breath started slowing" and that he "was foaming at the mouth."

Nurse Valberg did not begin life saving measures at this point but left the cell to retrieve an automatic blood pressure cuff. When she returned, Mr. Perry was still motionless lying flat on his back. Again, rather than check his vitals or call for emergency help, Nurse Valberg attempted to use the automated blood pressure machine on Mr. Perry. At the suggestion of a deputy, Nurse Valberg then attempted to use an AED. She delayed CPR while she waited for it to work properly.[139] Deputy Savage, who was in cell during the assessment testified that in this time the "color left his body" and "he turned to a gray, kind of ashy color."

In the incident report, Sergeant Johnson wrote that when he arrived in the cell, around when Nurse Valberg was waiting for the AED to work, "Mr. Perry was ashy colored and was not breathing on his own that I could tell." At the apparent direction of Nurse Valberg, jail staff did not begin sustained CPR or call 911 until approximately 5 minutes after Mr. Perry appears to stop moving in the video.[140]

Bryan Perry's estate filed suit against Nurse Valberg on October 2nd, 2018, less than 10 months prior to Jason's death under her care. She was personally served a copy of the lawsuit and read it.[141] Accordingly, at the time of Jason's overdose event, Nurse Valberg was on notice of the consequences of providing deliberately indifferent medical care to an overdosing inmate.

### b. Nurse Valberg harbored racial animus against Black people like Jason.

Multnomah County's Protected Class Complaint Investigation Unit conducted an extremely thorough investigation into Nurse Valberg's racial animus, interviewing eighteen witnesses. The conclusion was stark: Nurse Valberg engaged in discriminatory conduct on the

---

[136] Ex. 136.
[137] Ex. 91A at 00:11-00:27.
[138] *Id.* at 02:36.
[139] *Id.* at 04:05-07:25.
[140] *Id.* at 02:36-07:49
[141] Valberg Dep at 94:1-11.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

basis of race and national origin.[142] The racist and/or discriminatory comments and sentiments

that Nurse Valberg espoused while at work at Inverness include the following:

-   Valberg stated, "All of the black people should sit on one side of the room, and all of the white people should sit on the other side and then no one will get offended."[143]

-   In a conversation about a Syrian AIC, Valberg said that she "hates it when people change their names to Muslim names and become terrorists."[144]

-   Valberg wrote to her supervisor, "The stress here is becoming less and less worth it. Fire me. Hire a black nurse. At least maybe she'll/he'll get treated better."[145]

-   Valberg used her own life as an example to criticize black people, explaining that she did not ever use welfare or need a handout from the system.[146]

-   Valberg said, "I feel like black people have more rights than white people."[147]

-   Valberg spoke extensively about how the County was, in her view, engaged in "reverse racism" against white people.[148]

-   Valberg said that she believed many County employees should not have their jobs, referring to African American employees.[149]

-   Valberg complained that she was tired of others accusing her of being racist, saying that she could not be racist because her daughter is gay and she once dated a black man.[150]

-   She confronted a Filipino nurse about his immigration status, asking him if he was "illegal."[151]

-   She told an LGBT medication aide that "being gay was going against nature and against God, and it was a choice."[152]

Co-workers at MCHD agreed that Nurse Valberg harbored racist, discriminatory

sentiments. According to her supervisor, she was "someone who liked to categorize people," and

---

[142] Ex. 97, p. 15. ("Valberg did engage in discriminatory verbal conduct on the basis of race and national origin.").
[143] *Id.*, p. 2.
[144] *Id.*
[145] Ex. 95.
[146] Ex. 97, p 5. She was, however, booked into the Multnomah County Jail on multiple occasions. Ex. 46; Ex. 130, p. 1.
[147] Ex. 97, p. 5.
[148] *Id.*, p. 6, 8.
[149] *Id.*, p. 6.
[150] *Id.*, p. 2, 8.
[151] *Id.*, p. 10, Hatton Dep at 40:19-41:9.
[152] *Id.* at 42:5-23.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

that she spoke with an intonation of derision about others.[153]  A fellow nurse explained, "She is all about the, we're [white people] the ones who are having issues. It is always we are the ones being discriminated against."[154] A nurse practitioner noted another problem: he could not understand how Nurse Valberg could have these "internalized feelings and phobias, and care for the people within the communities that Corrections Health serves."[155]

Beyond this, Valberg espoused an affinity for the hate group the Proud Boys,[156] describing to a co-worker that she had gone through a vetting process to meet with a member of the group after contacting the "main guy" on Facebook.[157]  These connections, coupled with her inflammatory racial comments, caused the current MCHD Corrections Health Director – a black man – to fear for his physical safety and the safety of his family.[158]

Ultimately, Multnomah County agrees that Nurse Valberg discriminated against black people like Jason:

> **Q.   Nurse Valberg did engage in a pattern of ongoing discriminatory behavior?**
> A.    Yes.
>
> **Q.   [T]he discriminatory behavior included discriminatory behavior towards black people?**
> A.    Yes, about race in general. People that are not white.[159]

Nurse Valberg's care of Jason, a mixed-race African American man, exists only within this context.

### c.  When Jason overdosed, Nurse Valberg was deliberately indifferent to his serious medical needs.

Nurse Valberg was the first nurse to arrive at Jason's side at 5:47:11, pushing a cart that was likely stocked with Narcan.[160] For the next 40 seconds, she did not speak with Jason or

---

[153] Propert Dep at 79:8-12.
[154] Ex. 97, p. 8.
[155] *Id.*
[156] The County agrees that the Proud Boys are a hate group as designated by the Southern Poverty Law Center. Ex. 97, p. 1, fn. 1.
[157] *Id.*, p. 2. Notably, the former leader of the Proud Boys and three lieutenants were convicted of Seditious Conspiracy in relation to the January 6th, 2020, insurrection. *See: USA v. Nordean* et al, 1:21-cr-00175-TKJ-5 (D.C. District Court), ECF-804.
[158] Obiero Dep at 59:16-60:22.
[159] Propert Dep at 97:3-9
[160] Valberg Dep at 121:6-11; Ex. 18(b), 5:47:11; Hatton Dep at 66:18-67:4; Wheeler, Jami Dep at 57:5-13.

Page 29 -   **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

attempt to speak with him. She did not attempt to obtain his vital signs or perform any assessment of him whatsoever.[161]

When she did approach Jason at 5:47:51, she placed a pulse oximeter on his finger but never obtained his blood oxygenation level.[162] She noticed that his respirations were "not labored as expected", but were "more shallow."[163] Nevertheless, despite "reduced respiratory rate" and "shallow breathing" being the first listed objective symptoms of opioid overdose within the MCHD Narcan use policy, Nurse Valberg did not administer Narcan.[164]

At 5:48:20, Nurse Metea and CMAs Stewart and Hatton arrived, along with the emergency medical cart and its five doses of Narcan.[165] At this time, Jason was unable to breathe and his complexion and lips were changing to gray.[166] Despite "not breathing" and "turning pale, blue, or gray, especially lips" being the first two listed "signs of an overdose" in an MCHD training video,[167] Nurse Valberg did not give Jason Narcan.[168] By 5:49, Jason began to go limp. CMA Hatton, holding him upright in the chair, could still feel him breathing, describing his breath as "slow" and "shallow."[169] For the next 150 seconds, Hatton held Jason as Nurse Valberg continued to watch him suffer the classic objective symptoms of opioid overdose.[170]

Medical staff lowered Jason to the floor at 5:51:30.[171] He was then unresponsive to outside stimulus and had stopped breathing. His complexion was light gray.[172] For the next six minutes, Nurse Valberg did nearly the exact same things that Judge Hernandez found to be

---

[161] Ex. 18(b), 5:47:11-5:47:50; Valberg Dep at 124:16-125:10
[162] Ex. 18(b), 5:47:51; Valberg Dep at 124:22-125:1; 129:15-17, Ex. 58, p. 25.
[163] *Id.*
[164] Ex. 51; Valberg Dep at 131:10-11; 132:3-4.
[165] Ex. 18(b), 5:48:20; Hatton Dep at 68:13-69:8; Valberg Dep at 132:10-15; Ex. 52.
[166] Metea Dep at 48:4-15.
[167] Ex. 146.
[168] CMA Hatton did not know at the time whether she was authorized to administer Narcan. Hatton Dep. at 59:22-25.
[169] *Id.* at 72:25-73:8.
[170] Ex. 18(b), 5:49:00-5:51:30; Ex. 51; Freedman Expert Report, at 4-7; Nahid Expert Report, at 2-5; Malaer Expert Report, at 19-21, 26; Poetter Expert Report, at 8-9.
[171] Ex. 18(b), 5:51-30.
[172] Hatton Dep at 78:2-11; 73: 19-21.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

among the deliberately indifferent aspects of her care of Mr. Perry.[173] For Perry, she left the cell to retrieve an automatic blood pressure cuff while Mr. Perry lied motionless on his back, not breathing, and then wasted more time attempting to use the blood pressure cuff and then later an AED. She never began CPR or called for an emergency response.[174] For Jason, she likewise attempted to obtain his blood pressure while he lied motionless on his back, not breathing, and then needlessly and repeatedly interrupted CPR to attempt to use two separate AEDs.[175]

By 5:57:28 she ceased to play any active role in Jason's care. She can be seen kicking items on the floor and then standing – with her hands on her hips for 90 seconds – as Jason progressed closer towards death. The final two minutes before the paramedics arrived were no different. Nurse Valberg crouched down several times, including as CPR was stopped when Nurse Diamond arrived, but she provided no meaningful care to Jason.[176]

Nurse Valberg was deliberately indifferent to Jason's serious medical needs. Her failure to administer Narcan to Jason at any point is inexcusable. She did nothing even after the deputy posed the question, "does he need Narcan?" at 5:56.[177]  She did nothing after the other deputy asked AICs if he had overdosed.[178] She did nothing after AICs began yelling out – before paramedics arrived – that Jason had overdosed and needed Narcan.[179] Her explanation is revealing: "I don't really pay attention to them quite frankly."[180]

She did, however, pay enough attention to tell a detective six days later that, "she heard the deputies asking the group inmates in the dorm if any of them knew about [Jason] possibly having used drugs in the jail," and that she heard the response of "heroin."[181]

---

[173] *Nordenstrom v. Corizon Health, Inc., et al,* 3:18-CV-01754-HZ (D. Or.), ECF 115, at 26-27. (Internal citations omitted).
[174] Ex. 91A at 04:05-07:25.
[175] Ex. 18(b), 5:51:44 - 5:57:21; Poetter Expert Report, at 6. ("Not only did the Multnomah Medical staff appear to have issues providing CPR which was complicated by their attempts to utilize the AED, but the issues with the first AED served to delay and interrupt the CPR response even further.").
[176] Ex. 18(b), 5:57:28-5: 6:01:47.
[177] Stewart Dep at 42:1-43:6; 47:10-48:4 ("Q. Are you confident that Deputy Wilson's comment about Narcan was before PDX fire arrived? A. Yes.").
[178] *Id.* at 47:10-48:4.
[179] Taylor Dep at 98:13;99:2; Teeter Dep at 13:22-14:14; Wheeler, Jami Dep at 62:7-10.
[180] Valberg Dep at 149:7-12
[181] Ex. 3, p. 54.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

The record is overflowing with facts from which a reasonable jury may conclude that Nurse Valberg was deliberately indifferent to Jason's serious medical needs and that she was subjectively aware of the risk of her inaction. "Whether an official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The risk was obvious, well-known to Nurse Valberg, and her conduct, in light of her history, was unconscionable.

### iii. Nurse Metea was deliberately indifferent to Jason's serious medical needs.

Nurse Metea had nearly as much of an opportunity to save Jason's life as Nurse Valberg, arriving only two minutes later.[182] Moreover, she had the requisite knowledge to know to administer Narcan under the circumstances, having responded to "more than eight" opioid overdoses of AICs over her career at MCHD, administering naloxone twice.[183] She knew the protocol for responding to an opioid overdose, explaining: "We check the respiration, their pupil. We check their skin color. We also stimulate patient to see if they're responding… And if it's a respiration less than ten, we often give them Narcan."[184]

Jason met Nurse Metea's own guidelines for Narcan administration. When she arrived, she testified that, "he was not breathing," "he had some mottled color change around the lips… not purple but graying," and he was unable to speak.[185] Yet, she did not administer Narcan. Instead, like Nurse Valberg, she did nothing useful for the next eleven minutes and thirty seconds until paramedics came while Jason lied motionless on the floor, dying. And, after he was lowered to the ground, she provided no care to Jason whatsoever. She instead began filling out a form.[186]

---

[182] Ex. 18(b), 5:48:20.
[183] Metea Dep at 23:1-15; 23:25-25:2.
[184] *Id.* at 23:16-24.
[185] *Id.* at 48:4-18.
[186] Ex. 18(b), 5:52:23-6:01:51, Metea Dep at 57:9-25.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

As with Nurse Valberg, the record is littered with evidence that shows Nurse Metea had the requisite knowledge of the risk, and that she was deliberately indifferent to Jason's serious medical needs. She likewise didn't give him Narcan after the deputy suggested it. She likewise did nothing after the other deputy asked AICs if he had overdosed. She likewise did nothing after AICs yelled out that he had, in fact, overdosed.

Instead, she blames Jason. "He had enough chance to talk to deputy about his opiate [use]. He didn't. He didn't report it."[187] She later testified, "[H]e ha[d] ample opportunity to provide us that information. He failed."[188] Of course, Jason was unable to speak when Nurse Metea arrived.

Last, she chastised CMA Hatton for attempting to save Jason's life by performing mouth-to-mouth resuscitation. "She told me to never do it again," Hatton explained, "because you don't know what disease somebody has."[189]

### iv.  Nurse Wheeler was deliberately indifferent to Jason's serious medical needs.

Nurse Wheeler, arriving at 5:51:43, was present for a full ten minutes before paramedics arrived.[190] Per Nurse Wheeler, the cart she was pushing "should be" stocked with Narcan.[191] When she arrived, Jason was lying on the ground, and "unconscious," and unresponsive to outside stimulus. Nurse Wheeler specifically remembered him "looking blue."[192] Nobody relayed to her any of his vital signs, but she never attempted to obtain them.[193]

As with Nurses Valberg and Metea, Wheeler never made any attempt to administer Narcan to Jason. She did nothing after the deputy suggested it at 5:56. She did nothing after the other deputy asked AICs if Jason had overdosed. She did nothing after AICs yelled out that he

---

[187] *Id.* at 52:8-9.
[188] *Id.* at 72:23-73:6.
[189] Hatton Dep at 98:14-22.
[190] Ex. 18(b), 5:51:43.
[191] Wheeler, Jami Dep at 57:5-13.
[192] *Id.* at 59:21-60:10.
[193] *Id.* at 59:11-16.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

had, in fact, overdosed – something she specifically remembers hearing.[194] At a minimum, a question of fact remains as to whether Nurse Wheeler had the requisite knowledge of the risk – via her recent access to Jason's medical records – and whether her care was deliberately indifferent to Jason's obviously serious medical needs.

> **v.    Defendants' deliberately indifferent medical care was the cause of Jason's death.**

Medical experts agree that had any one of Nurses Valberg, Metea, and Wheeler given Narcan to Jason, he would be alive. The failure of each to administer Narcan is what caused him to die.

Dr. Nahid:

> that Mr. Forrest presented with clear signs of opioid overdose and had he received naloxone by jail nursing staff, it is more likely than not that the naloxone would have rapidly reversed the effects of opioid overdose and that Mr. Forrest would have survived this episode, just as he had done [when given Narcan during a prior overdose] on March 1st, 2019.[195]

Dr. Freedman:

> Nurse Camille Valberg, Nurse Koh Metea… and Nurse Jamie Wheeler['s] failure to identify Mr. Forrest's obvious symptom presentation as that of a narcotic overdose is what directly caused Mr. Forrest's death… [A] properly trained medical professional does not need to be told someone is overdosing in order to identify and treat a narcotic overdose… Given proper care, recognition, and treatment by the Medical Staff, Narcan would have been administered at once, respirations would have resumed, and the methamphetamine symptoms would have been treated less acutely with blood pressure correction and heart rate control.[196]

Robert Malaer, RN:

> The delayed administration of Narcan by the [Inverness] staff until arrival of the EMS more likely than not resulted in the death of [Jason].[197]

Dawn Poetter, Paramedic:

> Even after a patient goes into respiratory/cardiac failure (as Mr. Forrest did) Narcan is recommended…. Narcan displaces the opiate from the receptors that uptake the

---

[194] *Id.* at 62:5-10 ("I remember generally speaking that around the time that the paramedics showed up, that other of the inmates in the dorm started shouting that he may have overdosed.").
[195] Nahid Expert Report, at 2.
[196] Freedman Expert Report, at 3-4, 7.
[197] Malaer Expert Report, at 26.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

drug and causes respiratory arrest. By using the drug early, reversal is a possibility even in cardiac arrest.[198]

Defendants' failure to administer Narcan to Jason is the most direct cause of his death. If even one of these nurses had not been deliberately indifferent to his serious medical needs, Jason would be alive today.

### vi.    Defendant Nurses Valberg, Metea, and Wheeler are not entitled to qualified immunity.

Qualified immunity protects "government officials performing discretionary functions… from liability for civil damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Courts determine whether qualified immunity applies by analyzing "whether there has been a violation of a constitutional right[,]" and, if so, "whether that right was clearly established at the time of the official's alleged misconduct." *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019), *cert denied sub nom. Jessop v. City of Fresno, Calif.*, 140 S. Ct. 2793 (2020), *reh'g denied*, 2020 WL 449721(Aug. 3, 2020) (citations omitted). Courts retain "discretion to decide the order in which to engage in these two prongs" of the qualified immunity analysis. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Where there are factual disputes as to the parties' conduct or motives, the matter cannot be resolved at summary judgment on qualified immunity grounds. *Lolli v. County. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003).

In the context of qualified immunity, a plaintiff need only show that a reasonable trier of fact could conclude that the officials violated his or her federal constitutional rights, and that reasonable trier of fact could find those rights to be clearly established. *Johnson v. Tillamook Cty.*, 2016 WL 11383939, at *8 (D. Or. Apr. 18, 2016), *report & recommendation adopted by*

---

[198] Poetter Expert Report, at 9.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

2016 WL 3946919 (D. Or. July 20, 2016) (citing *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002)).

> ### a. Jason's constitutional right to adequate medical care was clearly established when he was incarcerated at Inverness Jail.

Qualified immunity requires "clearly established statutory or constitutional rights of which a reasonable person would have known. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citation omitted). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Whether the law was clearly established is an objective standard; the defendant's subjective understanding of the constitutionality of his or her conduct is irrelevant." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) (internal quotation marks and citations omitted). "To show that the right in question [is] clearly established, [a plaintiff] need not establish that [the officers'] behavior had previously been declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998) (internal quotation marks omitted).

An inmate has a right to receive medical care without deliberate indifference to her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995) (rejecting attempt to narrow the definition of the right to adequate medical care in the prison context because doing so would allow defendants to "define away all claims"). That right derives from both the Eighth and Fourteenth Amendments. *Sandoval v. City of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021).

"The Ninth Circuit has held that it is clearly established that a prison official cannot intentionally deny or delay medical care." *Johnson v. Tillamook Cty.*, 2016 WL 11383939, at *8 (D. Or. Apr. 18, 2016), *report & recommendation adopted by* 2016 WL 3946919 (D. Or. July 20, 2016) (citing *Clement*, 298 F.3d at 906); *see also Frary v. County of Marin*, 81 F. Supp. 3d 811,

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

825–30 (N.D. Cal. Feb. 25, 2015). "[S]tanding idly by and not calling for medical help or ensuring medical help was on the way" amounts to "'an unconstitutional failure to provide life-saving measures to an inmate in obvious need.'" *Nordenstrom v. Corizon Health, Inc.*, 2021 WL 2546275, at *10 (D. Or. June 18, 2021) (quoting *Sandoval*, 985 F.3d at 679). Prison officials may also be held liable if they "know that inmates face a substantial risk of serious harm and disregar[d] that risk *by failing to take reasonable measures to abate it*." *Castro*, 833 F.3d 1060, 1067 (citing *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009)) (emphasis in original).

Likewise, at the time of Jason's death, the law was well settled that prison officials "violate the Constitution when they choose a course of treatment that is medically unacceptable under all of the circumstances." *Gordon v. Cty. of Orange*, 6 F.4th 961, 970 (9th Cir. 2021). In cases involving "choices between alternative courses of treatment," a plaintiff must demonstrate that "'the course of treatment the doctors chose was medically unacceptable under the circumstances' and that 'they chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Id.* (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). The facts in the summary judgment record clearly meet this standard as to Defendants' conduct.

To be sure, Plaintiff need not cite a case addressing every specific factual circumstance of this case for the rights at issue to be clearly established. "'State officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances—*i.e.*, even without a prior case that had 'fundamentally similar' or 'materially similar' facts.'" *Nordenstrom*, 2021 WL 2546275, at *10 (quoting *Sandoval*, 985 F.3d at 680).

In light of the above, a reasonable jail nurse under the circumstances would have known that failing to administer Narcan or naloxone to Jason was "an unconstitutional failure to provide 'life-saving measures to an inmate in obvious need.'" *Sandoval*, 985 F.3d at 679. This right was clearly established at the time of Jason's death, and Defendants Valberg, Metea, and Jami Wheeler are not entitled to qualified immunity.

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

**B. Genuine disputes of material fact exist with respect to Plaintiff's Monell claim against Multnomah County.**

Under *Monell v. Department of Social Services*, the County may be liable under § 1983 if its policies, customs, or practices caused Jason's injuries through deliberate indifference to a constitutional right. *Monell v. Department of Social Services* 436 U.S. 658, 694 (1978). To prevail on a *Monell* claim, a plaintiff must show "that (1) she was deprived of a constitutional right, (2) the entity had a policy or custom evincing its deliberate indifference to the prisoner's constitutional right, and (3) the policy or custom was the moving force behind the constitutional violation." *Fricano*, 2018 WL 2770643, at *9 (D. Or. June 18, 2018) (citing *Burke v. County. of Alameda*, 586 F.3d 725, 734 (9th Cir. 2009)).

### i.    Constitutional Rights at Issue

The Eighth Amendment's prohibition on cruel and unusual punishment prevents government officials from acting with deliberate indifference to an inmate's 1) health and safety, or 2) serious medical needs. *Hope v. Pelzer*, 536 U.S. 730, 737–38, (2002) (health and safety); *Estelle*, 429 U.S. 97, 104 (serious medical needs).

A plaintiff must prove that she suffered a "sufficiently serious" deprivation, such as "incarcerat[ion] under conditions posing a substantial risk of serious harm," *id.* or that she had a "serious medical need," *Jett*, 439 F.3d 1091, 1096. A medical need is serious when the failure to treat it could result in significant injury or the unnecessary and wanton infliction of pain. *Id.* at 1096.[199]

When assessing whether a plaintiff was exposed to a substantial risk of serious harm, courts look to whether the risk "is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). This inquiry "is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire v. Cal. Dep't of Corr. & Rehab*, 726 F.3d at 1075–76.

---

[199] Defendants do not contest that Jason had a "serious medical need." Motion, ECF-59, at 46.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Unfettered access to illegal drugs and narcotics within a jail or prison is sufficiently serious to violate this right. *Zakora* v. *Chrisman*, 44 F.4th 452 (6th Cir. 2022), *cert. denied 599* U.S. __ (2023).  Likewise, the risk of injury or death from illegal drugs and narcotics inside a jail or prison 'is not one that today's society chooses to tolerate.'" *Id.* at 470 (quoting *Helling,* 509 U.S. 25, 36).

ii.    **The *Monell* deliberate indifference standard is objective.**

While under the Eighth Amendment, a claim of deliberate indifference against an individual jail official employs a subjective standard, the standard for municipalities is an objective one, "for the practical reason that government entities, unlike individuals, do not themselves have states of mind."  *Estate of Vela v. Cty. of Monterey*, 2018 WL 4076317, at *3 (N.D. Cal. Aug. 27, 2018) (quoting *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248 (9th Cir. 2016).  The standard is satisfied "when 'a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Mendiola-Martinez v. Arpaio*, 836 F.3d at 1248–49 (quoting *Castro*, 833 F.3d at 1076).

iii.    **Sources of *Monell* Liability.**

Policies of action or inaction may give rise to *Monell* liability.  "A policy of action is one in which the governmental body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a governmental body's 'failure to implement procedural safeguards to prevent constitutional violations.'" *Johnson v. Corizon Health, Inc.*, 2015 WL 1549257, at *9 (D. Or. Apr. 15, 2015) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1143 (9th Cir. 2012)).

A policy need not be written; policies "include[e] the acts of policymaking officials… practices so persistent and widespread as to practically have the force of law," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), or a "'deliberate choice to follow a course of action… made from among various alternatives by the official or officials responsible for establishing

Page 39 -    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571**

final policy with respect to the subject matter in question," *Castro*, 833 F.3d at 1075 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).  *Monell* liability may also arise from a "showing that the municipal entity had a permanent and well-settled practice, or 'custom,' which gave rise to the constitutional violation." *Fricano.*, 2018 WL 2770643, at *10.

A policy or custom may be shown by post-event evidence.  *Henry v. County of Shasta* 132 F.3d 512 (9th Cir. 1997), *amended*, 137 F.3d 1372 (9th Cir. 1998), *cert. denied*, *Coolbaugh v. Louisiana* 525 U.S. 819 (1998); *Johnson v. Corizon Health, Inc.*, 2015 WL 1549257, at *12.  Where the lack of training creates an obvious potential for a constitutional violation, failure to train gives rise to liability.  *Shadrick v. Hopkins Ct., Ky.*, 805 F.3d 724, 738–39 (6th Cir. 2015).

The deprivation of the constitutional right may also be based on the deliberate indifference of an individual "if [the municipality's] policies and customs were a moving force behind this deprivation and reflect their own deliberate indifference." *Fricano*, 2018 WL 2770643 at *10.  But even if the individuals are not personally liable, the municipality may be liable if "the combined acts or omissions of other officials operating under a municipal policy or custom, or an affirmative policy or custom which is constitutionally suspect on its face, created a 'substantial risk of harm' to [the plaintiff] and was employed despite the risk of harm being 'obvious.'" *Id.* at *10 (citing *Gibson v. County. of Washoe, Nev.*, 290 F.3d 1175, 1188–90 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d 1060).

Likewise, the conduct of an individual gives rise to *Monell* liability when a person with decision-making authority for the municipality ratifies the conduct. *Fricano*, 2018 WL 2770643, at *12. Ratification may also occur where a County decisionmaker acquiesces in a custom or practice of which the supervisor must have been aware, *Id.* (citing *City of St. Louis v. Paprotnik*, 485 U.S. 112, 130 (1988)).  Ratification is a question of fact for the jury.  *Ashley v. Sutton*, 492 F. Supp. 2d 1230, 1238 (D. Or. 2008).

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Lastly, to constitute the "moving force" behind the constitutional violation, the policy or custom must be "closely related to the ultimate injury." *Gibson*, 290 F.3d 1196.

### iv. Jason was deprived of two constitutional rights under the Eighth Amendment.

Unfettered access to illegal drugs and narcotics within a jail or prison violates an inmate's Eighth Amendment right to health and safety. *Zakora*, 44 F.4th 452, *cert. denied 599* U.S. __ (2023). Notably, MCSO leadership agrees that AICs have a right to a drug-free environment.[200]

As detailed above, the level of access that AICs had to illegal drugs within Inverness Jail Dorm Nine in the months leading to Jason's death was profound. It was obvious when it was a "heroin week" or a "meth week."[201] The dorm was so awash in drugs that MCSO concluded, "There is not enough evidence to know who gave [Jason] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."[202] This level of unfettered access to illegal drugs and narcotics violated Jason's Eighth Amendment right to health and safety.

Likewise, Jason was deprived of his constitutional right to be free from deliberate indifference to his serious medical needs, detailed *supra* at IV (A).

### C. Multnomah County had policies, customs, and practices that give rise to *Monell* liability.

#### i. Multnomah County had a policy, custom or practice of allowing AICs unfettered access to illegal drugs and narcotics.

The summary judgment record contains overwhelming evidence that in the months leading up to Jason's death and continuing for several weeks after, Multnomah County had a custom or practice of allowing the AICs within Inverness Jail Dorm Nine unfettered access to drugs.[203] The breadth and obviousness of the drug smuggling operation and massive amount of

---

[200] Morrisey O'Donnell Dep at 21:6-8 (Q: Would you agree that inmates at Multnomah County jails have a right to a drug-free environment? A: Yes.); Morrison Dep at 20:15-17 (same); Peterson Dep at 33:17-20.
[201] Taylor Dep at 106:4-14; Robinson Dep at 27:6-7 ("I just remember everybody being up all night and it was pretty obvious,")
[202] Ex. 3A, p. 1.
[203] Zwick at 48:17-49:1, 101:11-102:9; Ex. 3A, p. 1

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

drugs within the dorm are shocking, except to MCSO. "It happens a lot," said an Inverness

Sergeant, "so I mean it's not surprising."[204]

More, Multnomah County has continued this practice of allowing AICs access to illegal

drugs and narcotics through today, culminating with the spate of recent overdoses and deaths.

Only after two overdose deaths within weeks in the summer of 2023 did MCSO finally introduce

a policy to track the quantity and type of contraband confiscated within MCSO jails.[205]

The specific policies, customs, and practices that fall within this umbrella – that is, those

which enabled AICs to access to illegal drugs while incarcerated – are detailed below. Each of

these policies, customs, or practices was "closely related to" – and therefore was a "moving

force" – behind Jason's death. *Gibson*, 290 F.3d 1196. Put another way, had any one of the

policies or customs not persisted, the drug smuggling scheme would have been discovered,

interdicted, and the drugs that killed Jason never would have entered the facility. He would be

alive today.[206]

### ii. Multnomah County had a policy, custom or practice of failing to monitor and supervise AIC work crews at Inverness Jail.

One month following Jason's death, Inverness Jail Work Crew Sergeant Dan Brown

created the MCSO Work Crew Action Plan, which details how MCSO's then-existing policies

and procedures regarding inmate work crews directly led to the introduction into the facility of

the very drugs which killed Jason.[207] Prior to Jason's death, MCSO 1) did not constantly

supervise AICs on the work crew; 2) had no requirement that AICs remain in the line-of-sight of

the work crew deputy; 3) did not have surveillance camera coverage of all areas accessible to

AIC work crews on-site; 4) had no way of searching for contraband hidden within an AIC's body

as it did not have a body scanner; and 5) did not administer any random urinalysis testing to

---

[204] Maxwell Dep at 62:16-24.
[205] Reardon Dep at 18:16-20:10.
[206] Stanley Expert Report; Bishop Expert Report; Harle Expert Report; Harle Rebuttal Report.
[207] Ex. 4.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

members of the outside work crew.[208] The drug smuggling scheme took advantage of this lackadaisical supervision to successfully flood the work crew dorm with drugs for months, culminating in Jason's death.

Similarly, MCSO failed to connect the dots even when confronted with specific evidence that the work crew was the source of the drugs prior to Jason's death. On July 15th, a work crew AIC was found in possession of a syringe in the work crew truck. Two days later, a work crew AIC failed a urinalysis.[209] MCSO continued business as usual.[210]

Further, Inverness Jail Facility Commander Kurtiss Morrison was simply unfamiliar with the policies and practices in effect within parts of his jail.[211] He was specifically unfamiliar with the policies and practices of the work crew, because it is "sort of a separate unit, working out of the facility, supervised primarily through the sergeant, and not something I'm directly observing[.]"[212] This, despite the work crew sergeant reporting directly to him.[213]

The record is clear that – at a minimum – a question of fact exists as to whether MCSO had a policy, custom, or practice of failing to monitor and supervise AICs work crews at Inverness Jail. This policy, custom, or practice was a "moving force" behind the constitutional violation in that it was "closely related to" the ultimate injury. Had MCSO supervised the work crew, it would have interdicted the drug smuggling scheme, and the drugs with which Jason overdosed and died would never have entered the jail.

### iii.    Multnomah County had a policy of not conducting random or proactive searches to detect drugs or monitor potential criminal activity.

"Searches" that a jail may undertake to detect drugs include the following: 1) Random searches of living areas and common areas such as bathrooms to uncover hiding places for drugs,

---

[208] *Id.*
[209] Ex. 43, p. 8 (July 17th: "Inmate Pradith… took a random U/A. He failed this test."); p. 9 ("Inmate Gangewer was found in possession of a syringe on the back of the work crew truck.")
[210] Brown Dep at 123:8-23; Morrison Dep at 84:11-85:5.
[211] Morrison Dep at 49:16-19 (Q. Is it common for you to be unfamiliar with the policies and practices of parts of your jail's operation? A: To one extent or another, yes.").
[212] *Id.* at 49:21-24
[213] *Id.* at 50:17-19.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

alcohol and drug paraphernalia; 2) Random urinalysis to determine whether inmates are under the influence of drugs or alcohol; 3) Monitoring of telephone conversations to detect potential "buys" of drugs or plans for smuggling; and 4) examining Outgoing and incoming mail, apart from legal mail.[214] At the time of Jason's death, MCSO only conducted the fourth, searches of mail.

As to the first – random searches of living and common areas – the MCSO policy manual stated that "all inmates, their property, and housing areas are subject to routine and random searches."[215] However, this was not MCSO's custom and practice. In fact, the custom of not conducting random searches of the Inverness Jail work crew dorm was so deeply ingrained that the Inverness facility commander testified that there was not only no practice of conducting random searches or shakedowns of the dorm, but that there was no policy either.[216]

As to the second – random urinalysis testing – the MCSO policy manual specifically prohibited it: "Work Crew performs urinalysis only when an inmate is suspected; no monthly or random tests are completed."[217] "The policy was that there would not be random UAs," the work crew sergeant explained. MCSO followed this policy; no random UAs of inmate workers were actually conducted.[218]

As to the third – the monitoring of AIC phone calls – while MCSO's policy manual allows for monitoring of telephone calls and the calls are recorded,[219] its custom was to only listen to AIC phone calls retrospectively once a crime had been committed. It had no policy, custom, or practice of "spot checking" the phone recordings for evidence of criminal activity, including drug smuggling.[220] Had it done so, MCSO could have discovered the scheme as when it did listen to the phone calls after Jason died, it learned that "someone from the inside in the

---

[214] Stanley Expert Report at 12.
[215] Ex. 8, p. 6.
[216] Morrison Dep at 53:23-54:7.
[217] Ex. 8, p. 18.
[218] Brown Dep at 89:9-18; Morrison Dep at 52:15-53:4.
[219] Ex. 212, p. 1; Zwick Dep at 38:24-39:14.
[220] Stanley Expert Report, at 9 ("There was no plan at the inverness jail to spot check phone calls or any indication that jail staff were actively using any type of intelligence gathering to interdict the drug smuggling.").

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

work dorm would use the phones and coordinate drops to someone outside."[221] It also was obvious from the recordings that AICs were high while in custody. As to one, the MCSO investigator explained, "almost every jail call, he's on the nod."[222]

As with the above, the record is full of evidence of this policy and custom of MCSO. Again, it was a moving force behind the constitutional violation in that it was "closely related to" the ultimate injury, as it enabled Jason to obtain the drugs which then killed him.

### iv. Multnomah County had a policy, custom or practice of failing to train jail deputies on drug detection, drug use, and drug overdose by AICs.

The facts within the summary judgment record allow a reasonable jury to conclude that a properly trained force of corrections officers would have detected more drugs, prevented widespread drug use, and possessed the knowledge to identify an opioid overdose. None of that happened here. Even after Jason's death, MCSO did not train corrections officers on recognizing the signs and symptoms of drug use.[223]

Contrast this lack of training with MCSO's law enforcement officers. The sergeant who investigated Jason's death explained the difference:

> I don't know what training corrections has had on these topics, but I've had extensive training, so I know. When someone is on the nod, using heroin, searching the cells and finding needles and lighters and that kind of stuff and getting positive UAs, those are the signs at the beginning that something's going on and people are using drugs. [224]

This lack of training – perplexingly only within MCSO's corrections division - created an obvious potential for a constitutional violation, which gives rise to *Monell* liability. *Shadrick,* 805 F.3d 724, 738–39. It likewise was a moving force behind the violation as proper training would have enabled MCSO to interdict the drug smuggling operation.

### v. Multnomah County had a custom or practice of delaying the purchase and implementation of drug-detecting body scanners.

---

[221] Zwick Dep at 37:1-3.
[222] *Id.* at 89:15-18.
[223] McClure Dep at 83:21-84:6
[224] Zwick Dep at 54:17-24.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

The facts detailed unequivocally demonstrate that MCSO policymakers made repeated, deliberate choices among various alternatives to delay the purchase and implementation of drug-detecting body scanners until after Jason died.

On March 24th, 2015, three days following the fentanyl death of AIC Brogdon, MCSO first contacted a vendor to obtain a quote for a body scanner. Three months later, the "right-hand person" to then Chief Deputy of Corrections Michael Shultz, requested and received a list of the 41 states in which the particular body scanners, from the brand SecurPASS, were in operation. [225]

On July 23rd, 2015, Chief Deputy Shults held a meeting regarding the SecurPASS body scanner.[226] The following month, MCSO then sent a group to examine the body scanner in person at Federal Correctional Institution, Sheridan.[227] Then, for two years, MCSO did nothing. Only the elected sheriff possessed the authority to unilaterally approve a purchase of that size, and in 2016, former Sheriff Dan Staton resigned under a cloud of scandal.[228]

After taking office in August of 2016, Sheriff Reese was informed of the "past situation where someone brought a large quantity of drugs that resulted in overdoses inside the facilities," but took no steps to investigate the purchase and implementation of body scanners.[229] Had he done so, Reese could have used a small portion of the approximately $2.6 million in discretionary funds available at the end of fiscal year 2017 to purchase body scanners for the Multnomah County Jails, without approval from the County Board. Sheriff Reese alone possessed this authority in 2017. He did not exercise it. [230]

The first mention of body scanners during Sheriff Reese's tenure came from the same MCSO sergeant who obtained the SecurPASS quote in 2015, two weeks following the close of fiscal year 2017.[231] The sergeant wrote to Chief Deputy Shults:

---

[225] Ex. 28A, p. 3-4; Reese Dep at 16:12-16.
[226] Wheeler, Jeffrey Dep at 39:5-20.
[227] Ex. 28, p. 4-7, Ex. 28A, p. 1-2.
[228] Wheeler, Jeffrey Dep at 35:18-36:6.
[229] Reese Dep at 30:8-14.
[230] *Id.* at 67:14-68:22, Ex. 161, p. 2; Reese Dep at 63:12-23.
[231] Multnomah County's fiscal year ends on June 30th. *Id.* at 58:14-18.

**PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571**

Do you know if we will ever revisit getting SecurPass Digital X Ray Scanner's or even getting a Chair for detecting drugs… I know this happened during Sheriff [Staton's] stint. I was just inquiring to see if this has been discussed since Sheriff Reese has taken over? I was hoping this could be brought up again in the future, since it would be such an awesome tool to have.[232]

Chief Deputy Shults responded, "I believe we can – Year end money is the key. We just need to ask for it… One last note - Be careful on the items you ask for… Be prepared." [233]

Though the fiscal year had ended, it was still possible to use the 2017 "year-end money" to purchase body scanners, through a budget modification request to the Board of Commissioners. [234] Sheriff Reese alone possessed this authority. Once again, he did not exercise it.[235] Additionally, Reese also had the authority to request approval from the board for "capital improvement projects" for the coming fiscal year. [236] Even in the event of a budget deficit, there is no constraint on the Sheriff's ability to make this request.[237] In 2017 and every year thereafter, Sheriff Reese never made this request.[238]

During this same period, other local county jails began operating body scanners. In 2017, Washington County, Oregon and Cowlitz County, Washington, each installed and began operating body scanners. [239] Then, in early January of 2018, the Oregon State Sheriff's Association ("OSSA") and the vendor Command Sourcing negotiated a heavily reduced purchase price for a "B-Scan" body scanner. Sheriff Reese was aware of these efforts as the negotiations were underway, prior to receiving an email from the OSSA announcing the deal on January 8th, 2018.[240] "We believe we have hit a home run for you on a top-quality piece of equipment," OSSA Executive Director Sheriff John Bishop wrote to Reese. Within months, Yamhill, Polk, Josephine, Lincoln, and Clackamas Counties had all purchased body scanners

---

[232] Ex. 28A, p. 1-2.
[233] *Id.*, p. 1.
[234] Reese Dep at 71:4-16, 72:12-22.
[235] *Id.* at 74:18-20.
[236] *Id.* ep at 81:11-82:14
[237] *Id.* at 84:7-15.
[238] *Id.* at 82:19-83:10.
[239] Bishop Expert Report, p. 24; Ex. 28A p. 15-16.
[240] Reese Dep at 90:6-91:18.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

through the OSSA.[241] By July of 2018, Yamhill County's body scanner was installed and

operational, and the others soon followed.[242]

 Conversely, Multnomah County and Sheriff Reese repeatedly delayed, dithered, and then

flatly refused offers to purchase the B-Scan body scanners when they would have been delivered,

installed, and operational in time to deter, detect, and interdict the drug smuggling scheme that

provided the drugs that killed Jason.[243] Notably, Reese himself delayed and then refused to sign

the contract for the body scanners until physical alterations to the body scanner's location at

MCDC could be completed, even though no such delay was justified for Inverness.[244]

 It was not until September 25th, 2019 that Multnomah County executed its first purchase

order for a B-Scan body scanner, two months after Jason died in custody.[245]

 Today, the Inverness Jail body scanner scans all AICs returning from outside work

crew.[246] Since becoming operational, MCSO deputies operating its body scanners have

repeatedly discovered the very drugs that killed Jason – heroin and methamphetamine – stored

within AICs' body cavities.[247]

 Had such a body scanner been operational prior to Jason's death, the returning inmate

workers would have known they would be subjected to a body scan that could reveal objects

within their body cavities.[248] Had the body scanner revealed either 1) the medium-sized electric

taped bindles of heroin and methamphetamine, or 2) the syringes (which contain metal), the

MCSO Special Investigative Unit – the unit that ultimately interdicted the drug smuggling

operation after Jason's death – would have conducted the same investigation earlier in time and

---

[241] Ex. 28, p. 8 ("The counties that are receiving units are Josephine, Polk, Lincoln, and Yamhill."); Ex. 213 (Clackamas).
[242] Ex. 28A, p. 20.
[243] *Id.*, p. 17-18, 24, 27 ("I don't believe we will have the Sheriff ready to sign anything…"), 28 ("At this point the Sheriff has chosen not to sign the form."), Ex. 33, p. 1 ("At this time, we will be delaying consideration for purchasing this product."); Bishop Expert Report at 33.
[244] Ex. 28A, p. 27-28; Morrison Dep at 26:13-27:14 ("At our facility, it was fairly simple. We already had a room. We had power. We just had to install additional cameras in there… It was a relatively quick install."
[245] Ex. 214.
[246] Morrison Dep at 91:9-11.
[247] Ex. 215, p.
[248] Morrison Dep at 91:12-24.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

stopped the flow of drugs before he died.[249] Without unfettered access to drugs inside Dorm

Nine, Jason would not have overdosed and died.[250]

As such, the record is replete with evidence that this unofficial policy or custom was the

moving force behind the constitutional violation. Put another way, a reasonable jury could easily

conclude that an operational body scanner at Inverness would have discovered and stopped the

drug smuggling scheme prior to Jason's death, and his death would have been prevented.[251]

### a.  Neither qualified nor discretionary immunity applies to this *Monell* claim.

Of note, qualified immunity is not a defense to this or any part of Plaintiff's *Monell*

claim. *Leatherman v. Tarrant County. Narcotics Intel. &Coordination Unit*, 507 U.S. 163, 166-

167 (1993). Neither is discretionary immunity under the Oregon Tort Claims Act, ORS

30.265(6)(c). Plaintiff must simply present evidence which shows a custom or practice which

violated Jason's Eighth Amendment constitutional right to be free from unfettered access to

drugs while incarcerated. The evidence presented on MCSO's yearslong failure to timely

purchase and implement body scanners clears this bar, creating an obvious question of fact.

### vi.  Multnomah County had a policy of not authorizing corrections officers to administer Narcan to overdosing AICs.

At the time of Jason's death, MCSO corrections officers were not authorized to

administer Narcan to overdosing AICs. In September of 2021, more than two years after Jason's

death, a draft policy to allow corrections officers to administer Narcan was "in discussion."[252]

"We have no access to Narcan in the jails," an MCSO sergeant explained.[253]

This policy was also a moving force behind the constitutional violation in that it was

"closely related to" Jason's death, but for different reasons than above. Here, the first person that

---

[249] *Id.* at 91:25-95:7.
[250] Stanley Expert Report, at 10, Bishop Expert Report, at 33.
[251] Of note, MCSO's failure in 2023 to identify and interdict fentanyl smuggled within AICs' bodies despite the use of body scanners is not evidence of the body scanners' ineffectiveness. Rather, it is evidence of poor training and a substance much more difficult to identify than the "medium-sized electric taped bindles of heroin and methamphetamine" which were at issue in 2019.
[252] Wheeler, Jeffrey Dep at 16:23-17:14; Morrison Dep at 28:4-29:29; Ex. 34.
[253] Seals Dep at 24:21-25:7-13.

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

Jason approached was an MCSO deputy, who noticed that he was "hunched over," that his breath was "heavy", and "he seemed short of breath."[254] Two other MCSO officers assisted Jason before the first nurse arrived.[255] Later, a deputy posed the question out loud, "does he need Narcan?"[256] But, because of this policy, none of these deputies had the authority to administer the drug that would have saved Jason's life.

> **vii. Multnomah County had a custom or practice of failing to train medical staff as to its own Narcan administration policy.**

MCHD's written Narcan/Naloxone Use policy appropriately states what the drug is, and what the objective symptoms of opioid overdose are. The policy is reprinted in part below:

**NARCAN (NALOXONE) USE**

**POLICY:** Appropriate and timely use of Narcan (Naloxone). Naloxone is an antagonist of various opiates and can be useful in reversing the adverse effects of narcotic overdose, particularly respiratory depression. It should be given promptly when respiratory depression is observed in the setting of known or possible narcotic toxicity. Other than precipitating prompt narcotic withdrawal, there are no major contraindications to its use in the emergency setting.

**PROCEDURE:**

**Subjective:**
- Reduced level of consciousness and/or respirations in the setting of possible narcotic use, either prescription or non-prescription

**Objective:**
- Client will often present with reduced respiratory rate or shallow breathing
- O2 Oxygen saturation may be reduced (<92%)
- Blood pressure may be low and heart rate may be reduced
- Client may be slow to respond or be unresponsive: speech may be sparse or slurred
- Pupils may be small and pinpoint
- Rapid response with agitation and combativeness may be observed after successful reversal of narcotic induced symptoms

**Assessment:**
- Respiratory depression and reduced level of consciousness in the setting of possible narcotic overdose or toxicity
- Nursing diagnoses
  - Ineffective self-health management
  - Ineffective breathing pattern
  - Impaired spontaneous ventilation
  - Readiness for enhanced self-care

**Education:**
Naloxone restores breathing and cannot be abused. The effects of naloxone wear off after approximately 30 to 90 minutes. Naloxone can't cause additional harm to someone not experiencing an opiate overdose. [257]

---

[254] McClure Dep at 66:21-67:19.
[255] Ex. 18(b), 5:44:50-5:47:08.
[256] Stewart Dep at 42:1-43:6; 47:10-48:4 ("Q. Are you confident that Deputy Wilson's comment about Narcan was before PDX fire arrived? A. Yes.").
[257] Ex. 51.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

On its face, the policy is sound. In practice, MCHD does not train its nurses on the policy, and they do not follow it.

All MCHD clinical policies, including the Narcan/Naloxone policy, are shared with staff on an annual basis. Nurses are simply required to attest that they have read and understood the policies.[258] Beyond the yearly attestation, there is no ongoing training to ensure that nurses adhere to the Narcan/Naloxone use policy in the event of an actual opioid overdose. "The training is within the policies," MCHD testified, "It walks them through it and then they have to use their nursing judgment beyond that."[259]

This lack of ongoing training – particularly as to recognizing the objective signs and symptoms of opioid intoxication and overdose – was confirmed by the nurses themselves:

Nurse Jami Wheeler:

> **Q:     [H]ave you received any training from the County regarding recognizing the signs and symptoms of an opioid overdose?**
> A      No.[260]
>
> **Q.     Did Multnomah County do anything, to your knowledge, to make sure that you as a community health nurse at Inverness Jail were aware of these six symptoms of an opioid overdose?**
> A      We have a document that we sign every year that says that we're aware of the protocols.
>
> **Q.     Nothing other than that?**
> A      No.[261]

Nurse Diamond:

> **Q.     Did you ever receive any training from the county regarding recognizing the signs and symptoms of drug or alcohol intoxication?**
> A.     Not anything formal that I can remember.

---

[258] Seale Dep at 48:2-12.
[259] Obiero Dep at 34:17-23.
[260] Wheeler, Jami Dep at 16:14-17.
[261] *Id.* at 47:2-11 (objection omitted).

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

> **Q.**    **Did you ever receive any training from the County regarding recognizing signs and symptoms of an opioid overdose?**
>
> A.    Not any formal training.
>
> **Q.**    **Is there any informal training that comes to mind, regarding recognizing opioid overdose?**
>
> A.    Not that I can remember.[262]

Nurse Metea:

> **Q.**    **Did you receive any specific training on this [MCHD Narcan/Naloxone Use] policy or its contents from the county during your time as nurse?**
>
> A.    I remember signing the form that I read this.[263]

Thus, per its own nurses, MCHD provided no training whatsoever on its Narcan administration policy. [264] This complete lack of training on a critical policy created an obvious potential for a constitutional violation, again giving rise to *Monell* liability. *Shadrick,* 805 F.3d 724, 738–39. Likewise, the failure to train was the moving force behind the constitutional violation in that it was "closely related to" Jason's death, as Narcan would have been a lifesaving intervention.

> **viii.    Multnomah County had a custom or practice of not administering Narcan to overdosing AICs.**

The record shows that Jason's death was not an isolated incident.  In what could have served as a dry run for Jason's episode, MCHD nurses failed to administer Narcan to an overdosing inmate during a 2017 "Mass Disaster Drill," a simulated emergency involving mass disruption or multiple casualties requiring triage by medical staff.[265]

After the drill, staff performance is subject to four rounds of review by all MCHD employees who provide or supervise medical services to AICs.[266] This evaluation is a primary

---

[262] Diamond Dep at 16:6-23.
[263] Metea Dep at 37:21-24.
[264] Wheeler dep at 47:2-11 (objection omitted); Diamond Dep at 16:6-23; Metea Dep at 37:21-24.
[265] Propert Dep at 16:21-17:5; Ex. 56, p. 1.
[266] Propert Dep at 17:8-18:2.

Page 52 -    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

purpose of the drill.[267] Per MCHD, a mass disaster drill is "absolutely" a teachable moment that allows MCHD to identify staff deficiencies and prevent future mistakes through training.[268]

The 2017 Inverness Mass Disaster Drill involved a mock opioid overdose:

1615: Radio call: "Medical Back up In dorm 5 inmate unresponsive in the bathroom" (sic).

1617: Medical arrival in dorm 5. Deputy Koenig actively doing compression on patient who is lying on the bathroom floor just outside of stall door. Blood smear on left pant leg, client has sign stating "unresponsive with blue skin and blue lips". [Nurse Helen Blasko] relieved Deputy Koenig and began compressions. Multiple small empty plastic baggies noted on floor underneath and around client. Client not responding. [Nurse Blasko] asked for an ambulance. Ambulance called and scenario ended.[269]

MCHD staff did not administer or attempt to administer Narcan to the overdosing AIC. No vital signs were taken. As soon as the drill started, "it stopped."[270] The subsequent critiques noted that nurses did not administer Narcan, but lauded the nurses' "[g]reat teamwork," and "great focus even with an audience[.]"[271]

These connected episodes create a question of fact as to whether it was MCHD's custom or practice to not administer Narcan when providing medical care to an overdosing AIC. The circumstances are eerily similar. In both, nurses arrived quickly, performed CPR, called 911, and did not administer Narcan. In the real-life event, the patient died. As Narcan is the specific intervention that would have saved Jason's life, this custom is again a moving force behind Multnomah County's violation of Jason's constitutional right.

### ix. After Jason's death, Multnomah County ratified its custom of not administering Narcan to overdosing AICs.

After every in-custody death, MCHD conducts an "Internal Quality Improvement Death Review." While this process is not contained in any written policy, it is the longstanding custom

---

[267] *Id.* at 27:18-22.
[268] *Id.* at 27:23-28:9
[269] Ex. 56, p. 1.
[270] LaFollette Dep at 31:19-25.
[271] Ex. 56, p. 4.

**PIUCCI LAW**
**900 SW 13ᵗʰ Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

and continuing practice of MCHD to conduct these reviews.[272] Created by former MCHD Medical Director Michael Seale, M.D., the death review involves a preliminary chart review of the medical care provided during the person's incarceration and death event, along with any preexisting conditions and ancillary factors. A final review is then conducted following receipt of the medical examiner's report and toxicology results, after which the review is shared with MCHD leadership and members of the nursing staff. [273] One of the purposes of the review is "to look for opportunities to improve."[274]

Dr. Seale himself conducted the Internal Quality Improvement Death Review of Jason's death. In his preliminary review, Dr. Seale concluded, "no indication of an acute or chronic medical condition that was not properly addressed. Emergency care appears to have been extremely prompt and appropriate." Dr. Seale then answered the question, "Was an Earlier Intervention Possible[?]" "No." As to Narcan, Dr. Seale opined that, "I do not feel that it would have changed the eventual outcome."[275]

After receiving the Medical Examiner's report which determined the cause of death to be the "combined toxic effects of heroin and methamphetamine," Dr. Seale nonetheless concluded that the "[a]utopsy findings support the preliminary assessment," and the "response by medical staff was appropriate for the situation." These conclusions were then shared with the MCHD leadership team and with the nursing staff.[276]  To date, Multnomah County stands by the conclusions of the Internal Quality Improvement Death Review.[277]

In addition to the above review, Jason's death was also the subject of a "Man-Down Event" Review, a separate internal process in which all levels of MCHD corrections health staff – nurses, providers, management, and leadership – review the event and critique the response. [278]

[272] Seale Dep at 54:2-24; Lawson Dep at 10:24-11:6.
[273] Seale Dep at 52:20-54:1
[274] Lawson Dep at 11:24-12:12.
[275] Ex. 103, p. 1, 11.
[276] *Id.*, p. 11-12.
[277] Seale Dep at 107:23-109:14
[278] *Id.* at 124:20-125:9;

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

In a debrief with medical staff, a CMA reported that "[w]hat was being said at the meeting was that Narcan wouldn't have made a difference."[279] The provider critique – that is, by doctors and nurse practitioners, etc. – concluded, "Nursing response was rapid and clinically appropriate… Appropriate response to drug OD which was fatal, recovery effort was medically futile." [280]

Despite acknowledging both that 1) it is appropriate to administer Narcan in the event of an opioid overdose; and 2) that Jason died of a toxic combination of heroin and methamphetamine, MCHD will not acknowledge the possibility that it has erred.[281] The administration of Narcan, Multnomah County testified, "would not have changed the eventual outcome."[282]

In this case, the MCHD policymaker –Dr. Seale – did not simply acquiesce to a custom or practice. Rather, he expressly approved of and ratified the nurses' failure to administer Narcan to Jason, further confirming the custom of not administering Narcan to overdosing AICs. That the failure to administer Narcan was a moving force behind the constitutional violation requires no further explanation.

### D. Genuine disputes of material fact exist with respect to Plaintiff's claim against Defendant Reese.

To establish an Eighth Amendment failure-to-protect claim, an inmate must show that prison officials acted with "deliberate indifference" to "a substantial risk of serious harm." *Farmer,* 511 U.S. 825, 828. A viable claim has both an objective and a subjective prong, requiring the plaintiff to demonstrate that "(1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citing *Farmer*, 511 U.S. at 833).

Unfettered access to drugs within a jail or prison is sufficiently serious to satisfy the objective prong. *Zakora*, 44 F.4th 452, *cert. denied 599* U.S. __ (2023). As detailed, *supra*, the

---

[279] Stewart Dep at 52:5-9.
[280] Ex. 79, p. 6.
[281] Seale Dep at 131:18-132:13.
[282] *Id.* at 109:9-14.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

level of access that AICs had to illegal drugs within Inverness Jail Dorm Nine in the months leading to Jason's death was profound, evidenced by the conclusion that, "There is not enough evidence to know who gave [Jason] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."[283] The objective prong, for summary judgment purposes, is satisfied.

Likewise, as detailed *supra* at IV(C)(v), the summary judgment record contains substantial evidence from which a jury could conclude that Defendant Reese subjectively ignored the risk to Jason's and other AICs' safety by delaying the purchase and implementation of drug-detecting body scanners expressly and repeatedly, for years. Immediately upon taking office in August of 2016, Reese was aware of large quantities of drugs having been smuggled into MCSO facilities and the resulting overdoses and deaths but did nothing to investigate the purchase and implementation of body scanners.[284] Then, as the Oregon State Sheriff's Association led a statewide push to get counties to adopt body scanners in 2018, Reese – both directly and through his senior lieutenants – repeatedly delayed, dithered, and then flatly refused offers to purchase the B-Scan body scanners when they would have been delivered, installed, and operational in time to deter, detect, and interdict the drug smuggling scheme that provided the drugs that killed Jason.[285]

> i. **A sufficient causal connection exists between Defendant Reese's yearslong delay in purchasing body scanners and Jason's death.**

An official may be liable as a supervisor if a sufficient causal connection exists "between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). "The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others,

---

[283] Ex. 3A, p. 1.
[284] Reese Dep at 30:8-14.
[285] Ex. 33, p. 1; Ex. 28A, p. 23, 24, 27, 28 ("At this point the Sheriff has chosen not to sign the form [to purchase the body scanners].").

PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." Id. at 1207–08. *Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018).

The causal link between the absence of a body scanner at Inverness and Jason's death is clear. Correctional Expert Ric Bishop:

> MCSO Officials' failure to prioritize the purchase of a body scanner earlier in time was not reasonable. As a result, MCSO lacked the available technology that, more likely than not, would have allowed [MCSO] employees to discover and stop the work-crew drug smuggling scheme prior to Mr. Forrest's death. If [MCSO] had prevented the drugs from entering, Mr. Forrest more likely than not would have been unable to obtain the drugs he used to overdose, and he would not have died.[286]

Reese was the only MCSO official who possessed the authority to approve the purchase of body scanners.[287] Every decision to delay their purchase was Reese's alone, and directly contributed to Jason's overdose and death.

### ii.    Defendant Reese is not entitled to qualified immunity.

U.S. Supreme Court precedent leaves no room for debate regarding the danger posed by narcotics and illegal contraband in a jail or prison environment. For example, in *Bell v. Wolfish*, 441 U.S. 520, 540 (1979), the Supreme Court addressed a suit on behalf of a group of prisoners who contended that the governmental defendants were violating their constitutional rights through their policies that sought to control the items coming into the prison. Those policies included searches of prisoners' cells and strip searches of prisoners following visitation periods. In holding that the Defendants were acting lawfully, the Court noted that "[a] detention facility is a unique place fraught with serious security dangers." *Id.* at 559. Consequently, "the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees."

The Supreme Court has further recognized the serious danger posed by drugs in prison in both *Block v. Rutherford*, 468 U.S. 576 (1984) and *Hudson v. Palmer*, 468 U.S. 517 (1984). Likewise, the Third Circuit has recognized that "[t]he inherent danger of drugs is magnified

---

[286] Bishop Expert Report, at 33.
[287] Reese Dep at 67:14-68:22

**PIUCCI LAW**
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571

when introduced to a controlled environment like a prison." *United States v. Colon*, 246 F. App'x 153, 156 (3d Cir. 2007).

As "'State officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances—*i.e.*, even without a prior case that had 'fundamentally similar' or 'materially similar' facts," *Nordenstrom*, 2021 WL 2546275, at *10 (quoting *Sandoval*, 985 F.3d at 680), the absence of a specific case finding a county sheriff liable with relation to body scanners does not mean that Reese is entitled to qualified immunity here. Rather, the authority above demonstrates that the danger of illegal narcotics and drugs of abuse in custodial environments was clearly established and that the Eighth Amendment obligates jails and prisons to take reasonable steps to ensure the safety of prisoners. Reese is not entitled to qualified immunity as a matter of law.

### E. Plaintiff's negligent hiring and retention claim is supported by substantial evidence.

The summary judgment record is filled with evidence that Multnomah County knew or should have known that Nurse Valberg lacked the appropriate skills, competency, diligence, or compassion necessary to perform the duties of her job as a corrections health nurse. This was true at the time of her hiring in May of 2018, and became progressively more obvious over the course of 2019.

#### i. Multnomah County negligently hired Nurse Valberg.

At the time of Nurse Valberg's hiring, Multnomah County knew that (1) she had been recently arrested on suspicion of domestic violence;[288] (2) she had failed to disclose several of her prior domestic violence arrests and incarcerations, including within Multnomah County Jails;[289] and (3) the reference from her most recent direct supervisor within a correctional setting was "very poor."[290]

---

[288] Lee Dep at 21:13-20
[289] Ex. 130, p. 1.
[290] Ex. 129, p. 1.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Nadia Petrov, her prior supervisor at Clackamas County Jail, specifically recommended against Nurse Valberg's hiring. To the question, "Would Camille be someone you would be interested in hiring/working with again?", Petrov answered, "No." As further reasons to not hire her, Petrov also cited her "lack of attention to detail, [that she] did not see the big picture, often spent her energy on unnecessary things, [and] got into conflict with others." Ultimately, Petrov concluded that Nurse Valberg, "lacked some essential skills to work in corrections."[291]

In conducting a preliminary background check, MCSO also cautioned MCHD that Nurse Valberg had not been fully truthful on her application:

> [She] was in custody less than two years ago and has been incarcerated several times for similar charges. Each time the charges were dismissed, but there is a pattern and she did not divulge the other incarcerations. The check does say "incarcerations/convictions." …Just thought you may want to know.[292]

Ultimately, the manager responsible for hiring at MCDC rejected her from hiring at that facility and did not recommend her hiring generally.[293] MCHD hired her to work within Inverness anyway.

Sheriff Reese found the circumstances of Nurse Valberg's hiring "deeply troubling," noting her "concerning" failure to divulge her prior incarcerations and equally concerning negative review from her previous supervisor.[294] But, most troubling was MCHD's split decision – rejecting her for hiring at MCDC but hiring her to work at Inverness. "I have no idea why they would make that decision."[295]

### ii. Multnomah County failed to timely terminate Nurse Valberg before Jason died.

When the Oregon Department of Corrections conducted a probationary review of Nurse Valberg following her first six months of employment at Coffee Creek Correctional Facility, it

---

[291] Ex. 126, p. 2.
[292] Ex. 130, p. 1.
[293] Obiero 51:20-52:19; 54:10-13.
[294] Reese Dep at 141:24. ("deeply troubling");140:20-141:10 ("concerning").
[295] *Id.* at 142:1-12.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

terminated her employment.[296] Conversely, Multnomah County conducted no such review at the end of her probationary period in November of 2018.[297]  This, despite all of MCHD Corrections Health management – including the Medical Director, Dr. Seale – knowing of her involvement in the death of the overdosing inmate Bryan Perry at Clackamas County Jail.[298]

From there, things only got worse.  Nurse Valberg engaged in a sexual relationship with a MCSO corrections deputy and twice petitioned the Multnomah County Circuit Court for a Stalking Protective Order against the deputy's wife, also an employee of MCSO.[299] This episode ultimately led to the involvement of Sheriff Reese, but the County took no action with respect to Nurse Valberg.[300]

Then, on June 11th, 2019, six weeks prior to Jason's death, Nurse Valberg was disciplined for calling an AIC an "asshole."[301] On July 20th, 2019, only five days prior to Jason's death, Nurse Valberg wrote to her manager, "The stress here is becoming less and less worth it. Fire me. Hire a black nurse. At least maybe she'll/he'll get treated better."[302] The county took no action.[303]

Ultimately, MCHD placed Nurse Valberg on administrative leave in February of 2020 and terminated her employment in September of 2020 due to an ongoing pattern of race-based discriminatory conduct, as detailed, *supra*.[304]

### iii. The applicable causation standard to this and all of Plaintiff's negligence claims is "substantial factor."

There are two standards for causation under Oregon law – "but for" causation and the "substantial factor" standard.  In cases involving multiple tortfeasors or where two causes concur

---

[296] Ex. 134, p. 1; Valberg Dep at 51:18-24.
[297] LaFollette Dep at 70:1-9; Lee Dep at 29:15-18.
[298] *Id.* at 23:6-20; 24:5-25.
[299] Valberg Dep at 100:11-20, Ex. 39, Ex. 40.
[300] Seals Dep at 84:8-25, 91:17-18; While MCHD makes the employment decisions regarding correctional health nurses, MCSO has ultimate authority and may prohibit any MCHD employee from working within its jails. Propert Dep at 35:7-14; Reese Dep at 145:14-18.
[301] Ex. 92.
[302] Ex. 95, p. 1.
[303] Propert Dep at 54:17-55:15. LaFollette Dep at 125-21:25
[304] Propert Dep at 54:24-55:2, Ex. 98; Ex. 97.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

to bring about a harmful result, the "substantial factor" test applies. *Joshi v. Providence Health Sys. of Oregon Corp.*, 342 Or 152 (2006). This case, involving numerous tortfeasors, policies, and customs that contributed to Jason's death, is such a case. The substantial factor jury instruction is as follows:

> Many factors may operate either independently or together to cause harm. In such a case, each may be a cause of the harm even though the others by themselves would have been sufficient to cause the same harm.
>
> If you find that the defendant's act or omission was a substantial factor in causing the harm to the plaintiff, you may find that the defendant's conduct caused the harm even though it was not the only cause.[305]

Causation is a question of fact; not a question to be decided at summary judgment. *Babler Bros., Inc. v. Pacific Intermountain Express. Co*., 244 Or 459, 464 (1966) ("ordinarily it is for the trier of fact to say whether (a) the conduct complained of was a substantial cause of the harm, and (b) whether the conduct in question was negligent"). However, the evidence within the summary judgment records is sufficient to meet either causation standard.

### iv.    Multnomah County's negligent hiring and retention of Nurse Valberg meets any causation standard.

Nurse Valberg was critically important to the medical response to Jason's overdose. As the first nurse to arrive she was, by the account of others, in charge.[306] While her primacy does not excuse the deliberate indifference of the other defendants, it allows a juror to reasonably conclude that were she not there, the medical outcome could have been different. This is sufficient to satisfy either the "but-for" or "substantial factor" causation standard.

Expert opinion buttresses this conclusion. Robert Malaer, RN:

> Multnomah County failed to adequately and effectively review, investigate, and vet Ms. Valberg prior to employment… [I]t is clear that additional information and investigations were required to ensure the safety of the inmates housed at MCIJ under Ms. Valberg's care. As a result of their failed review and hiring practices, another inmate expired under Ms. Valberg's direct care.[307]

---

[305] Oregon Uniform Civ. Jury Instruction 23.02.
[306] Metea Dep at 46:16-47:1.
[307] Malaer Expert Report, at 24.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

Defendants make no argument as to foreseeability. It is foreseeable that hiring or failing to terminate a corrections health nurse who is unfit for duty could lead to adverse patient outcomes including death. Therefore, summary judgment should be denied as to this claim.

### F.  Multnomah County is not entitled to summary judgment on Plaintiff's gross negligence claim.

To prevail on a claim for gross negligence in Oregon, a plaintiff must show that the defendant's conduct, "'when measured objectively, reveals a state of mind indicative of an indifference to the probable consequences of one's acts.'" *Fisher v. Huck*, 50 Or. App. 635, 649 (1981) (quoting *Hill v. Garner*, 277 Or. 641, 646 (1977)). That state of mind "may be inferred from evidence of a defendant's conduct in light of conditions and what reasonably must have been known." *Id.* (citing *Lochard v. Vosika*, 267 Or. 213 (1973)). "A defendant need not appreciate the danger if a reasonable person under the circumstances would." *Id.*

For the reasons set forth above with respect to Plaintiff's deliberate indifference claims under federal law, a reasonable juror could easily conclude that Defendant Multnomah County was grossly negligent in adopting certain policies, customs, and practices evincing deliberate indifference, and that Defendants Valberg, Metea, and Wheeler were each grossly negligent in delivering medical care to Jason, thereby causing his death.

### G.  Multnomah County is not entitled to summary judgment on Plaintiff's negligence claims.

Defendants offer no specific argument or rationale as to why summary judgment should be granted as to the specifications of negligence contained in ¶132 (b), (c), (d), (e), (f), (g), (h), (i), (m), (n), (s), and (t), because none exists.[308] These allegations – concerning Multnomah County's failure to prevent AICs from accessing dangerous drugs through not enforcing contraband policies, supervising work crews, searching returning work crew AICs, securing its facility, monitoring cameras and telephones, responding appropriately to positive drug tests, and

---

[308] ¶132 (a) does not exist due to a typo.

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

for failing to prevent future AICs overdoses and deaths in light of prior overdoses and deaths –
are supported by the summary judgment record. Likewise, defendants make no argument on
foreseeability. Accordingly, summary judgment should be denied.

### i.    Multnomah County is not entitled to discretionary immunity.

Defendants argue that discretionary immunity applies to two categories of Plaintiff's
negligence allegations – those concerning the County's failure to train its corrections deputies
and nursing staff (¶132 (l), (o), (p), (q), (r)), and those concerning the County's failure to timely
purchase and implement body scanners (¶132(j)(k)). Discretionary immunity plainly does not
apply to the failure to train allegations. As to the body scanner allegations, discretionary
immunity does not apply because a public body does not have the discretion to do nothing.

### a.    The failure to train allegations do not involve high-level policy decision subject to discretionary immunity.

ORS 30.265, Oregon's discretionary immunity statute, protects only those government
decisions or actions that "embody 'a choice among alternative public policies by persons to
whom responsibility for such policies have been delegated.'" *Ramirez v. Hawaii T&S Enters.,
Inc.*, 179 Or. App. 416, 419 (2002); see also *Westfall v. State*, 355 Or. 144, 157 (2014) ("[T]he
decision of a governmental official, employee, or body is entitled to discretionary immunity if a
governmental person or entity made a policy choice among alternatives, with the authority to
make that choice.").

To be entitled to immunity, the government actor's decision or action must fall within the
"range of permissible choices" protected under the statute.  The decision must also satisfy three
criteria: (1) "[i]t must be the result of a choice, that is, the exercise of judgment"; (2) "that choice
must involve public policy,  as opposed to day-to-day activities of public officials"; and (3) "the
public policy choice must be  exercised by a body that has, either directly or by delegation, the
responsibility or authority to  make it." *Ramirez*, 179 Or. App. at 419.   That the statute protects
only a "range of permissible choices" means, of course, that its reach is not unlimited. *Mosley v.*

*Portland School Dist*. No. 1J, 315 Or. 85, 92 (1992). Indeed, Oregon courts have identified at least three limitations on its application, discussed below.

But first, discretionary immunity plainly does not apply to the failure to train allegations. These allegations do not involve the exercise of judgment as to any public policy. Rather, they allege – and the facts support – that Multnomah County did not train the individuals it employed within Inverness jail well enough to perform essential functions of their jobs. This involved mid-level employees providing inadequate training – or no training at all – to low-level employees. These are not the types of allegations that are subject to discretionary immunity under ORS 30.265.

> **b. The body scanner allegations are not subject to discretionary immunity because a public body does not have the discretion to do nothing.**

ORS 30.625 "does not protect a government's failure to take action where there is a duty to do so."  *Turner v. State ex rel. Dep't of Transp*., 270 Or. App. 353, 363 (2015).  In other words, "if the law requires a government to exercise due care, then ORS 30.265 does not immunize its decision not to exercise care at all."  *Hughes v. Wilson*, 345 Or. 491, 496 (2008). Although the public body "has discretion in choosing the means by which it carries out that duty," "'[t]he range of permissible choices does not . . . include the choice of not exercising care.'"  Id. (quoting *Mosley*, 315 Or. at 92) (alterations and omissions in original).

Here, Defendants have an affirmative duty—indeed, a constitutional obligation—to provide individuals in their custody with conditions of reasonable health and safety.  Defendants cannot invoke ORS 30.265 to protect them from liability flowing from their failure to fulfill that affirmative duty. The record, discussed at length above, demonstrates that Multnomah County failed to take any meaningful action to purchase and implement body scanners for years, despite knowing the consequences of inaction from the 2015 fentanyl overdoses and deaths. The range of permissible choices does not include the choice of not exercising care. *Id.* That is precisely

**PIUCCI LAW**
**900 SW 13th Ave. Suite 200**
**Portland, Oregon 97205**
**Telephone: (503) 228-7385**
**Fax: (503) 228-2571**

what Multnomah County did, for over four years. As such, discretionary immunity does not bar these allegations of negligence.

**V.    CONCLUSION**

Except as to Defendants Alexander, Diamond, and Jeffrey Wheeler, Defendants' Motion for Summary Judgment should be denied.

DATED this 5th day of April, 2024.

_____
Joe Piucci, OSB No. 135325
Of Attorneys for Plaintiff

Page 65 -    **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

**PIUCCI LAW
900 SW 13th Ave. Suite 200
Portland, Oregon 97205
Telephone: (503) 228-7385
Fax: (503) 228-2571**