```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF OREGON
 3
 4   THE ESTATE OF RICHARD JASON FORREST,
 5   Van Loo Fiduciary Services, LLC, Personal
 6   Representative,
 7              Plaintiff,
        V.                      Case No. 3:20-CV-01689-BR
 8   MULTNOMAH COUNTY, a political subdivision
 9   of the State of Oregon; MICHAEL REESE, Multnomah
10   County Sheriff, CAMILLE VALBERG, KOH METEA, JAMI
11   WHEELER, JACOB DIAMOND, STEVEN ALEXANDER, JEFFREY
12   WHEELER, DERRICK PETERSON, and NICOLE MORRISEY
13   O'DONNELL, acting in concert and in their individual
14   capacities,
15              Defendants.
16
17           DEPOSITION OF CHRYSTAL HEAGLE FORREST
18              Taken in behalf of the Defendants
19                     December 14, 2021
20
21         BE IT REMEMBERED THAT, the deposition of
22   Chrystal Heagle Forrest was taken before Mary Jacks,
23   Court Reporter and Notary Public, on Tuesday,
24   December 14, 2021, commencing at the hour of 9:00
25   a.m., via Zoom videoconference.
```

PLAINTIFF'S EXHIBIT E

```
 1                    APPEARANCES
 2
 3    Appearing on behalf of the Defendant:
 4    Andy Jones (Appearing Remotely)
 5    501 SE Hawthorne, Suite 500
 6    Portland, Oregon 97214
 7    503-998-3138
 8    Andy.jones@multco.us
 9
10    Appearing on behalf of the Plaintiff:
11    Drake Aehegma (Appearing Remotely)
12    Joseph Piucci
13    900 SW 13th Avenue, Suite 200
14    Portland, Oregon 97205
15    503-228-7385
16    Joe@piucci.com
17    Drake@aehegmalaw.com
18
19
20    ALSO PRESENT REMOTELY:  Jake Quain, Videographer
21
22
23
24
25
```

```
 1                    EXAMINATION INDEX
 2   EXAMINATION BY:                              PAGE NO.
 3   Mr. Jones                                        5
 4
 5
 6
 7                      EXHIBIT INDEX
 8   EXHIBIT NO.          DESCRIPTION            PAGE NO.
 9   59         Inmate Memo Form                     55
10   60         Inmate Memo Form                     57
11   61         Inmate Memo Form                     60
12   62         Inmate Memo Form                     60
13   63         Inmate Memo Form                     86
14   64         Text Messages                        99
15   65         Notice of Exceptional Circumstances 151
16   66         Ex Parte Motion and Affidavit For   161
17              Dismissal of Restraining Order
18   67         Petition For Restraining Order      166
19   68         Article, "$10 Million Lawsuit Filed 170
20              Against Multnomah County in 2019 Drug
21              Overdose Death of Inmate
22   69         Audio                               184
23   70         Inmate Memo Form                    205
24   71         Privilege Log                       211
25
```

```
 1            PORTLAND, OREGON; TUESDAY, DECEMBER 14, 2021
 2                          9:00 A.M.
 3
 4            THE VIDEOGRAPHER:  Here begins the video
 5   recorded deposition of Chrystal Forrest in the matter
 6   of the Estate of Richard Jason Forrest, Van Loo
 7   Fiduciary Services, LLC., versus Multnomah County, et
 8   al.
 9            Will counsel please state your appearances
10   for the record?
11            MR. JONES:  This is Andrew Jones on behalf
12   of all defendants.
13            MR. AEHEGMA:  And this is Drake Aehegma on
14   behalf of plaintiff along with co-counsel, Joe
15   Piucci, also present.
16            THE VIDEOGRAPHER:  And will the
17   stenographer please swear in the witness?
18            THE COURT REPORTER:  Please raise your
19   right hand.
20            Do you solemnly swear or affirm that the
21   testimony you're about to give will be the truth, the
22   whole truth and nothing but the truth?
23            THE WITNESS:  Yes.
24            THE COURT REPORTER:  Thank you.
25
```

```
 1   CHRYSTAL HEAGLE FORREST,
 2   having first been duly sworn, was examined and
 3   testified as follows:
 4
 5                      EXAMINATION
 6   BY MR. JONES:
 7       Q.  Good morning, Ms. Forrest.  Can you hear me all
 8   right?
 9       A.  Yes.
10       Q.  All right.  My name is Andy Jones.  We met
11   briefly off the record, but I am the lawyer for the
12   defendants in this lawsuit.  I'll be taking your
13   deposition today.
14           My first question is, has anybody from
15   Multnomah County talked to you about your husband's
16   death before today?
17       A.  Yes.  A detective came out.
18       Q.  Do you remember that detective's name?
19       A.  Yandell.
20       Q.  Was Detective Yandell the one that notified you
21   about your husband's death?
22       A.  Yes.
23       Q.  Since Detective Yandell, anybody else from
24   Multnomah County that you've talked to?
25       A.  No.
```

1    Q.  Okay.  So in other words, what you gave to the
2  probation officer may not include all of the messages
3  that either your husband sent you or you sent back to
4  him; is that fair?
5    A.  Can you say that again, please?
6    Q.  Sure.  So all of the messages that you screen
7  shotted and provided to his probation officer, that's
8  what I'm talking about here.  Okay?
9    A.  Okay.
10   Q.  Before you took those screen shots and sent
11 them to the probation officer, did you delete any of
12 the messages either that your husband sent you or
13 that you sent him during that time period?
14   A.  I may have deleted some of the messages from me
15 but I'm not sure.
16   Q.  In other words, there could be more
17 communications between the two of you during that
18 time period that are not reflected in what you sent
19 to the probation officer?
20   A.  Yes.
21   Q.  All right.  I'll stop sharing for just a minute
22 here.
23       Why did you give those messages to his
24 probation officer?
25   A.  Because his drug addiction was getting super

1  bad and I was scared for him and I was scared for
2  myself.
3      Q.  What were the things that scared you?
4      A.  I thought I was going to lose him.
5      Q.  What do you mean lose him?
6      A.  The drug addiction, just the lifestyle that he
7  was living.  I was worried about him.
8      Q.  How would you lose him to that lifestyle?
9      A.  To an OD.
10     Q.  What worried you about your safety at that time
11 that caused you to go to his probation officer?
12     A.  Because when he was sick he would get mean.
13     Q.  And when you say sick, you mean he would use
14 drugs?
15     A.  Yeah.
16     Q.  You need a minute, ma'am?
17     A.  Yeah.
18     Q.  Okay.
19     A.  Thank you.
20     Q.  Yes.
21         (Brief recess.)
22 BY MR. JONES:
23     Q.  So, Ms. Forrest, we'll go for just another ten
24 minutes to work efficiently here and then we'll take
25 a little bit of a break so you can go get lunch.

```
 1   altercation?
 2       A.  Yes.
 3       Q.  When was this?
 4       A.  August of 2018.
 5       Q.  Tell me about the altercation.
 6       A.  His drug use was getting super bad and we
 7   started fighting daily so we were arguing.  I would
 8   nitpick at him for every single thing and didn't want
 9   the drugs around, didn't want the people around that
10   he was associated with and so caused arguments and
11   fights and his not coming home at night.
12       Q.  How is it your brother came to come over that
13   day?
14       A.  My brother called and so -- that he was coming
15   over to visit and that's how he came over.
16       Q.  And then tell me about the altercation that
17   your husband had with your brother in August 2018.
18       A.  My brother told him that he just needs to stop
19   and go, and he got upset with my brother saying that
20   he shouldn't be butting in, so he said he was going
21   to beat him up.
22       Q.  Did your husband tell anybody other than your
23   brother to stay out of his relationship with you?
24       A.  That day?
25       Q.  At any time.
```

```
 1      Q.  This was in November of 2018?
 2      A.  Yes.
 3      Q.  Is there anything in writing, messages between
 4  you and your mother about this incident where he
 5  broke the back window of her vehicle in November of
 6  2018?
 7      A.  No.
 8      Q.  What did your mother say or do after your
 9  husband broke the windows out of her vehicle?
10      A.  She was upset.
11      Q.  Did she follow through with him?
12      A.  Follow through?
13      Q.  Did she talk to him about him repairing her
14  windows?  Did she make contact with him again the
15  rest of his life?
16      A.  Oh, yeah, she talked to him afterwards.
17      Q.  And November of 2018 was one of those times
18  where his drug use had escalated?
19      A.  Yes.
20      Q.  To the point where you felt unsafe?
21      A.  Yes.
22      Q.  To the point where you needed a court order,
23  you felt, to keep yourself safe?
24              MR. AEHEGMA:  Object to the form.
25              THE WITNESS:  Yes.
```

1  Q. Did he have to go to the emergency room for
2  asthma attacks?
3  A. Yes.
4  Q. How many times did that happen?
5  A. Too many. I can't count.
6  Q. What did it look like when he had an asthma
7  attack?
8  A. He would turn purple and blue. He started
9  getting gray. He would start pacing, trying to find
10 an inhaler. He couldn't sit down because when you
11 sit down it puts a lot of pressure on his lungs. A
12 lot of times by the time the ambulance would get
13 there, they would need to hook him up to a machine
14 and give him a nebulizer and take him in to the
15 hospital.
16 Q. How many times did the ambulance have to come
17 get him for an asthma attack?
18 A. I want to say more than ten.
19 Q. Did he have any other health conditions that
20 you knew about?
21 A. No.
22 Q. Was there a no-contact in order -- order in
23 place between you and your husband at the time he
24 died?
25 A. Yes.

```
 1   Facebook to see if you can recover any of this
 2   information that you deleted?
 3      A.  No.
 4      Q.  All right.
 5          MR. AEHEGMA:  And, Andy, for the Lite
 6   Brite AO account, we're happy to make that request.
 7   I don't believe we've done it yet.
 8          MR. JONES:  Okay.  Then as you can
 9   imagine, I'm going to ask you to do that, Drake, so
10   I'll put this in my list.
11   BY MR. JONES:
12      Q.  You were worried in 2019 that you were going to
13   lose your husband to a drug overdose?
14      A.  Yes.
15      Q.  You told his probation officer that you were
16   worried that you were going to lose him to a drug
17   overdose?
18      A.  Yes.
19      Q.  And in those initial, say, hours or days after
20   your husband's death you thought he died of an asthma
21   attack; is that right?
22          MR. AEHEGMA:  Object to the form of the
23   question.
24          But go ahead and answer it.
25          THE WITNESS:  Yes, not that I thought
```

```
 1   (phonetic), something like that.
 2       Q.  Did you know who Candy was at that time?
 3       A.  No.
 4       Q.  Do you know who she is now?
 5       A.  No.
 6       Q.  Did you have any suspicions that your husband
 7   was romantically involved with Candy at that time?
 8       A.  No.
 9       Q.  Were there times that you spoke to your husband
10   on the phone or via video chat or in person during
11   the period of time between April 2019 and his death
12   where you suspected he was under the influence of
13   methamphetamine?
14       A.  Can you say that again, please?
15       Q.  For the time period that your husband was in
16   jail from April 2019 until the end of his life,
17   that's what I'm referring to.  Okay?
18       A.  Okay.
19       Q.  And you talked to him regularly during that
20   time?
21       A.  Uh-huh.
22       Q.  That's a yes?
23       A.  Yes.
24       Q.  Okay.  In any of the phone conversations you
25   had with him during that period of time, did you
```

1 suspect he was using methamphetamine while in jail?
2    A.  No.
3    Q.  During any of the video visits you had with him
4 during that time period between April 2019 and his
5 death, did you suspect he was using heroin while in
6 jail?
7    A.  No.
8    Q.  What about during your in-person visits?  Did
9 you suspect during any of those in-person visits
10 between April 2019 and his death that your husband
11 was using methamphetamine while he was in Multnomah
12 County custody?
13    A.  No.
14    Q.  What about heroin?  Did you have any of those
15 interactions on the phone where you suspected he had
16 been using heroin?
17    A.  No.
18    Q.  Same question for the video visits, did you
19 have any suspicion that your husband had been using
20 heroin recently during your video visits between
21 April 2019 and his death?
22    A.  No.
23    Q.  Finally, the in-person visits you had with him,
24 during any of those visits between April 2019 and his
25 death, did you have any suspicions that he had been

```
 1  using heroin while he was in county custody?
 2      A.  Can you say that again, please?
 3      Q.  During your in-person visits with him, your
 4  husband, between April 2019 and his death, was there
 5  ever one of those where you had a suspicion that he
 6  was using heroin while in county custody?
 7      A.  No.
 8              MR. PIUCCI:  Can we just go off the record
 9  for one second?  We don't need a break.  I just want
10  to --
11              (Brief break.)
12              MR. JONES:  I think we still got you
13  walking through there, Joe, so that's still on video.
14              MR. PIUCCI:  Well, now you know that I'm
15  not wearing a three-piece suit like Drake.
16              MR. AEHEGMA:  Every once in a while you've
17  got to just put it on.
18              MR. JONES:  Are we back on the record?
19  Are we okay?  Are we back on the record?  Sorry.  I
20  just want to make sure.
21              THE COURT REPORTER:  Yes.  We're good.
22  BY MR. JONES:
23      Q.  Okay.  Did you ever see withdrawal symptoms
24  from what you described earlier while your husband
25  was in custody between April 2019 and his death?
```