**Stephen V. Piucci OSB No. 821056**
**Joseph E. Piucci OSB No. 135325**
Piucci Law, LLC
900 SW 13th Avenue, Suite 200
Portland, Oregon 97205
Telephone: 503-228-7385
Facsimile: 503-228-2571
E-mail: steve@piucci.com
joe@piucci.com

**Drake Aehegma, OSB No. 132905**
Drake Aehegma Attorney at Law LLC
PO Box 8404
Portland, OR, 97207
Telephone: 503-208-5717
Facsimile: 503-914-1472
E-mail: drake@aehegmalaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **THE ESTATE OF RICHARD JASON FORREST,** Van Loo Fiduciary Services, LLC, Personal Representative,<br><br>Plaintiff,<br><br>v.<br><br>**MULTNOMAH COUNTY**, a political subdivision of the state of Oregon,<br><br>Defendant. | Case No. 3:20-CV-01689-SI<br><br>**SECOND AMENDED COMPLAINT**<br><br>VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983; WRONGFUL DEATH, NEGLIGENCE<br><br>**JURY DEMAND** |

**INTRODUCTORY STATEMENT**

This is an action brought to vindicate Richard Jason Forrest's rights under the Eighth

Amendment to the Constitution of the United States pursuant to 42 U.S.C. § 1983 and the

Oregon Tort Claims Act.

Page 1 – **Second Amended Complaint**

A jail has a basic obligation to keep its inmates safe. Here, Multnomah County egregiously failed. Like so many in our jails, Forrest was an addict. His wife hoped that he would get clean there. Instead, Inverness Jail was awash in heroin and methamphetamine smuggled in through a rudimentary, preventable scheme.

It was only a matter of time before an inmate overdosed. It happened to be Forrest. And when he did, Multnomah County failed him again. The overdose-reversing drug Narcan was stocked in a medical cart jail nurses brought to his side, but not one of them thought to use it. As a result, Forrest died.

At this moment of reckoning for our criminal justice system, Richard Jason Forrest deserved a chance at a better life. Instead, it was taken from him.

Mr. Forrest is survived by his wife and their minor son and stepson.

## JURISDICTION AND VENUE

1. This action arises under the constitution and laws of the United States and jurisdiction is based on 28 USC § 1331 and 28 USC § 1343(a). This Court has pendant jurisdiction of the state law negligence claims pursuant to 28 USC § 1367.

2. Venue is proper under 28 U.S.C.1391(b) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Oregon, and because Defendant is subject to personal jurisdiction in the District of Oregon.

## PARTIES

### A. Plaintiff and Decedent

3. Richard Jason Forrest, deceased, ("Forrest") was born on November 20th, 1981 in Portland, Oregon. He was the father of a minor son. At the time of his death, Richard Forrest was a

Page 2 – **Second Amended Complaint**

citizen and resident of the State of Oregon. At all times herein pertinent, Richard Forrest was an inmate at the Multnomah County Inverness Jail.

4.    Plaintiff Van Loo Fiduciary Services, LLC is the duly appointed personal representative of the Estate of Richard Jason Forrest, deceased. Van Loo Fiduciary Services, LLC is an Oregon Limited Liability Company and its principal, Cindy Van Loo, is a citizen and resident of the State of Oregon.

## B.  Defendant

5.    Multnomah County is an Oregon county. Multnomah County operates a jail, known as Inverness Jail. Multnomah County has a duty to provide for the health and safety of, and provide all necessary medical care for, all detainees and persons convicted of crimes held at Inverness Jail.

### ii.    Medical Staff

6.    The Medical Staff named in this lawsuit are employees of the Multnomah County Health Department, working at Multnomah County Inverness Jail, who provided medical treatment to Forrest on the day his death. At all times, Medical Staff were acting in the course and scope of their employment and under color of state law.

7.    At all material times, Camille Valberg was a Registered Nurse working at Inverness Jail. Nurse Valberg was the first person to arrive at Mr. Forrest's side after he notified deputies of trouble breathing. Nurse Valberg failed to recognize or treat Forrest's overdose, despite having been recently named as a defendant in a lawsuit alleging that

Page 3 – **Second Amended Complaint**

she deliberately failed to treat a Clackamas County inmate's drug overdose, causing him to die.[1]

8.  At all material times, Koh Metea was a Registered Nurse working at Inverness Jail. Nurse Metea was the second RN to arrive at Mr. Forrest's side after he notified deputies of trouble breathing.

9.  At all material times, Jami Wheeler was a Registered Nurse working at Inverness Jail. Nurse Wheeler was the third RN to arrive at Mr. Forrest's side after he notified deputies of trouble breathing.

## FACTUAL ALLEGATIONS

### *Background*

10.  Multnomah County's Inverness Jail houses pretrial detainees and persons convicted of crimes. Multnomah County is obligated by state and federal law to provide for the health and safety of all persons lodged in the Inverness Jail, to prohibit the availability of illegal narcotics to detainees and inmates, and to provide adequate medical and mental health care for the same.

11.  On or about February of 2018, Forrest was released from the custody of the Oregon Department of Corrections and placed on Post-Prison Supervision with the Multnomah County Department of Community Justice.

12.  On or about April 28th, 2020, decedent's wife Chrystal Forrest called decedent's Post-Prison Supervision Officer with the Multnomah County Department of Community Justice and described that Forrest was spiraling downward with his addiction to heroin and

---

[1] *Nordenstrom v. Corizon Health, Inc.* et al, 3:18-CV-01754-HZ (D. Or.)

Page 4 – **Second Amended Complaint**

methamphetamine. Ms. Forrest asked decedent's Post-Prison Supervision Officer to arrest her husband in an effort to get him clean, into treatment, and to save his life. The Post-Prison Supervision Officer then issued a detainer and warrant for Forrest's arrest.

13. On April 29, 2019, Richard Jason Forrest, then 37 years old, was booked into the Multnomah County Detention Center. During his initial medical assessment upon coming into custody, Forrest reported a history of asthma and recent methamphetamine use.

14. On April 30th, 2019, Forrest was transferred to Inverness Jail. On May 4th, 2019, Forrest filed a Medical Request Form stating "coming down from heroin[,] can't sleep[,] can I still get protocol[?]" He later reports to a nurse that he uses heroin "a lot."

15. On June 10th, 2019, Forrest was transferred from to Inverness Jail Dorm 7 to Dorm 9, which houses inmates who participate in work crews outside of the jail.

16. Mr. Forrest remained in the custody of the Multnomah County Sheriff at Inverness Jail for the final three months of his life until his death on July 25, 2019.

### The Rich History of Drugs, Overdoses, Medical Neglect, and Death in Multnomah County Jails

17. Multnomah County knows that there is a rich history of drugs, overdoses, medical neglect, and death within the Multnomah County Jails.

18. On April 2, 2003, Nick Baccelleri died at Inverness as a result of a methadone overdose. The methadone was provided by the medical staff at the jail. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Baccelleri's family.

19. On October 1, 2004, Anthony Delarosa died at either MCDC or Inverness as a result of heroin withdrawal. On information and belief, he vomited and slipped into a withdrawal

Page 5 – **Second Amended Complaint**

coma in his cell. Multnomah County agreed to pay $200,000 to settle a lawsuit brought by Mr. Delarosa's family.

20.    On September 17, 2006, James Chasse died of blunt force trauma after being booked into and then released from MCDC. The jail staff did not call an ambulance for Mr. Chasse, who died during transport to a local hospital in a deputy's car. On information and belief, Multnomah County agreed to pay $925,000 to settle a lawsuit brought by Mr. Chasse's family.

21.    On January 4, 2008, Holly Jean Casey died at MCDC of pneumonia after repeatedly seeking medical help. On information and belief, Multnomah County and other defendants agreed to pay $905,000 to settle a lawsuit brought by Ms. Casey's family, and Multnomah County fired one of the nurses who was working in the jail.

22.    In March 2008, the Multnomah County District Attorney's Office issued a memo detailing the results of its investigation into the deaths of Jody Gilbert Norman and Holly Jean Casey (the "2008 DA's Office Memo"). The 2008 DA's Office Memo stated that their deaths "seem to raise serious questions about inmate management and health care practices within the Multnomah County corrections system and the level of health services."

23.    On February 2nd, 2013, David Chilton died of a heroin overdose at MCDC from drugs he obtained while in custody. Regarding Chilton's death, Defendant Alexander stated, "You always have that problem of contraband. It's this constant battle we face." [2]

24.    In March 2015, an inmate arrested on federal drug trafficking charges, Channing Lacey, smuggled 33 packets of fentanyl into the jail within her body, weighing approximately 35 grams. The US Department of Justice described what happened as a consequence:

---

[2] https://www.oregonlive.com/portland/2013/06/multnomah_county_inmate_died_o.html

Page 6 – **Second Amended Complaint**

Three inmates overdosed on the fentanyl between March 7 and 9, 2015. All three victims required immediate life-saving medical attention and the administration of Narcan to reverse the overdose and prevent their death. On March 21, 2015, another inmate overdosed on the fentanyl and died as a result.[3]

25.    On July 17th, 2015, heroin addict Lloyd Vernig died at MCDC one day following his arrest for possession of heroin.

26.    On December 31, 2015, William Coupchiak died of a drug overdose at MCDC. On July 25, 2017, the family of Mr. Coupchiak filed a lawsuit against Multnomah County and other defendants. In September 2018, Multnomah County agreed to pay $195,000 to settle that lawsuit.

27.    In January 2017, Multnomah County received the Corrections Grand Jury 2016 Report (the "2016 GJ Report"). Here are some of the overview findings of the 2016 GJ Report:

> "The number of deputies on staff may be insufficient. There is no current study of the appropriate number of deputies needed to support Multnomah County correctional facilities. The 2006 Post Factor Study indicated that 440 deputies were needed (38 more than currently budgeted). However, this report neither reflects current policies nor the current number of inmates/available beds."
>
> "Some deputies are working multiple straight days of 16 hour shifts. While much of this is certainly voluntary overtime, the Corrections Grand Jury is concerned that working extremely long hours over multiple days is not good for the health of the employees and could put both employees and inmates in danger."
>
> "At MCDC and [Inverness], the medical clinics hours are limited to five hours per day due to deputy availability, although the staff is there longer. Open hours could be expanded and more inmates served if additional deputy time was available to provide security. Many services that should be provided in a clinic setting have to be brought to the inmates in the dorms or cells."

---

[3] https://www.justice.gov/usao-or/pr/portland-woman-sentenced-135-months-prison-distributing-fentanyl-inside-multnomah-county

Page 7 – **Second Amended Complaint**

28. On August 11,2017 Dee Glassman was booked into Multnomah County Detention Center. Ms. Glassmann appeared to be under the influence of drugs and alcohol and was "[a]t risk for withdrawal." Approximately 34 hours later, Ms. Glassmann was found dead in her cell. Ms. Glassman's estate has filed suit.

29. In June and July of 2020, Multnomah County failed to protect inmates at the Multnomah County Detention Center from repeated and horrific exposure to tear gas through the ventilation system of the jail. Representatives for the putative class have filed suit.

### *The Drugs in Dorm 9*

30. In 2019, after Forrest's booking and prior to his death, 12 or more individuals engaged in a criminal conspiracy to smuggle controlled substances including heroin and methamphetamine into Inverness Jail. The conspiracy, which was successful, involved dropping drugs at publicly accessible locations on the jail property, after which and inmates on the work crew would pick up the drug packages and walk them into their dorm at the jail, Dorm 9.

31. As a result of this drug smuggling scheme, heroin and methamphetamine were readily available to inmates housed in Dorm 9, including Forrest.

32. The prevalence and availability of illegal narcotics at Inverness Jail in 2019 was easily preventable. The drug deliveries were arranged using jail telephones and paid for using the jail's system of inmate accounts. The work crew staging area on the Inverness property where civilians dropped and inmates picked up drugs was both open to the public and not covered by the jail's surveillance cameras. The drugs being smuggled into jail– whether

Page 8 – **Second Amended Complaint**

smuggled within the inmates' clothes or within their bodies – were detectible by either strip search or by body scanner.

33.    While Forrest was housed in Dorm 9, the Multnomah County Sheriff's Office and its deputies knew or should have known that drugs were present and readily available within the dorm, as shown by the following summaries of entries in the Inverness Jail Activity Diary for the period in which Forrest resided in the dorm:

a.    On June 10th, an inmate was moved to Dorm 16 on disciplinary for possession of contraband;

b.    On July 3rd, 2019, deputies conducted a "shake down" of Dorm 9. The "shake down" resulted in the following:

i.    Inmate A refused a urinalysis and deputies found two needles in his bunk area. The inmate was written up for major misconduct for contraband.

ii.    Inmate B refused a urinalysis and was written up for major misconduct;

iii.    Inmate C refused a urinalysis and was written up for major misconduct; and

iv.    Inmate D failed a urinalysis (meaning, tested positive for drugs or alcohol), and was written up for major misconduct for contraband.

c.    On July 14th, a deputy noted, "When I shut the dorm down at 2230, there was a faint smell of smoke in the bathroom. There were ashes on the ground in one of the stalls. There seems to be a lot of smoking going on this dorm from what I have heard from other deputies."

d.    On July 15th, inmate RG was found in possession of a syringe on the back of the work crew truck;

e.    On July 17th, inmate DP failed a random urinalysis test and was written up for major misconduct for contraband.

34.    The day prior to Forrest's death, Nurse Helen Blasko observed what looked like a transient female in an area open to the public near Inverness Jail, acting strangely and possibly trying

Page 9 – **Second Amended Complaint**

to hide something. Nurse Blasko reported this information to a Sergeant at Inverness Jail, and on information and belief the Sergeant inspected the area and found syringes.

35.    Despite this knowledge, Defendant Multnomah County and its Sheriff's deputies took no meaningful steps to determine the source and prevent the continued entry of drugs and their availability to inmates.

36.    Regarding the availability and prevalence of illegal drugs in Dorm 9 of Inverness Jail during for the period in which Forrest resided in the dorm, other inmates have reported the following:

 f. ""If it was a meth week- you'd hear shit all night. Everyone was up all night wired."

 g. "The guards knew but they couldn't figure out how it was coming in. They'd know someone was on meth and if someone was too wired or couldn't keep it together – they'd pull them off the work crew and keep them in the dorm."

 h. "About a week before it happened, [another inmate] was on heroin and he was nodding off like crazy. A deputy saw it and walked over to him and said, 'You're high.' The deputy just walked away and didn't do shit. If he had just pulled [the other inmate] out, Forrest would still be alive."

 i. "Workers were bringing [drugs] in. I thought it was real obvious."

 j. "The guards knew there were drugs and cigarettes in there and they ignored it. The way people were acting in there – the guards had to know."

 k. "Most of the people coming back [from the work crew] were high. The staff knew full well what was going on."

 l. "I swear, they have more drugs than they do outside. They can get them fast."

Page 10 – **Second Amended Complaint**

m. "People calling family, 'Can you do drops?' Even the COs told them where we'd be going to be. Sometimes we do freeway cleaning, and friends they throw drugs. Lots of drug pick-ups at the homeless camps. People would drop off drugs by the big machines right at the jail where people grab tools. Two inmates go in – one grabs the tools and one grabs the drugs."

n. "There was a lot of drugs. Some days it was all heroin and some days it was all meth. During that period, there was someone getting drops outside and another inmate 'butt carries' it in. If you are in the group of people, you just know who has what – word of mouth."

o. "A lot of pills, a lot of people cheek their prescriptions, and a lot of heroin – especially heroin. In that dorm everyone was doing heroin."

37. The investigation into Mr. Forrest's death confirmed this extreme availability of drugs in Dorm 9 of Inverness jail during this time period. The report concluded, "there is not enough evidence to know who gave [Forrest] the heroin that may have killed him because there [were] so many people dealing heroin and meth inside the same dorm."

### *Nurse Valberg's History*

38. On November 3rd, 2016 at 7:15pm, a 31 year-old US Army veteran named Bryan Perry was booked into the Clackamas County Jail. Mr. Perry was overdosing on methamphetamines and was not able to control his bodily movements. Clackamas County Jail deputies did not send him to the hospital and instead placed him in a padded cell, where he continued to move uncontrollably for four hours. Jail deputies recorded cell phone videos of Mr. Perry while laughing and joking about his deteriorating condition. Defendant Camille Valberg was his nurse, and Bryan Perry died.

Page 11 – **Second Amended Complaint**

39. On October 2nd, 2018, less than one year prior to Forrest's death, the Estate of Bryan Perry filed suit against Nurse Valberg and others, alleging that she was deliberately indifferent to Mr. Perry's constitutional rights by failing to properly treat Bryan Perry's serious medical needs while he was overdosing, causing his death.

40. On June 18th, 2021, Federal District Court Judge Marco Hernandez denied Nurse Valberg's Motion for Summary Judgment regarding her participation in the death of Brian Perry at Clackamas County Jail. Judge Hernandez summarized the facts regarding Nurse Valberg's actions, which include lying about her own conduct and delaying CPR until five minutes after Mr. Perry had stopped moving: [4]

> Plaintiff creates a question of fact as to whether Nurse Valberg had the requisite knowledge and was deliberately indifferent to Mr. Perry's life and serious medical needs. Nurse Valberg made the decision to send Ms. Mountsier[5] to the emergency room. She knew Mr. Perry had taken a similar mixture of drugs and was exhibiting similar symptoms to Ms. Mountsier. Still, she did not call the ER to get a report on Ms. Mountsier's condition after she was transferred out of the jail.
>
> Nurse Valberg conducted her assessment of Mr. Perry around 11 pm. There is video evidence of the entire assessment. In her late entry chart note, Nurse Valberg said that Mr. Perry sat up on his own at the start of her visit, but the video shows two deputies lifting Mr. Perry into a seated slumped position. Nurse Valberg attempted to check his blood pressure while he was in this position. During this check Mr. Perry stopped moving. A deputy in the cell stated at this point Mr. Perry's "breath started slowing" and that he "was foaming at the mouth."
>
> Nurse Valberg did not begin life saving measures at this point but left the cell to retrieve an automatic blood pressure cuff. When she returned, Mr. Perry was still motionless lying flat on his back. Again, rather than check his vitals or call for emergency help, Nurse Valberg attempted to use the automated blood pressure machine on Mr. Perry. At the suggestion of a deputy, Nurse Valberg then

---

[4] *Nordenstrom v. Corizon Health, Inc., et al,* 3:18-CV-01754-HZ (D. Or.), ECF 115, at 26-27. (Internal citations omitted).
[5] Ms. Mountsier was Mr. Perry's girlfriend who was arrested at the same time. She survived.

Page 12 – **Second Amended Complaint**

attempted to use an AED. She delayed CPR while she waited for it to work properly. Deputy Savage, who was in cell during the assessment testified that in this time the "color left his body" and "he turned to a gray, kind of ashy color."

In the incident report, Sergeant Johnson wrote that when he arrived in the cell, around when Nurse Valberg was waiting for the AED to work, "Mr. Perry was ashy colored and was not breathing on his own that I could tell." At the apparent direction of Nurse Valberg, jail staff did not begin sustained CPR or call 911 until approximately 5 minutes after Mr. Perry appears to stop moving in the video.

41. After the death of Mr. Perry, Nurse Valberg ceased working at the Clackamas County Jail.

42. On May 10th, 2018, Multnomah County hired Nurse Valberg as a part-time Community Health Nurse within its jails. On July 26th, 2018, Nurse Valberg became a full-time Multnomah County Health Department employee.

43. On January 4th, 2019, Nurse Valberg filed a Petition for a Stalking Protective Order against the "spouse of a co-worker." On January 1st, 2020, Nurse Valberg filed a second Petition for a Stalking Protective order against the same woman, whom she noted was an employee of "MCDC Recog." Both Stalking Protective Orders have been dismissed.

44. On information and belief, Nurse Valberg has been terminated as an employee of Multnomah County.

//

//

//

//

//

//

Page 13 – **Second Amended Complaint**

*The Narcan Policy for Multnomah County Jails*

45.    The Multnomah County Health Department Corrections Division policy for the

lifesaving, overdose-reversing drug Narcan use is as follows:

**MULTNOMAH COUNTY HEALTH DEPARTMENT**
**CORRECTIONS HEALTH**
**CLINICAL STANDARD**

| | |
|---|---|
| Issued: | 08/10/03 |
| Previous Revision: | 12/01/16 |
| Current Revision: | 12/03/18 |

Approved by: _Michael Seale_

Michael Seale, M.D.
*Director*
*Responsible Health Authority*

J-D-02/J-E-08

## NARCAN (NALOXONE) USE

**POLICY:**    Appropriate and timely use of Narcan (Naloxone). Naloxone is an antagonist of various opiates and can be useful in reversing the adverse effects of narcotic overdose, particularly respiratory depression. It should be given promptly when respiratory depression is observed in the setting of known or possible narcotic toxicity. Other than precipitating prompt narcotic withdrawal, there are no major contraindications to its use in the emergency setting.

**PROCEDURE:**

**Subjective:**
- Reduced level of consciousness and/or respirations in the setting of possible narcotic use, either prescription or non-prescription

**Objective:**
- Client will often present with reduced respiratory rate or shallow breathing
- O2 Oxygen saturation may be reduced (<92%)
- Blood pressure may be low and heart rate may be reduced
- Client may be slow to respond or be unresponsive: speech may be sparse or slurred
- Pupils may be small and pinpoint
- Rapid response with agitation and combativeness may be observed after successful reversal of narcotic induced symptoms

**Assessment:**
- Respiratory depression and reduced level of consciousness in the setting of possible narcotic overdose or toxicity
- Nursing diagnoses
  - Ineffective self-health management
  - Ineffective breathing pattern
  - Impaired spontaneous ventilation
  - Readiness for enhanced self-care

//

//

//

//

//

Page 14 – **Second Amended Complaint**

**Plan:**
1. Access ABC's-Airway, Breathing, Circulation.
2. Monitor oxygen saturation.
3. Call 911.
4. If time permits, call provider for orders.
5. For clients with no pulse, proceed to BLS guidelines.
6. If client apneic with pulse, establish oral airway and begin bag ventilation with 100% oxygen.
7. Peel back the package to remove the device (Narcan Nasal Spray 4 mg).
8. Hold the device with your thumb on the bottom of the plunger and two fingers on the nozzle.
9. Place and hold the tip of the nozzle in either nostril until your fingers touch the bottom of the client's nose.
10. Press the plunger firmly to release the dose into the client's nose.
11. Continue ventilating client as needed.
12. The goal of naloxone administration is NOT a normal level of consciousness, but adequate ventilation. If no clinical effect is seen, the diagnosis of opiate intoxication should be reconsidered.
13. Continued evaluation of the client is required. Repeat vital signs every five minutes at a minimum. Clients who use long-acting opiate preparations may need repeated dosing. If breathing does not return to normal or if breathing difficulty resumes, after 2-3 minutes, give an additional dose of Narcan Nasal Spray using a new device in the alternate nostril.
14. Acceptable to administer to pregnant women in opiate overdose. Use lowest dose that has clinical effect to avoid triggering acute opioid withdrawal, which may cause fetal distress.
15. Initiate appropriate life support activities, including the use of O2 by NC or mask, as needed.

    Note: it is not necessary to delay use of naloxone to obtain consent in the emergent situation.

**Documentation:**
1. Record assessment and intervention on Emergency Response Form with any additional information on progress notes and send with the client to the hospital.
2. Notify provider, on-site or on-call as needed for additional orders.

**Education:**
Naloxone restores breathing and cannot be abused. The effects of naloxone wear off after approximately 30 to 90 minutes. Naloxone can't cause additional harm to someone not experiencing an opiate overdose.

## *FORREST'S DEATH BY OVERDOSE*

46.    On July 25th, 2019, Forrest ingested, inhaled, or injected heroin and/or methamphetamine he obtained while in custody at Inverness Jail. One inmate reported smoking a joint with Forrest in the bathroom after returning from work crew on the day of Forrest's death. The inmate stated, "pretty sure he did some other shit too." A different inmate reported, ""He [Forrest] was doing bumps (snorting heroin) with a guy in his house on bunk next to his."

47.    At 5:45 pm On July 25, 2019, Forrest reported trouble breathing to a deputy at Inverness Jail. Nurse Valberg arrived at 5:47 and assessed Forrest for an asthma attack, despite his

Page 15 – **Second Amended Complaint**

presentation of the subjective and objective symptoms of a heroin overdose. At this point in time, Forrest was seated in a chair and responsive.



Nurse Valberg did not administer Narcan to Forrest.

48.    Nurse Metea arrived at 5:48 pm, along with two medical assistants and a "code cart." The "code cart" is a medical cart with supplies necessary for medical emergencies, and is visible in the image below:



49.    The Inverness Jail "code cart" is stocked with five nonexpired doses of Narcan, the lifesaving drug that per Multnomah County Correctional Health Policy "restores breathing" and "can't cause additional harm to someone not experiencing an overdose." Nurse Metea did not administer Narcan to Forrest.

Page 16 – **Second Amended Complaint**

50.  At 5:51 pm, Forrest's breathing deteriorated, and he was lowered to the floor.



51.  Between 5:51 and 6:00, Nurse Wheeler arrived. Nurse Diamond arrived at 6:00. Neither Nurse Wheeler nor Nurse Diamond administered Narcan to Forrest.

52.  Between 5:45 and 6:01 pm – the period of time when only Multnomah County nurses and deputies were treating Forrest – multiple other inmates were yelling "Narcan!" to the nurses and deputies. The deputies told the inmates to sit down and be quiet. Another inmate reported, "I heard them tell the COs, 'I think he's overdosed.' The CO was saying back, 'Well that's your guys' fault - you know not to do drugs in here.'" During this period of time, no one administered Narcan to Forrest.

53.  Portland Fire and Rescue paramedics arrived at 6:01 pm and administered Narcan within four minutes of their arrival. By then, it was too late. Mr. Forrest was taken to Adventist Hospital where he was pronounced dead.

54.  Jail medical staff reported their awareness of Forrest's possible heroin use to the Portland Fire and Rescue paramedics, which the paramedics documented in the following medical record regarding Forrest's death:

> E2 ARRIVED TO FIND THE PT WHO WAS AN INMATE AT INVERNESS JAIL LYING SUPINE ON THE FLOOR CAOX0 WITH THE JAIL STAFF PERFORMING CPR AND THEIR AED HOOKED UP, THE STAFF STATED

Page 17 – **Second Amended Complaint**

THAT THE PT CAME TO THEM AND STATED THAT HE WAS HAVING TROUBLE BREATHING AND HAD TOOK HIS INHALER AND THEN COLLAPSED TO THE FLOOR AND WENT UNCONSCIOUS, **THE STAFF DID STATE THAT THERE IS A CHANCE THAT THE PT DID DO HEROIN** AS WELL, LATER IN THE CALL WHEN ASKED BY STAFF OTHER INMATES DID SAY HE HAD DONE HEROIN. (Emphasis added).

55. The American Medical Response ("AMR") medical record also readily acknowledges the implications of heroin in Forrest's death:

> INMATES RELATE PT WAS SOB REPORTED AS ASTHMA BUT THEY ADMITTED PT HAD USED HEROINE (sic) AN UNKNOWN TIME BEFORE BECOMING NONRESPONSIVE.

56. Following Forrest's death, an inmate relayed, "People one-by-one are going to the bathroom to flush drugs. Some dudes are pissed because people are hiding their drugs in their mouth instead of flushing."

57. On July 26, 2019, Dr. Michelle Stauffenberg, the county medical examiner, performed an autopsy of Forrest. Dr. Stauffenberg wrote: "It is my opinion that Richard Forrest… died as a result of the combined effects of the heroin and methamphetamine."

58. In the aftermath of Mr. Forrest's death, at least 12 individuals were indicted for their involvement in smuggling drugs into the jail.

59. On July 31st, 2019, Michael Seale, MD, Deputy Director of Corrections Health, performed a "chart review" of Forrest's death. He wrote that "Narcan should have been considered as an early step in the resuscitation process."

60. Mr. Forrest is survived by his wife and their minor son and stepson.

//

//

//

//

//

Page 18 – **Second Amended Complaint**

**FIRST CLAIM FOR RELIEF**

**42 USC § 1983 – Eighth Amendment Violation -** *Monell*

**Unconstitutional Policy, Custom, or Practice**

*Defendant Multnomah County*

61.  Plaintiff realleges and incorporates each previous paragraph.

62.  At all material times, Forrest had a protected liberty interest under the Eighth Amendment not to be subjected to cruel and unusual punishment through regular access to heroin and methamphetamine while incarcerated, and though the delay or denial of lifesaving, essential, or appropriate medical treatment. Defendant violated each of these Eighth Amendment rights.

63.  At all material times, Multnomah County had a custom, practice, or unofficial policy of the following:

   a.  Failing to keep drugs including heroin and methamphetamine out of Multnomah County jails;

   b.  Failing to enforce policies and procedures that would prevent heroin, methamphetamine, and other controlled substances from being accessible to inmates;

64.  These customs, practices, or unofficial policies were the moving forces that resulted in the unconstitutional cruel and unusual punishment of Forrest by way of access to drugs and lack of access to lifesaving medical treatment. As a direct result of these constitutional violations, Forrest died of a drug overdose.

//

//

Page 19 – **Second Amended Complaint**

65. These customs, practices, or unofficial policies posed a substantial risk of causing substantial harm to Multnomah County inmates, and Multnomah County was aware of the risk.

66. As a direct result of these customs, practices, or unofficial policies, Forrest was provided regular access to heroin and methamphetamine while incarcerated and overdosed. As a further direct result of these customs, practices, or unofficial policies, Forrest was not provided appropriate lifesaving medical care, and he suffered an agonizing death. His wife, son, and stepson have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages as follows, all in amounts to be determined by the jury:

    a. For Mr. Forrest's pain, suffering and existential terror prior to his death;

    b. For the loss of Mr. Forrest's life; and

    c. For the loss of society and companionship suffered by Chrystal Forrest, Sir Jayceon Forrest, and Marcus Heagle.

67. Plaintiff is entitled to necessary and reasonable attorney fees and costs incurred in the prosecution of this action pursuant to 42 USC § 1988.

## SECOND CLAIM FOR RELIEF

### State Law – Wrongful Death, Negligence

### *Defendant Multnomah County*

68. Plaintiff re-alleges and incorporates each previous paragraph.

69. Defendant Multnomah County, acting by and through its employees and agents, was negligent in one or more of the following particulars:

Page 20 – **Second Amended Complaint**

b.  In failing to prevent drugs, including heroin and methamphetamine, from entering Multnomah County and being accessible to inmates;

c.  In failing to enforce policies and procedures that would prevent heroin, methamphetamine, and other controlled substances from being accessible to inmates;

d.  In failing to appropriately supervise inmate work crews;

e.  In failing to properly search each inmate returning from work crew into Inverness jail;

f.  In failing to notice that inmates on the work crew were picking up packages of controlled substances left on the Inverness Jail property and bringing them into the jail;

g.  In failing to secure and surveil its own facility such that a member of the public could not enter and leave drugs on the property without jail staff noticing and intercepting the drugs;

h.  In failing to notice that members of the public were entering the Inverness Jail property and leaving drugs on the property;

i.  In failing surveil with appropriate camera coverage all portions of the Inverness Jail property that were accessible both by members of the public and inmates on the work crew;

j.  ~~In failing to immediately purchase and utilize body scanners following the 2015 fentanyl overdoses and death within MCDC;~~

k.  ~~In delaying for four years the purchase of body scanners that would detect and prevent drugs from entering Multnomah County jails via inmate body cavities;~~

Page 21 – **Second Amended Complaint**

l. ~~In failing to adequately train jail deputies to recognize the signs and symptoms of drug use by inmates;~~

m. After discovering drugs within a secured facility, or discovering that an inmate tested positive for drugs that could only have been used or consumed while the inmate was in custody, failing to find, confiscate, and destroy the remaining drugs available to inmates within the facility;

n. In failing to monitor the jail's telephones and system of inmate accounts for evidence of drug incursion, and failing to then find, confiscate, and destroy the remaining drugs available to inmates within the facility;

o. In failing to adequately train correctional staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

p. In failing to adequately train medical staff to recognize the signs and symptoms of heroin and methamphetamine overdoses;

q. In failing to adequately train correctional staff in the administration of Narcan;

r. In failing to adequately train medical staff in the administration of Narcan;

s. After an inmate overdose, failing to take appropriate measures to prevent future inmate overdoses;

t. After an inmate death by overdose, failing to take appropriate measures to prevent future inmate deaths by overdose;

70. Defendant Multnomah County is vicariously liable for the acts of its employees, the Medical Staff Valberg, Metea, and Wheeler. The Medical Staff were negligent, and failed to meet the appropriate standard of care, in the following particulars:

a. In failing to identify Forrest's symptom presentation as that of a heroin overdose;

Page 22 – **Second Amended Complaint**

b.  In failing to administer Narcan to Forrest during the fourteen minutes before paramedics arrived, despite his symptom presentation of a heroin overdose and inmates yelling out "Narcan!";

c.  In failing to consider Narcan as an early step in the resuscitation process;

d.  In failing to consider alternative diagnoses, other than an asthma attack, despite Forrest presenting symptoms inconsistent with an asthma attack;

e.  In failing to provide appropriate resuscitative treatment other than Narcan to Forrest; and

f.  In failing generally to respond properly to Richard Forrest's serious medical needs before, during, and after his overdose.

71.  As a direct result of the actions and inactions of Multnomah County, and of its employees and agents, Forrest was provided regular access to heroin and methamphetamine while incarcerated, after which he overdosed and died. His wife, son and stepson have been denied his love, society and companionship. Mr. Forrest's estate is entitled to compensatory damages as follows, all in amounts to be determined by the jury:

a.  For Mr. Forrest's pain, suffering and existential terror prior to his death; and

b.  For the loss of society and companionship suffered by Chrystal Forrest, Sir Jayceon Forrest, and Marcus Heagle.

72.  Notice pursuant to the Oregon Tort Claims Act was given to defendant Multnomah County within the time prescribed by law.

//

//

//

Page 23 – **Second Amended Complaint**

WHEREFORE, plaintiff prays for a judgment against Defendant as follows:

1. For compensatory economic and noneconomic damages as follows, all in amounts to be determined by the jury:

   a. For Mr. Forrest's pain, suffering and existential terror prior to his death; and

   b. For the loss of society and companionship suffered by Chrystal Forrest, Sir Jayceon Forrest, and Marcus Heagle.

2. For plaintiff's attorney fees pursuant to 42 U.S.C. § 1988;

3. For plaintiff's costs and such other and further relief as the Court may deem just and equitable; and

4. Plaintiff demands a jury trial for all matters triable by jury.


Dated : March 9, 2026

By,

/s/ *Drake Aehegma*
Drake Aehegma, OSB #132905
Email: drake@aehegmalaw.com
Drake Aehegma, Attorney at Law, LLC
PO Box 8404
Portland, OR 97207
Telephone: (503) 208-5717
Fax: (503)914-1472

/s/ *Joe Piucci*
Joseph E. Piucci, OSB No. 135325
E-mail: joe@piucci.com
Piucci Law, LLC
900 SW 13th Avenue, Suite 200
Portland, Oregon 97205
Telephone: 503-228-7385
Facsimile: 503-228-2571


Page 24 – **Second Amended Complaint**